# EXHIBIT D

Filed: 9/3/2026 3:49 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 119509460
By: Shailja Dixit
9/3/2026 3:51 PM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD., Plaintiff** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

**DEFENDANT CITY OF LEAGUE CITY'S NOTICE OF REMOVAL TO UNITED STATES DISTRICT COURT**

May it Please the Court:

COMES NOW, DEFENDANT CITY OF LEAGUE CITY, and in accordance with 28 U.S. Code §1446(b), hereby gives this Notice of Removal of the above styled and numbered cause from the 405th District Court of Galveston County, Texas to the United States District Court for the Southern District of Texas-Galveston Division.

SIGNED on the 3rd day of SEPTEMBER 2026.

Respectfully submitted,

*Andrew J. Fitzgerald III*
Andrew J. Fitzgerald III
State Bar No. 24142611
ajfitzgerald@rampagelaw.com

*Kelly R. Albin*
KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com

*Ricardo J. Navarro*
RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com

**DENTON NAVARRO RODRIGUEZ BERNAL SANTEE & ZECH, P.C.**
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
210/227-3243
210/225-4481 Fax
lfdenton@rampagelaw.com

By: ______________________
LOWELL F. DENTON
State Bar No. 05764700

Attorneys for Defendant League City

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 3rd day of SEPTEMBER 2026.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

Andrew J. Fitzgerald III
______________________
ANDREW J. FITZGERALD III
LOWELL F. DENTON
RICARDO J. NAVARRO
KELLY R. ALBIN

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 3rd day of SEPTEMBRE 2026.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

By: Andrew J. Fitzgerald III
ANDREW J. FITZGERALD III
KELLY R. ALBIN
RICARDO J. NAVARRO
LOWELL F. DENTON

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Kelly Albin
Bar No. 24086079
ggwilliams@rampagelaw.com
Envelope ID: 119509460
Filing Code Description: Notice of Removal
Filing Description: Deft City of League City's Notice of Removal to United States District Court
Status as of 9/3/2026 3:51 PM CST

Associated Case Party: West FM 517, Ltd.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Thania Prudencio | | tprudencio@rmwbh.com | 9/3/2026 3:49:11 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey D.Roberts | 17008800 | jroberts@rmwbh.com | 9/3/2026 3:49:11 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 9/3/2026 3:49:11 PM | SENT |
| Elissa Ballew | 24075503 | eballew@rmwbh.com | 9/3/2026 3:49:11 PM | SENT |

Associated Case Party: City of League City

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 9/3/2026 3:49:11 PM | SENT |
| Ricardo Navarro | 14829100 | rjnavarro@rampagelaw.com | 9/3/2026 3:49:11 PM | SENT |
| Gina G.Williams | | ggwilliams@rampagelaw.com | 9/3/2026 3:49:11 PM | SENT |
| Mark A.Bricker | | mabricker@rampagelaw.com | 9/3/2026 3:49:11 PM | SENT |
| Andrew J. Fitzgerald III | | ajfitzgerald@rampagelaw.com | 9/3/2026 3:49:11 PM | SENT |

Filed: 8/11/2026 4:12 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 118494433
By: Lisa Kelly
8/11/2026 4:44 PM

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*, | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | 405TH JUDICIAL DISTRICT |
| CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§<br>§ | GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD.'S FIRST AMENDED PETITION AND APPLICATION FOR INJUNCTION**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff West FM 517, LTD. ("Plaintiff"), and files this, its First Amended Petition and Application for Injunction against Defendant City of League City (the "City") in the above-captioned matter, and respectfully shows the Court the following:

## I. DISCOVERY LEVEL

1. Plaintiff West FM 517, LTD. pleads that discovery should be conducted under a Level 2 discovery control plan pursuant to Tex. R. Civ. P. 190.3.

## II. PARTIES AND SERVICE

2. Plaintiff West FM 517, LTD. is a limited partnership organized and existing under the laws of the State of Texas. Plaintiff conducts business in Galveston County, Texas.

3. Defendant City of League City is a Texas municipality. The City has already appeared in this matter.

## III. JURISDICTION AND VENUE

4. The subject matter of this controversy is within the jurisdiction of this Court and the Court has personal jurisdiction over the Defendant.

5. Venue is proper in Galveston County, Texas, because the acts and/or omissions occurred in Galveston County, Texas and the City of League City is located in Galveston County. Venue is also proper under Texas Local Government Code Sec. 395.077(e) as League City is located in Galveston County.

## IV. RULE 47 STATEMENT

6. Plaintiff seeks damages within the court's jurisdictional limits in an amount over $1,000,000.00 in addition to non-monetary relief.

## V. BACKGROUND

7. Plaintiff West FM 517, LTD. is a residential developer that owns and develops real property in League City, Galveston County, Texas. Plaintiff's development requires municipal approvals, plats, permits, and related authorizations from the City. As a condition of moving forward with residential development, the City requires developers, including Plaintiff, to pay development-related charges and to satisfy dedication requirements imposed by City ordinance, policy, or practice. Those charges directly affect the economic feasibility, lot pricing, financing, timing, and marketability of Plaintiff's project.

8. On or about June 13, 2023, the League City City Council voted to adopt new impact fees. The adopted fees increased the City's impact-fee burden on residential development by approximately 93%, nearly doubling the prior charges

after only four years since the City's last adoption of impact fees in 2019. Because residential developments commonly include hundreds or thousands of lots, the increase imposes millions of dollars in additional development costs. Plaintiff contends that the City's adopted fees and related exactions exceed the costs reasonably attributable to Plaintiff's development, including reasonable construction, inflation, contingency, and financing costs, and are not tied to an individualized determination of the burden created by Plaintiff's project.

9. The present focus of this lawsuit is the City's separate "park fee" exaction. The City has charged, and continues to charge, Plaintiff $3,000.00 per lot as a park fee while also imposing a parkland dedication requirement of one acre per seventy-five lots. The City has not provided Plaintiff with an individualized engineer-approved determination showing that the combined park fee and parkland dedication are roughly proportionate to the actual park or recreational impact of Plaintiff's development. Nor has the City identified a cost study, nexus analysis, credit calculation, offset, individualized demand analysis, or project-specific finding demonstrating that Plaintiff's development creates park needs equal to both the required land dedication and the additional $3,000.00-per-lot charge.

10. The park fee operates as a condition of development approval. The fee is therefore not a voluntary payment or ordinary tax, but a monetary exaction imposed in exchange for governmental approval of development. The City's demand requires Plaintiff to surrender money and property interests for public recreational purposes without the constitutionally required showing that the demand bears an essential

nexus and rough proportionality to impacts specifically attributable to Plaintiff's development.

## VI. CAUSES OF ACTION

Plaintiff realleges the preceding paragraphs as if fully set forth in each of the causes of action alleged.

### *A. Violations of Tex. Loc. Gov't. Code*

11. Texas Local Government Code § 212.904(a) provides that when a municipality requires, as a condition of approval for a property development project, that a developer bear a portion of municipal infrastructure costs through dedications, fees, or construction costs, the developer's portion may not exceed the amount required for infrastructure improvements that are roughly proportionate to the proposed development, as approved by a Texas-licensed professional engineer retained by the municipality.

12. The City violated § 212.904 by requiring Plaintiff to pay park fees and dedicate parkland without first making the required project-specific, engineer-approved rough-proportionality determination. The City's formulaic $3,000.00-per-lot charge, when combined with the one-acre-per-seventy-five-lots dedication requirement, shifts public park acquisition and improvement costs to Plaintiff without demonstrating that those costs are attributable to Plaintiff's development. Plaintiff therefore seeks refund, withdrawal, and invalidation of the park-fee exaction, together with costs, and expert fees, as authorized by law.

### *B. Violations of Plaintiff's Substantive Due Process Rights*

13. The City's park-fee scheme violates Plaintiff's substantive due process rights because it imposes substantial development costs without a rational, lawful, and constitutionally adequate connection to the impacts of Plaintiff's project. The City has treated the park fee as a generalized revenue measure for public park purposes rather than as a calibrated condition tied to Plaintiff's actual development impact.

14. By failing to require both an essential nexus and rough proportionality between the park fee, the parkland dedication requirement, and Plaintiff's project-specific impacts, the City has imposed arbitrary and excessive conditions on Plaintiff's right to develop its property. Plaintiff seeks declaratory, injunctive, and monetary relief, including refund of unlawful park fees previously exacted.

### *C. Violations of Tex. Const. Art. I, § 17 and U.S. Constitution, amend. V/Improper Taking/Exaction*

15. The Texas Constitution states that "no person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . ." Tex. Const. Art. I, § 17. Likewise, the Fifth Amendment provides that private property may not be taken for public use without just compensation. U.S. Constitution, amend. V. In limited circumstances, a government may take property, even when there is not a physical invasion, by applying a regulation to the property that deprives it of value. As the Supreme Court held in *Nollan v. California Coastal Commission,* permit conditions must have an "essential nexus" to the government's land-use interest. *Nollan* 483 U.S. at837, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). In *Dolan v. City of Tigard*, the second requirement for a governmental taking of private

property is that permit conditions must have a "rough proportionality" to the development's impact on the land-use interest. *Dolan*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Both prongs of the tests formulated by the Supreme Court in Nollan and Dolan were later reaffirmed in *Sheetz v. County of El Dorado, California* 144 S.Ct. 893, 218 L.Ed.2d 224 (2024).

16. The City's park fee and dedication requirements are unconstitutional exactions and takings. They condition development approval on Plaintiff's surrender of money and property interests for public park purposes without an individualized showing that the demand is necessary to offset impacts caused by Plaintiff's development. The fact that the fee is imposed by ordinance or schedule does not exempt it from constitutional scrutiny. The City must demonstrate both an essential nexus to a legitimate land-use interest and rough proportionality between the amount demanded and the impact of Plaintiff's project. Because the City has not made that showing, the park fee takes and damages Plaintiff's property without just compensation in violation of the Texas and United States Constitutions. Plaintiff seeks declaratory, injunctive, and monetary relief, including refund of unlawful park fees previously exacted.

### *D. Claim for Declaratory Judgment – Park fees.*

17. Plaintiff seeks a judicial declaration of the following:

I. The City may not impose a park fee or parkland dedication condition unless the condition bears an essential nexus to a legitimate land-use impact attributable to Plaintiff's development.

II. The City may not require Plaintiff to pay park fees, dedicate parkland, or do both in an amount exceeding the costs roughly proportionate to Plaintiff's proposed development.

III. The City's $3,000.00-per-lot park fee, when combined with the one-acre-per-seventy-five-lots dedication requirement, fails the nexus and rough-proportionality standards required by Texas Local Government Code § 212.904 and constitutional exaction doctrine.

IV. The City's park fees are illegal and unconstitutional exactions that must be withdrawn, refunded, and enjoined unless and until the City satisfies the required nexus and rough-proportionality standards.

## VII. REQUEST FOR INJUNCTIVE RELIEF

18. Plaintiff incorporates and re-alleges in full the preceding paragraphs of this petition as if fully set forth herein.

**Application for Temporary and Permanent Injunction**

19. Plaintiff's application for injunctive relief is authorized by Section 65.011(5) of the Texas Civil Practices and Remedies Code.

20. Plaintiff seeks injunctive relief prohibiting the City from charging, collecting, conditioning approvals upon, or otherwise enforcing park fees against Plaintiff unless and until the City demonstrates, through a lawful project-specific analysis supported by a Texas-licensed professional engineer where required, that the fee and any related parkland dedication bear an essential nexus and rough proportionality to impacts caused by Plaintiff's development. Without injunctive relief, Plaintiff will continue to face unlawful development conditions, increased carrying costs, impaired project financing, delayed lot delivery, and the loss of money and property rights that cannot be adequately remedied by damages alone.

## VIII. CONDITIONS PRECEDENT

21. All conditions precedent to filing this lawsuit have occurred.

## IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff West FM 517, LTD. respectfully requests that upon final hearing the Court enter judgment for Plaintiff and against Defendant awarding: (1) the declaratory relief requested herein; (2) refund and restitution of all unlawful and unconstitutional park fees imposed on Plaintiff, including amounts in excess of $2,000,000.00, together with pre- and post-judgment interest; (3) temporary and permanent injunctive relief prohibiting the City from charging, collecting, or enforcing unlawful park fees against Plaintiff; (4) applicable costs, and expert witness fees; and (5) all other relief, at law or in equity, to which Plaintiff is justly entitled.

Respectfully submitted,

**ROBERTS MARKEL WEINBERG BUTLER HAILEY PC**



**JEFFREY D. ROBERTS**
TBA No. 17008800
jroberts@rmwbh.com
**ELISSA J. BALLEW**
TBA: 24075503
eballew@rmwbh.com
2800 Post Oak Blvd., 57th Floor
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD**

**CERTIFICATE OF SERVICE**

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on August 11, 2026.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Mark A. Bricker
mabricker@rampagelaw.com
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
2517 N. Main Avenue
San Antonio, Texas 78212
**ATTORNEYS FOR DEFENDANT**

**ELISSA J. BALLEW**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Thania Prudencio on behalf of Elissa Ballew
Bar No. 24075503
Tprudencio@rmwbh.com
Envelope ID: 118494433
Filing Code Description: Amended Petition
Filing Description: Pltf West FM 517. LTD.'s First Amended Petition and Application for Injunction
Status as of 8/11/2026 4:45 PM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 8/11/2026 4:12:17 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 8/11/2026 4:12:17 PM | SENT |
| Ricardo Navarro | 14829100 | rjnavarro@rampagelaw.com | 8/11/2026 4:12:17 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 8/11/2026 4:12:17 PM | SENT |
| Elissa Ballew | | eballew@rmwbh.com | 8/11/2026 4:12:17 PM | SENT |
| Gina G.Williams | | ggwilliams@rampagelaw.com | 8/11/2026 4:12:17 PM | SENT |
| Thania Prudencio | | tprudencio@rmwbh.com | 8/11/2026 4:12:17 PM | SENT |
| Mark A.Bricker | | mabricker@rampagelaw.com | 8/11/2026 4:12:17 PM | SENT |

Filed: 8/11/2026 11:47 AM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 118471235
By: Elissa Alvarado
8/11/2026 12:03 PM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD.,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

**NOTICE OF APPEARANCE OF COUNSEL**
**ON BEHALF OF DEFENDANT CITY OF LEAGUE CITY**

MAY IT PLEASE THE COURT:

NOW COMES undersigned defense counsel, MARK A BRICKER and hereby enters an appearance as counsel in this cause on behalf of DEFENDANT, CITY OF LEAGUE CITY (hereafter "DEFENDANT").

Attorney MARK A. BRICKER is licensed to practice law in the State of Texas, is in good standing, and is authorized to appear as co-counsel on behalf of Defendant in this matter.

Attorneys LOWELL F. DENTON, RICARDO J. NAVARRO, and KELLY R. ALBIN are still attorneys of record for the DEFENDANT for purposes in this litigation.

**CONCLUSION**

Therefore, undersigned counsel MARK A. BRICKER hereby enters this appearance in this case on behalf of the DEFENDANT, as more specifically identified above, for the purpose of receiving any and all notices, orders, and settings from the Court.

SIGNED on the 11th day of August 2026.

Respectfully submitted,

DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
210/227-3243
210/225-4481 Fax
lfdenton@rampagelaw.com

By: ______________________________
LOWELL F. DENTON
State Bar No. 05764700

*Ricardo J. Navarro*
RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com

*Kelly R. Albin*
KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com

*Mark A. Bricker*
MARK A. BRICKER
State Bar No. 24152215
mabricker@rampagelaw.com

**DENTON NAVARRO RODRIGUEZ BERNAL SANTEE & ZECH, P.C.**
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

ATTORNEYS FOR DEFENDANT CITY OF LEAGUE CITY

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 11th day of August 2026.

Elissa Ballew
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

VIA E-NOTIFICATION

Mark A. Bricker
KELLY R. ALBIN
LOWELL F. DENTON
RICARDO J. NAVARRO
MARK A. BRICKER

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Kelly Albin
Bar No. 24086079
ggwilliams@rampagelaw.com
Envelope ID: 118471235
Filing Code Description: Notice of Appearance
Filing Description: Notice of Appearance of Counsel on Behalf of Defendant City of League City
Status as of 8/11/2026 12:04 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 8/11/2026 11:47:59 AM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 8/11/2026 11:47:59 AM | SENT |
| Elissa Ballew | | eballew@rmwbh.com | 8/11/2026 11:47:59 AM | SENT |
| Gina G.Williams | | ggwilliams@rampagelaw.com | 8/11/2026 11:47:59 AM | SENT |
| Thania Prudencio | | tprudencio@rmwbh.com | 8/11/2026 11:47:59 AM | SENT |
| Mark A.Bricker | | mabricker@rampagelaw.com | 8/11/2026 11:47:59 AM | SENT |
| Ricardo Navarro | 14829100 | rjnavarro@rampagelaw.com | 8/11/2026 11:47:59 AM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 8/11/2026 11:47:59 AM | SENT |

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*, | §<br>§ | IN THE DISTRICT COURT |
| | § | |
| v. | § | 405TH JUDICIAL DISTRICT |
| | § | |
| CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§ | GALVESTON COUNTY, TEXAS |

**NOTICE OF STATUS CONFERENCE**

PLEASE TAKE NOTICE that a status conference in this case has been scheduled for **Thursday, July 2, 2026, at 10:00 a.m.** in the 405th Judicial District Court of Galveston County, Texas located at 600 59th Street, Suite 4304, Galveston, Texas 77551.

Respectfully submitted,

**ROBERTS MARKEL WEINBERG BUTLER HAILEY PC**

**JEFFREY D. ROBERTS**
Texas Bar No. 17008800
jroberts@rmwbh.com
**ELISSA J. BALLEW**
Texas Bar No. 24075503
eballew@rmwbh.com
2800 Post Oak Blvd., 57th Floor
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD**

**CERTIFICATE OF SERVICE**

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on this 5th day of June 2026.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Scott M. Tschirhart
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573

ELLISA J. BALLEW

Filed: 1/6/2026 11:56 AM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 109701737
By: Shailja Dixit
1/6/2026 12:03 PM

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*, | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | § | 405TH JUDICIAL DISTRICT |
| CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§<br>§ | GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD'S NOTICE OF MANDATE ISSUED**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, West FM 517, LTD ("Plaintiff"), by and through its undersigned counsel, and hereby submits this Notice of Mandate Issued and states that on September 30, 2025, the Fourteenth Court of Appeals issued a Mandate in appellate Cause No. 14-24-00405-CV, *City of League City v. West FM 517, Ltd*, in the Fourteenth Court of Appeals, Houston, Texas (the "Mandate").[1] Accordingly, Plaintiff requests that this Court take notice of the issuance of the Mandate and proceed in accordance with the instructions of the Court of Appeals.

[1] *See* Ex. 1, Mandate.

Respectfully submitted,

**ROBERTS MARKEL WEINBERG**
**BUTLER HAILEY PC**

______________________________
**JEFFREY D. ROBERTS**
Texas Bar No. 17008800
jroberts@rmwbh.com
**ELISSA J. BALLEW**
Texas Bar No. 24075503
eballew@rmwbh.com
2800 Post Oak Blvd., 57th Floor
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD**

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on this 6th day of January 2026.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Scott M. Tschirhart
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573

______________________________
ELLISA J. BALLEW

**EXHIBIT 1**

# MANDATE

## The Fourteenth Court of Appeals

NO. 14-24-00405-CV

City of League City, Appellant

v.

West FM 517, Ltd, Appellee

Appealed from the 405th District Court of Galveston County. (Trial Court No. 23-CV-1501). Memorandum Opinion delivered by Justice Boatman. Justices Wilson and Hart also participating.

**TO THE 405TH DISTRICT COURT OF GALVESTON COUNTY, GREETINGS:**

Before our Court of Appeals on July 22, 2025, the cause upon appeal to revise or reverse your judgment was determined. Our Court of Appeals made its order in these words:

This cause, an appeal from the order in favor of appellee, West FM 517, Ltd, signed May 24, 2024, was heard on the appellate record. We have inspected the record and find error. We therefore order the order of the court below **REVERSED** and **RENDER** judgment dismissing West FM 517, Ltd's declaratory judgment claim relating to the impact fee for want of jurisdiction.

We further order that all costs incurred by reason of this appeal be paid by appellee, West FM 517, Ltd.

We further order this decision certified below for observance.

**WHEREFORE, WE COMMAND YOU** to observe the order of our said Court in this behalf and in all things have it duly recognized, obeyed, and executed.

**WITNESS**, the Hon. Tracy Christopher, Chief Justice of our Fourteenth Court of Appeals, with the Seal thereof affixed, at the City of Houston, Texas, September 30, 2025.

COURT OF APPEALS OF THE STATE OF TEXAS

**DEBORAH M. YOUNG, CLERK**

Deborah M. Young

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Stefanie Martinez on behalf of Elissa Ballew
Bar No. 24075503
smartinez@rmwbh.com
Envelope ID: 109701737
Filing Code Description: Notice of Filing
Filing Description: Plaintiff West FM 517, LTD's Notice of Mandate Issued
Status as of 1/6/2026 12:04 PM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 1/6/2026 11:56:46 AM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 1/6/2026 11:56:46 AM | SENT |
| Ricardo Navarro | 14829100 | rjnavarro@rampagelaw.com | 1/6/2026 11:56:46 AM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 1/6/2026 11:56:46 AM | SENT |
| Elissa Ballew | | eballew@rmwbh.com | 1/6/2026 11:56:46 AM | SENT |
| Thania Prudencio | | tprudencio@rmwbh.com | 1/6/2026 11:56:46 AM | SENT |

Filed: 6/10/2024 4:10 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 88637130
By: Shailja Dixit
6/10/2024 4:13 PM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD.,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

**DEFENDANT CITY OF LEAGUE CITY'S**
**DESIGNATION OF THE CLERK'S RECORD**

============================================================

MAY IT PLEASE THE COURT:

NOW COMES DEFENDANT, CITY OF LEAGUE CITY, TEXAS and files this Designation of Clerk's Record with the Clerk of the Trial Court pursuant to Rule 34 of the Texas Rules of Appellate Procedure (TRAP) identifying the items to be included in the Clerk's Record to be forwarded to the Clerk of the 14th Court of Appeals.

Defendant hereby requests that in addition to those items designated by Rule 34.5, the Clerk's Record on Appeal contain the following items, including all attachments thereto, which were filed on or about the indicated dates as reflected in the Trial Court Case Summary Report:

09/08/2023 Original Petition – OCA Original Petition and Application for Temporary Injunction.

10/06/2023 Original Answer City's Answer to Plaintiff's Original Petition

04/05/2024 Plea to Court Defendant City of League City's Partial Plea to the Jurisdiction

04/15/2024 Notice of Hearing Notice of Oral Hearing- Plea to the Jurisdiction

05/15/2024 Response Plaintiff West FM 517's Response to Defendant City of League City's Partial Plea to the Jurisdiction

05/20/2024 Hearing (10:00 AM) (Judicial Officer: Robinson, Jared; Location: 405th District Court) Defendants partial plea to the Jurisdiction

05/24/2024 Court Coordinator's Case Notes. Order Denying Defendant League City's Partial Plea to the Court's Jurisdiction.

06/05/2024 Appeal - Assignment Letter to the Court of Appeals Filed w/14th CRT; Mailed to Attys & Hand-Delivered to CRT Reporter

Please advise of any fees that are due and transmit any notices relating to this appeal to the address indicated below.

SIGNED on the 10th day of JUNE 2024.

Respectfully submitted,

**DENTON NAVARRO RODRIGUEZ BERNAL SANTEE & ZECH, P.C.**
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

By: *Ricardo J. Navarro*
RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com

By: *Kelly R. Albin*
KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com

ATTORNEYS FOR DEFENDANT
CITY OF LEAGUE CITY, TEXAS

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 10th day of JUNE 2024.

Jeffrey D. Roberts **VIA E-NOTIFICATION**
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

By: Ricardo J. Navarro
RICARDO J. NAVARRO

# EXHIBIT A

405TH DISTRICT COURT

# CASE SUMMARY

## CASE NO. 23-CV-1501

**West FM 517, Ltd. vs. City of League City**

| | |
|---|---|
| Location: | **405th District Court** |
| Judicial Officer: | **Robinson, Jared** |
| Filed on: | **09/08/2023** |
| Appellate Case Number: | **14-24-00405-CV** |

### CASE INFORMATION

| | |
|---|---|
| Case Type: | **Other Civil - Cases** |
| Case Status: | **06/05/2024 Appealed** |
| Case Flags: | **Jury Requested** |

### DATE — CASE ASSIGNMENT

**Current Case Assignment**

| | |
|---|---|
| Case Number | 23-CV-1501 |
| Court | 405th District Court |
| Date Assigned | 09/08/2023 |
| Judicial Officer | Robinson, Jared |

### PARTY INFORMATION

| | | *Lead Attorneys* |
|---|---|---|
| **Plaintiff** | **West FM 517, Ltd.** | **Spears, Justin L.** *Retained* 713-840-1666(W) |
| **Defendant** | **City of League City** | **Navarro, Ricardo J.** *Retained* 832-632-2102(W) |
| **Appellant** | **City of League City** | **Navarro, Ricardo J.** *Retained* 832-632-2102(W) |
| **Appellee** | **West FM 517, Ltd.** | **Spears, Justin L.** *Retained* 713-840-1666(W) |

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 09/08/2023 | Original Petition - OCA<br>*Original Petition and Application for Temporary Injunction. No request nor fee paid for service at this time.* | |
| 09/11/2023 | Status Conference Sheet<br>*Emailed to Atty.* | |
| 09/11/2023 | Receipt Acknowledge<br>*Emailed Status Conference Sheet to Atty.* | |
| 09/11/2023 | Request for Civil Service<br>*1 Citation to be Emailed; Assigned to E.A.* | |
| 09/12/2023 | Citation Issuance - Work Product<br>Party: Defendant City of League City | |

 

| | |
|---|---|
| | *1 citation issued and emailed to attorney* |
| 09/12/2023 | Receipt Acknowledge<br>Party: Attorney Spears, Justin L.<br>*of e-citation* |
| 09/14/2023 | Return of Service on Citation/Subpoena<br>*Return of Service P314796_001.pdf* |
| 10/06/2023 | Original Answer<br>*City's Answer to Plaintiff's Original Petition* |
| 11/06/2023 | Certificate<br>*Defendant The City of League City's Certificate of Written Discovery* |
| 12/04/2023 | Jury Demand<br>*Defendant City of League City's Jury Demand* |
| 12/04/2023 | Court Coordinator's Case Notes<br>*PTC 5-20-24/JTRL 6-10-24 given to pltf counsel office* |
| 12/06/2023 | Proposed Order (unsigned)<br>*Joint Proposed Docket Control Order* |
| 12/07/2023 | **Status Conference** (10:00 AM) (Judicial Officer: Robinson, Jared ;Location: 405th District Court) |
| 12/07/2023 | Docket Control Order (Judicial Officer: Robinson, Jared )<br>*discovery and d c o* |
| 02/02/2024 | Motion<br>*Defendant City of League City's Motion to Quash Depositions and Motion for Protective Order* |
| 02/02/2024 | Proposed Order (unsigned)<br>*Order Granting City of League City's Motion to Quash Depositions and Motion for Protective Order* |
| 03/05/2024 | Rule 11 Agreement<br>*Rule 11 Agreement re Discovery and Expert Designation Deadline Extensions* |
| 03/22/2024 | Designation of Witness<br>*Plaintiff West FM 517, LTD.'s Designation of Expert Witnesses* |
| 04/02/2024 | Attorney Vacation Letter<br>*Attorney Vacation Schedule Request for Plaintiff's Counsel* |
| 04/05/2024 | Motion for Continuance<br>*Plaintiff's Unopposed Motion for Continuance and Entry of Amended Docket Control Order* |
| 04/05/2024 | Proposed Order (unsigned)<br>*Order Granting Plaintiff's Unopposed Motion for Continuance and Entry of Amended Docket Control Order* |

| | |
|---|---|
| 04/05/2024 | Request for Hearing<br>*Request for Hearing - Unopposed Mtn for Cont & Entry of Am DCO* |
| 04/05/2024 | Plea to Court<br>*Defendant City of League City's Partial Plea to the Jurisdiction* |
| 04/05/2024 | Proposed Order (unsigned)<br>*Order on Defendant's Partial Plea to the Jurisdiction* |
| 04/05/2024 | Request for Hearing<br>*Defendant City of League City's Request for Oral Hearing Setting* |
| 04/15/2024 | Notice of Hearing<br>*Notice of Oral Hearing- Plea to the Jurisdiction* |
| 04/16/2024 | Court Coordinator's Case Notes<br>*ptc 8-19-24/jtrl 8-26-24 given to pltf office* |
| 04/16/2024 | Motion<br>*Plaintiff's Motion to Quash Deft's Notice Intent to Take the Oral and Videotaped Depositions* |
| 04/16/2024 | Motion<br>*Deft City of League City's Motion to Quash the Depositions of Paul Maaz and Chris Dodson and Motion for Protective Order* |
| 04/23/2024 | Motion for Continuance<br>*Agreed Motion for Continuance and Entry of Amended DCO* |
| 04/23/2024 | Proposed Order (unsigned)<br>*Order Granting Agreed Motion for Continuance and Entry of Amended DCO* |
| 04/25/2024 | Court Coordinator's Case Notes<br>*parties filed agr mcon & prop order w/ amd DCO as exhibit instead of proposed order* |
| 04/25/2024 | Proposed Order (unsigned)<br>*Proposed Agreed Amended Discovery and Docket Control Order* |
| 04/29/2024 | Docket Control Order (Judicial Officer: Robinson, Jared )<br>*amended discovery and d c o* |
| 04/29/2024 | Order Granting Motion for Continuance (Judicial Officer: Robinson, Jared ) |
| 04/30/2024 | Certificate<br>*Certificate of Deposition of John Baumgartner* |
| 04/30/2024 | Docket Control Order (Judicial Officer: Robinson, Jared )<br>*amended discovery and d c o* |
| 05/06/2024 | Certificate<br>*REPORTERS CERTIFICATION FOR THE DEPOSITION OF TRACY GOZA* |

| | |
|---|---|
| 05/10/2024 | Receipt Acknowledge<br>Party: Attorney Denton, Lowell F.; Attorney Spears, Justin L.<br>*E-serve confirmation of Discovery & DCO to atty's* |
| 05/13/2024 | Receipt Acknowledge<br>Party: Attorney Denton, Lowell F.; Attorney Spears, Justin L.<br>*E-serve confirmation of Order Granting Continuance to atty's* |
| 05/15/2024 | Certificate<br>*CHRISTOPHER SIMS* |
| 05/15/2024 | Response<br>*Plaintiff West FM 517's Response to Defendant City of League City's Partial Plea to the Jurisdiction* |
| 05/15/2024 | Proposed Order (unsigned)<br>*order denying Defendants partial plea to the Jurisdiction* |
| 05/17/2024 | Certificate<br>*CHIEN WEI* |
| 05/17/2024 | Certificate<br>*ANGIE STEELMAN* |
| 05/20/2024 | **Hearing** (10:00 AM) (Judicial Officer: Robinson, Jared ;Location: 405th District Court)<br>*defts partial plea to the Jurisdiction* |
| 05/20/2024 | *CANCELED* **Pre-Trial Conference** (9:00 AM) (Judicial Officer: Robinson, Jared ;Location: 405th District Court)<br>*Reset* |
| 05/24/2024 | Court Coordinator's Case Notes<br>*order denying deft city of LC partial plea to jurisdiction* |
| 05/24/2024 | Order Denying Plea to Jurisdiction (Judicial Officer: Judge, Visiting )<br>*Partial Plea to the Jurisdiction* |
| 05/24/2024 | Certificate<br>*RICHARD WEATHERLY* |
| 06/04/2024 | Certificate<br>*Reporter's Certificate Videotaped Depo of Richard Weatherly - 4-15-2024* |
| 06/05/2024 | Notice of Appeal<br>Party: Defendant City of League City<br>*Defendant City of League City's Notice of Interlocutory Appeal From Denial of Plea to the Jurisdiction* |
| 06/05/2024 | Appeal - Assignment Letter to the Court of Appeals<br>*Filed w/14th CRT; Mailed to Attys & Hand-Delivered to CRT Reporter.* |
| 06/05/2024 | Receipt Acknowledge<br>Party: Interested Party Fourteenth Court of Appeals<br>*Email Confirmation of Notice of Assignment on Appeal.* |

 

405TH DISTRICT COURT

# CASE SUMMARY

## CASE NO. 23-CV-1501

| | |
|---|---|
| 06/06/2024 | Correspondence from Court of Appeal<br>*CLR due to file by Monday, June 17, 2024.* |
| 06/10/2024 | *CANCELED* **Jury Trial** (9:00 AM) (Judicial Officer: Robinson, Jared ;Location: 405th District Court)<br>*Reset* |
| 08/19/2024 | **Pre-Trial Conference** (9:00 AM) (Judicial Officer: Robinson, Jared) |
| 08/26/2024 | **Jury Trial** (9:00 AM) (Judicial Officer: Robinson, Jared ;Location: 405th District Court) |

| DATE | FINANCIAL INFORMATION | |
|---|---|---|
| | **Defendant** City of League City | |
| | Total Charges | 80.00 |
| | Total Payments and Credits | 80.00 |
| | **Balance Due as of 06/06/2024** | **0.00** |
| | | |
| | **Plaintiff** West FM 517, Ltd. | |
| | Total Charges | 358.00 |
| | Total Payments and Credits | 358.00 |
| | **Balance Due as of 06/06/2024** | **0.00** |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kristin Getty on behalf of Ricardo Navarro
Bar No. 14829100
kngetty@rampagelaw.com
Envelope ID: 88637130
Filing Code Description: Request for Clerk Record on Appeal
Filing Description: Defendant City of League City's Designation of the Clerk's Record
Status as of 6/10/2024 4:13 PM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 6/10/2024 4:10:41 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 6/10/2024 4:10:41 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 6/10/2024 4:10:41 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 6/10/2024 4:10:41 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 6/10/2024 4:10:41 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 6/10/2024 4:10:41 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 6/10/2024 4:10:41 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 6/10/2024 4:10:41 PM | SENT |

Filed: 6/5/2024 2:36 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 88477734
By: Shailja Dixit
6/5/2024 2:51 PM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD.,** **Plaintiff** | § § § | **IN THE DISTRICT COURT** |
| **VS.** | § § | **405TH JUDICIAL DISTRICT** |
| **CITY OF LEAGUE CITY** **Defendant** | § § | **GALVESTON COUNTY, TEXAS** |

**DEFENDANT CITY OF LEAGUE CITY'S**
**NOTICE OF INTERLOCUTORY APPEAL FROM DENIAL**
**OF PLEA TO THE JURISDICTION**

==========================================================

May It Please The Court:

COMES NOW, the DEFENDANT CITY OF LEAGUE CITY (hereinafter "Defendant" or "League City") and hereby files this Notice of Interlocutory Appeal pursuant to Rules 26.1(b) and 28.1 of the Texas Rules of Appellate Procedure, from the trial court's May 24, 2024, *Order Denying Defendants' Plea to the Jurisdiction* by the Hon. Judge Matthews, sitting by assignment, for the 405th Judicial District Court in Galveston County, Texas, in *West FM 517, LTD. v. City of League City*, Cause No. 23-cv-1501. A true and correct copy of the Order is attached as Exhibit "A." Defendant desires to and hereby does appeal from the Trial Court's interlocutory order denying Defendants' Plea to the Jurisdiction.

This is an accelerated appeal that is not a parental termination or child protection case. This appeal is taken to either the First or Fourteenth Court of Appeals sitting in Houston, Texas.

This interlocutory appeal is authorized by Section 51.014(a)(8) of the Tex. Civ. Prac. & Rem. Code and is subject to the automatic stay provision in Section 51.014(b) because the plea was filed and requested for hearing within the time prescribed by the trial court's docket control order. *See In re Univ. of the Incarnate Word*, 469 S.W.3d 255, 258 (Tex. App.—San Antonio 2015, orig. proceeding)("To trigger the automatic stay, the plea to the jurisdiction must have been filed and a hearing requested no later than the date set in a scheduling order, if any, or 180 days after the defendant's original answer or first other responsive pleading.").

The automatic stay provision in Section 51.014(b) states that "[a]n interlocutory appeal under Subsection (a), other than an appeal under Subsection (a)(4) or in a suit brought under the Family Code, stays the commencement of a trial in the trial court pending resolution of the appeal. An interlocutory appeal under Subsection (a)(3), (5), (8), or (12) also stays all other proceedings

in the trial court pending resolution of that appeal." Tex. Civ. Prac. & Rem. Code § 51.014(b). "[T]he stay set forth in section 51.014 is statutory and allows no room for discretion." *In re Univ. of the Incarnate Word*, 469 S.W.3d 255, 259 (Tex. App.—San Antonio 2015, orig. proceeding) (*quoting Sheinfeld, Maley & Kay, P.C. v. Bellush*, 61 S.W.3d 437, 439 (Tex. App.--San Antonio 2001, no pet.)).

Thus, Defendant hereby takes this interlocutory appeal, which stays all proceedings in the trial court pending resolution of the appeal.

SIGNED on the 5th day of JUNE 2024.

Respectfully submitted,

DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

By: *Ricardo J. Navarro*
RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com

By: *Kelly R. Albin*
KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com

ATTORNEYS FOR DEFENDANT
CITY OF LEAGUE CITY, TEXAS

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 5th day of JUNE 2024.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

By: Ricardo J. Navarro
RICARDO J. NAVARRO

# EXHIBIT A

Received 5/15/2024 6:38 PM
Envelope No. 87794974

FILED
2024 MAY 24 AM 10: 14
DIST CLERK
GALVESTON COUNTY, TEXAS

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD. *Plaintiff,* | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | 405TH JUDICIAL DISTRICT |
| | § | |
| CITY OF LEAGUE CITY, *Defendant.* | § | GALVESTON COUNTY, TEXAS |

**ORDER DENYING DEFENDANT CITY OF LEAGUE CITY'S PARTIAL PLEA TO THE JURISDICTION**

On this day, the Court considered Defendant City of League City's Partial Plea to the Jurisdiction ("Plea to the Jurisdiction"). The Court, having considered the Plea to the Jurisdiction, Response, ~~Reply (if any),~~ and arguments of counsel, finds that the Plea to the Jurisdiction should be **DENIED**. It is therefore,

**ORDERED** that Defendant City of League City's Partial Plea to the Jurisdiction is **DENIED**.

It is further ordered that Plaintiffs objections to the exhibits offered at the hearing are sustained.

Signed this __ day of May 24, 2024.

[signature]

JUDGE PRESIDING
Sitting by Assignment

23-CV-1501
DCORDPJ
Order Denying Plea to Jurisdiction
2789340

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kristin Getty on behalf of Ricardo Navarro
Bar No. 14829100
kngetty@rampagelaw.com
Envelope ID: 88477734
Filing Code Description: Notice of Appeal
Filing Description: Defendant City of League City's Notice of Interlocutory Appeal From Denial of Plea to the Jurisdiction
Status as of 6/5/2024 2:51 PM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 6/5/2024 2:36:22 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 6/5/2024 2:36:22 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 6/5/2024 2:36:22 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 6/5/2024 2:36:22 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 6/5/2024 2:36:22 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 6/5/2024 2:36:22 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 6/5/2024 2:36:22 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 6/5/2024 2:36:22 PM | SENT |

Filed: 5/15/2024 6:36 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 87794886
By: Ann Vaughn
5/16/2024 9:28 AM

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*, | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | 405TH JUDICIAL DISTRICT |
| CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§ | GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD.'S RESPONSE TO DEFENDANT CITY OF LEAGUE CITY'S PARTIAL PLEA TO THE JURISDICTION**

TO THE HONORABLE COURT:

COMES NOW, Plaintiff, West FM 517, LTD. ("Plaintiff"), and files this Response to Defendant City of League City's Partial Plea to the Jurisdiction, and would respectfully show unto this Honorable Court as follows:

## I. SUMMARY OF THE ARGUMENT

1. Defendant's Plea to the Jurisdiction should be denied as Plaintiff West FM 517, Ltd. is an aggrieved party that has standing to challenge Defendant's 2023 ordinance that increased its impact fees on new development by 93%. Defendant's increased impact fees have substantially increased the cost of new development in League City and have affected Plaintiff's business – the development of residential property in League City. Chapter 395 of the Local Government Code provides that an aggrieved party by an impact fee assessed against new development is entitled to a trial de novo. In accordance with the Local Government Code, Plaintiff, a residential developer, filed this lawsuit against the City of League City in response to the City's substantial increase in impact fees assessed against new development.

Plaintiff sells its developed land to home builders that pay the City directly - however, as the impact fee affects new development and affects the price of new development from developer to home builder to home buyer – Plaintiff has standing to maintain this lawsuit. Finally, Plaintiff is a limited partnership, where one such limited partner is a home builder that purchases lots from Plaintiff within League City and pays impact fees to League City. Thus, Defendant's Plea to the Jurisdiction should be denied and this case should proceed to trial.

## II. BACKGROUND

2. This is a complex case involving governmental fees to be assessed, collected, and utilized in excess of a hundred million dollars. Plaintiff West FM 517 is a residential developer that owns and develops property in League City for residential purposes.[1] As a residential developer in League City, Plaintiff's residential developments are subject to "impact fees" that are set and adopted by the City of League City ("Defendant and/or "The City"). Impact fees are defined by the Local Government Code as a "charge or assessment imposed by a political subdivision against new development in order to generate revenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development."[2]

---

[1] *See* Plaintiff's Original Petition at p. 2. *See* also, Exhibit "F," Declaration of Tracy Goza.
[2] Tex. Loc. Gov't Code 395.001(4).

3. On or about June 13, 2023, the League City Council voted on and approved an adoption of new impact fees.[3] The City Council voted to increase its impact fees on developers by 93%, or nearly double the amount of previous impact fees.[4] The City's new impact fees went into effect on December 1, 2023.[5] The City last adopted impact fees in 2019.[6]

4. As developers like Plaintiff often develop their land into hundreds and thousands of individual lots for residential purposes, a 93% increase in impact fees will result in tens of millions of additional dollars assessed to the new development.[7] The City's stated goal of increasing impact fees as drastically as 93% is for developers to "pay their fair share".[8] After the City proposed raising impact fees, multiple developers, including Plaintiff, sent in letters protesting the proposed ordinance.[9] Plaintiff and the other developers' attempt to have the City reconsider its substantial increase in impact fees was not successful.[10] In response, and in accordance with the Local Government Code, Plaintiff filed this lawsuit requesting a declaratory judgment declaring: (1) that the City's adoption of impact fees was not done in conformity with Chapter 395 of the Texas Local Government Code; (2) that the City's

---

[3] *See* Plaintiff's Petition at p. 2 and Exhibit "A," Defendant City of League City's Responses to Requests for Admissions, p. 2.
[4] *See* "League City impact fees set to increase 93%." *Community Impact. https://communityimpact.com/houston/bay-area/government/2023/05/24/league-city-impact-fees-set-to-increase-93.* May 24, 2023.
[5] *See* Exhibit "A" at p. 3.
[6] *Id.*
[7] *See* Exhibit "B," Declaration of Richard Muller.
[8] *See* Exhibit "C," Deposition excerpts from deposition of Christopher Sims.
[9] *See* Exhibit "F," Declaration of Tracy Goza.
[10] *Id.*

adoption of impact fees was based on based on flawed methodology; and (3) that the City's adopted impact fees are excessive and unreasonable.[11]

5. Since December 2023, the Parties have exchanged substantial written discovery and have taken a number of depositions. Shortly after Defendant took the deposition of Plaintiff's owner, Tracy Goza, Defendant filed its Plea to the Jurisdiction on the basis that Plaintiff does not have standing. Plaintiff files this Response as it is clear Defendant mischaracterizes the issue of Plaintiff's standing pursuant to the Local Government Code. Defendant's Plea should be denied, and all claims should proceed to trial.

## III. <u>ARGUMENT & AUTHORITIES</u>

### *A. Plea to the Jurisdiction Standard*

6. When a defendant asks a court to dismiss a suit on the basis of jurisdiction, the court must overrule the motion unless the pleadings and parties' evidence clearly demonstrate that the court lacks jurisdiction.[12] The purpose of a plea to the jurisdiction is to dismiss a cause of action without regard to whether the claim has merit.[13] The plaintiff must plead facts which affirmatively show that the trial court has jurisdiction.[14] Whether a court has subject-matter jurisdiction is a question of law.[15] The trial court must consider evidence on the plea to the

---

[11] *See* Plaintiff's Original Petition at p. 4.
[12] *See Bland Indep. Sch. Dist v. Blue*, 34 S.W.3d 547,555 (Tex. 2000); see. e.g., State v. Sledge, 36 S.W.3d 152, 155 (Tex. App.-Houston [1st Dist.] 2000, pet. denied) (trial court conducted hearing and received oral testimony, affidavits, exhibits, and stipulations).
[13] *Bland ISD*, 34 S.W.3d 547, 554.
[14] *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 SW2d 440 (Tex. 1993).
[15] *City of Dallas v. Carbajal*, 324 S.W.3d 537, 538 (Tex. 2010).

jurisdiction when evidence is necessary to determine jurisdictional facts.[16] Unless it is clear from the pleadings that the court does not have jurisdiction over the controversy, the court should retain the case.[17] The court must take the allegations in the petition as true and must construe them liberally in favor of the plaintiff when ruling on the pleading.[18] If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do.[19] If the evidence creates a fact question regarding the jurisdictional issue, then the plea to the jurisdiction must be denied.[20]If the facts alleged fail to establish the court's jurisdiction, the plaintiff should be allowed the opportunity to amend the petition.[21]

***B. Plaintiff is an aggrieved party with standing to maintain this lawsuit.***

7. Relevant to the lawsuit at hand, Chapter 395 of the Texas Local Government Code provides that a person that, “a person who has exhausted all administrative remedies within the political subdivision and who is aggrieved by a final decision is entitled to trial de novo under this chapter.”[22] The Texas Local Government Code does not define “aggrieved party”. The term ‘aggrieved’ refers

[16] *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007).
[17] *See Peek v. Equipment Serv.*, 779 S.W.2d 802, 804 (Tex. 1989)
[18] *Continental Coffee Prods. Co. v. Cazarez*, 937 SW2d 444, 449 (Tex. 1996); *Texas Dep't of Mental Health and Mental Retardation v. Pearce*, 16 SW3d 456, 459-60 (Tex. App. Waco, 2000, no pet. h.)
[19] *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).
[20] *Id*. at 227–28.
[21] *Texas Ass'n of Bus.*, 852 SW2d at 446
[22] Tex. Loc. Gov’t Code 395.077(a).

to a substantial grievance, a denial of some personal or property right or the imposition of a burden or obligation upon a party."[23] The Supreme Court of Texas has previously held that "[t]he terms 'aggrieved' and 'affected' are synonymous."[24]

8. Here, Defendant argues that because Plaintiff did not directly pay an impact fee to Defendant that Plaintiff lacks standing to bring this lawsuit. Defendant misstates the issue. First, there is no requirement in Chapter 395 that Plaintiff directly pay an impact fee to be qualified as an "aggrieved party." Second, Plaintiff's owner, Tracy Goza, testified in detail as to exactly how Plaintiff has been affected by the increased impact fees:[25]

113:15 **Q.** The builder is paying the impact fee and not
113:16 you as developer. If these impact fees are
113:17 unreasonable, how are you aggrieved?
113:18 **A.** Builders won't pay me as much for the lots as
113:19 they would prior to the impact fee being increased.
113:20 **Q**. What do you base that on?
113:21 **A.** Experience. Ultimately the costs have to be
113:22 passed on to somebody. I share it. The builder shares
113:23 it. And then the homeowner at the end gets some of it.
113:24 Everybody does.
113:25 **Q**. So, the increased costs of development whether
114:1 you directly bear the cost, whether it's passed on to
114:2 the builder or the homeowner affects everyone involved?
114:3 Yes.

119:7 **Q**. Mr. Goza, you said that the – essentially the
119:8 cost to the builders you feel is then passed onto you
119:9 when the impact fees are increased. Was that fair?
119:10 Is that a fair summary of testimony of your testimony?

---

[23] *McIntyre v. El Paso Indep. Sch. Dist.*, 499 S.W.3d 820, 824 (Tex. 2016).
[24] *Hooks v. Texas Department*, 611 S.W.2d 417, 419 (Tex.1981) (holding that riparian landowners had standing to bring an action in district court challenging the Department of Water Resources's proposed location of a sewage treatment plant).
[25] *See* Exhibit "D," Deposition excerpts from deposition of Tracy Goza: 113:15-114:3; 119:7-18; 119:22-120:3.

| | | |
|---|---|---|
| 119:11 | **A.** | Yes. They're going to pay me less for a lot |
| 119:12 | | when the impact fees are higher. |
| 119:13 | **Q.** | And that has happened since December 1, 2023? |
| 119:14 | **A.** | Yes. |
| 119:15 | **Q.** | Where? |
| 119:16 | **A.** | Everywhere. |
| 119:17 | **Q.** | Which developments? |
| 119:18 | **A.** | Pedregal, The Commons at Sedona. |
| | | |
| 119:22 | **Q.** | Okay. And what is the difference between what |
| 119:23 | | you were making before December 20 – December 1, 2023, |
| 119:24 | | per lot and what you make now per lot? |
| 119:25 | **A.** | Well, it's the time. It's things like that |
| 120:1 | | slow down the sale of houses; right? So if houses sell |
| 120:2 | | slower, I don't make my money back as fast; therefore, I |
| 120:3 | | don't make as much. |

Mr. Goza's testimony describes exactly how Plaintiff is aggrieved by Defendant's ordinance increasing impact fees – (1) Plaintiff is burdened by slowing sales to home builders and (2) has had difficulty maintaining prices of lots sold to home builders.[26] Plaintiff's injuries are not hypothetical – they are concrete and show that Plaintiff qualifies as an "aggrieved party" as previously defined by the Supreme Court of Texas.[27]

### *C. Chapter 395 contemplates that developers are affected by impact fees.*

9. Chapter 395 of the Local Government Code provides impact fees are charges and costs assessed against new development.[28] Chapter 395 does not define

[26] *See* also Exhibit "F," Declaration of Tracy Goza.
[27] *McIntyre,* 499 S.W.3d 820, 824.
[28] Tex. Loc. Gov't Code 395.001(4).

impact fees as specifically affecting only those who pay the fee to the municipality. Rather, the legislature stated that impact fees are assessed against "new development."[29] New development includes (but is not limited to) the developer, home builders, and home buyers.[30] Impact fees affect the price of the land sold by the developer to the home builder and then the price of the home sold to the home buyer.[31] Indeed, Chapter 395 requires that municipalities assessing impact fees must form an advisory committee to assist in the adoption of impact fees.[32] Chapter 395 further mandates that not less than 40% of the advisory committee must include, "representatives of the real estate, development, or building industries who are not employees or officials of a political subdivision or governmental entity."[33]

10. Chapter 395's plain language is counter to the thrust of Plaintiff's Plea that only those parties that pay impact fees have a stake in the imposition of impact fees. The legislature expressly included representatives of the development industry as it is clear that developers are affected by impact fees.[34] Defendant's Director of Engineering testified that the City is looking for developers to "pay their fair share".[35] Defendant's Plea ignores the spirit of Chapter 395 – that developers will be affected by and are a contemplated party to the impact fee process. Defendant's Plea is disingenuous and does not establish that Plaintiff lacks standing. Thus, Defendant's

---

[29] *Id.*
[30] *See* Exhibit "D," deposition of Tracy Goza at 113:15-114:3.
[31] *See Id.* and Exhibit "B," Declaration of Richard Muller and Exhibit "F," Declaration of Tracy Goza.
[32] Tex. Loc. Gov't Code 395.058(b).
[33] *Id.*
[34] *Id.*
[35] *See* Exhibit "C."

Partial Plea to the Jurisdiction should be denied and this case should fully proceed to trial on August 26, 2024.

### *D. Plaintiff has an interest in an entity that directly pays impact fees and a justiciable interest in the outcome of this lawsuit.*

11. A determination of standing focuses on whether a party has a "justiciable interest" in the outcome of the lawsuit, such as when it is personally aggrieved or has an enforceable right or interest.[36] " Defendant alleges that Plaintiff does not have a cognizable interest in another entity's payment of impact fees.[37] Not so. Plaintiff is a Texas limited partnership comprised of three partners.[38] One of those partners forming Plaintiff's partnership is Cervelle Homes, Inc. Cervelle is a residential home builder that is not only a limited partner within West FM but also purchases residential lots from West FM:[39]

| | | |
|---|---|---|
| 17:25 | **Q.** | Okay. And is Cervelle Homes the homebuilder in |
| 18:1 | | Pedregal? |
| 18:2 | **A.** | Yes, ma'am. |
| 18:3 | **Q.** | Are they the exclusive homebuilder in Pedregal? |
| 18:4 | **A.** | Yes ma'am. |
| 18:5 | **Q**. | So West FM is selling a lot that has the |
| 18:6 | | infrastructure built to one of its partners, |
| 18:7 | | Cervelle Homes; is that correct? |
| 18:8 | **A**. | Yes, ma'am. |

Not only does Cervelle purchase lots from Plaintiff within League City, but Cervelle also pays impact fees relating to Plaintiff's developments:

| | | |
|---|---|---|
| 36:22 | **Q.** | Okay. So Cervelle Homes is the entity that has |
| 36:23 | | paid impact fees to the City of League City since |

[36] *Austin Nursing Center, Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex.2005); citing *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist*., 925 S.W.2d 659, 661 (Tex.1996)).
[37] *See* Defendant's Plea to the Jurisdiction at p. 4.
[38] *See* Exhibit "E," West FM 517, Ltd.'s Partnership Agreement.
[39] *See* Exhibit "D," Deposition of Tracy Goza at 17:25-18:8.

36:24 December 1, 2023?
36:25 **A.** Yes, ma'am.

In sum, one of the limited partners forming Plaintiff as a limited partnership has (1) purchased residential lots from Plaintiff and (2) has paid impact fees to the City of League City since December 1, 2023. Subsequently, Plaintiff can show a clear cognizable interest in the outcome of this lawsuit through it partner, Cervelle, and the payment of impact fees to Defendant.[40] Plaintiff has demonstrated sufficient facts establishing jurisdiction and Defendant's Plea should be denied.

## III. <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff West FM 517, LTD. respectfully requests that the Court deny Defendant City of League City's Partial Plea to the Jurisdiction. Plaintiff further prays for all other relief, both in law and in equity, to which they may be justly entitled.

Respectfully submitted,

**Roberts Markel Weinberg Butler Hailey PC**



Jeffrey D. Roberts
TBA No. 17008800
jroberts@rmwbh.com
Justin L. Spears
TBA: 24117086
jspears@rmwbh.com
2800 Post Oak Blvd., Floor 57
Houston, TX 77056
(713) 840-1666

[40] *City of San Antonio v. Rogers Shavano Ranch, Ltd.*, 383 S.W.3d 234, 245 (Tex. App.-San Antonio 2012, pet. denied) (finding that limited partners had standing to bring action pursuant to the Local Government Code even though they were not "permit applicants".)

(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD**

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on this 15th day of May 2024.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Scott M. Tschirhart
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573



JUSTIN L. SPEARS

**EXHIBIT A**

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD.,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

---

**DEFENDANT CITY OF LEAGUE CITY'S RESPONSES TO PLAINTIFF WEST FM 517, LTD'S REQUESTS FOR ADMISSION**

---

TO: WEST FM 517, LTD., by and through its attorneys of record, Jeffrey D. Roberts, and Justin L. Spears; Roberts Markel Weinberg Butler Hailey PC, 2800 Post Oak Blvd., Floor 57, Houston, Texas 77056

Now comes Defendant CITY OF LEAGUE CITY ("City"), in the above styled and numbered cause of action, through its attorneys of record, and files this its Responses to Plaintiff's Requests for Admissions.

Respectfully submitted,

DENTON NAVARRO ROCHA BERNAL & ZECH
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
210/227-3243
210/225-4481 Fax
lfdenton@rampagelaw.com

By: ______________________________

LOWELL F. DENTON
State Bar No. 05764700
SCOTT M. TSCHIRHART
State Bar No. 24013655

RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com
DENTON NAVARRO ROCHA
BERNAL & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com
DENTON NAVARRO ROCHA
BERNAL & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

*Attorneys for Defendant League City*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 15th day of December 2023.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

LOWELL F. DENTON

**DEFENDANT CITY OF LEAGUE CITY'S RESPONSES TO REQUESTS FOR ADMISSIONS**

**Request for Admission No. 1:** Admit that the City adopted new impact fees in June 2023.

**Response:** The City admits that it adopted impact fees in June 2023 that are effective beginning December 1, 2023.

**Request for Admission No. 2:** Admit that the City adopted new impact fees that are over ninety percent (90%) more in monetary amount than the previous impact fees, adopted in 2019.

**Response:** The City admits in part and denies in part. Not all categories of fees saw an increase in excess of 90% from the 2019 fees.

**Request for Admission No. 3:** Admit that the City adopted new impact fees that are over eighty percent (80%) more in monetary amount than the previous impact fees, adopted in 2019.

**Response:** The City admits in part and denies in part. Not all categories of fees saw an increase in excess of 80% from the 2019 fees.

**Request for Admission No. 4:** Admit that the City adopted new impact fees in June 2023 that include the following costs: construction contract price, surveying and engineering fees, land acquisition costs, consultant fees, and finance costs.

**Response:** The City admits in part and denies in part. The City admits that the impact fees adopted in 2023 include construction contract price, surveying and engineering fees, finance costs, and consultant fees. The City denies that land acquisition costs were included.

**Request for Admission No. 5:** Admit that the City adopted new impact fees in June 2023 that include the following costs: construction, acquisition, or expansion of public facilities or assets other than those identified on the capital improvements plan.

**Response:** Deny.

**Request for Admission No. 6:** Admit that the City adopted new impact fees in June 2023 that include the following costs: repair, operation, or maintenance of existing or new capital improvements.

**Response:** Deny.

**Request for Admission No. 7:** Admit that the City adopted new impact fees in June 2023 that include the costs only identified for new growth over a ten-year period.

**Response:** Admit.

**<u>Request for Admission No. 8:</u>** Admit that the City adopted new impact fees in June 2023 that include the following costs: upgrading, updating, expanding, or replacing existing capital improvements to serve existing development.

**Response:** Deny.

**<u>Request for Admission No. 9:</u>** Admit that the City adopted new impact fees in June 2023 that include the following costs: administrative and operating costs of the political subdivision.

**Response:** Deny.

**<u>Request for Admission No. 10:</u>** Admit that the City adopted new impact fees in June 2023 that include the following costs: principal payments and interest or other finance charges on bonds without pledging impact fee revenue as security for the payment of debt service.

**Response:** The City cannot admit or deny this request as it is premised on assumptions about future bond issuances that have not yet been determined.

**<u>Request for Admission No. 11:</u>** Admit that the City will not pledge impact fee revenue as security for the payment of debt service related to future development costs.

**Response:** The City cannot admit or deny this request as it requires the City to speculate about what may or may not happen in the future with regard to debt services and development costs, but the City can and does admit that it will continue to comply with all applicable laws regarding security for debt services for future development projects.

**<u>Request for Admission No. 12:</u>** Admit that the City will pledge impact fee revenue as security for the payment of debt service related to development costs.

**Response:** The City cannot admit or deny this request as it requires the City to speculate about what may or may not happen in the future with regard to debt services and development costs, but the City can and does admit that it will continue to comply with all applicable laws regarding security for debt services for future development projects.

**<u>Request for Admission No. 13:</u>** Admit that the City assessed impact fees based on the 2013 capital recovery fee and 2018 capital recovery fee studies.

**Response:** Admit.

**<u>Request for Admission No. 14:</u>** Admit that the City and/or its third-party consultant, included costs for projects identified in the 2013 and 2018 capital recovery fee studies that have not been completed as of 2023.

**Response:** Admit.

**<u>Request for Admission No. 15:</u>** Admit that the 2023 capital recovery fee study completed by Freese and Nichols includes costs for prior projects included in 2013 and 2018 studies that were not completed.

**Response:** Admit.

**<u>Request for Admission No. 16:</u>** Admit that the 2023 capital recovery fee study completed by Freese and Nichols includes costs for prior projects included in 2013 and 2018 studies that never commenced.

**Response:** Admit.

**<u>Request for Admission No. 17:</u>** Admit that the 2023 capital recovery fee study completed by Freese and Nichols includes costs to repair, operate, rehab, or maintain projects serving existing development.

**Response:** Deny.

**<u>Request for Admission No. 18:</u>** Admit that the City discussed growth projections with developers regarding the projections contained in the 2023 Freese and Nichols capital recovery fee study.

**Response:** The City admits that the following developers engaged with the City during their respective PUD development processes, during which there were discussions about the timing of certain development projects that inherently informed the City about land use growth in 2023: Westland Ranch, Samara, Pedregal, and Legacy Subdivisions.

**<u>Request for Admission No. 19:</u>** Admit that the City did not discuss growth projections with developers regarding the projections contained in the 2023 Freese and Nichols capital recovery fee study.

**Response:** Deny.

**<u>Request for Admission No. 20:</u>** Admit that the City has seen population growth above three percent (3%) once since 2019.

**Response:** Admit.

**<u>Request for Admission No. 21:</u>** Admit that the City has assessed a park fee to developers.

**Response:** Admit.

**<u>Request for Admission No. 22:</u>** Admit that the City has a legal basis to assess park fees to developers.

**Response:** Admit.

**<u>Request for Admission No. 23:</u>** Admit that the City has assessed a park fee to developers related to the repair, rehabilitation, or modifications of existing parks.

**Response:** The City admits that the current use of park fees is described in League City Ordinance 2018-45, which was adopted and implemented in conjunction with the City's Parks, Trails, and Open Spaces Master Plan.

**<u>Request for Admission No. 24:</u>** Admit that the City has assessed a park fee that is separate from impact fees.

**Response:** Admit.

**<u>Request for Admission No. 25:</u>** Admit that the City has assessed a park fee that is not authorized by any Texas statute.

**Response:** Deny.

**<u>Request for Admission No. 26:</u>** Admit that the City's meetings regarding the adopted impact fees are subject to Chapter 551 of the Open Meetings Act.

**Response:** The City admits that certain official City meetings are subject to the Texas Open Meetings Act, with which the City fully complied.

**<u>Request for Admission No. 27:</u>** Admit that the City's meetings regarding the adopted impact fees were not held in accordance with Chapter 551 of the Texas Open Meetings Act.

**Response:** Deny.

**<u>Request for Admission No. 28:</u>** Admit that the City has not issued rebates in accordance with Chapter 395 of the Texas Local Government Code.

**Response:** Admit.

**EXHIBIT B**

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff,* | § | IN THE DISTRICT COURT |
| v. | § | 405TH JUDICIAL DISTRICT |
| CITY OF LEAGUE CITY,<br>*Defendant.* | § | GALVESTON COUNTY, TEXAS |

**UNSWORN DECLARATION UNDER TEXAS CIVIL PRACTICES & REMEDIES CODE 132.001[1] OF RICHARD MULLER**

STATE OF TEXAS §
COUNTY OF FORT BEND §

Richard Muller submits this unsworn declaration in support of Plaintiff West FM 517's Response to Defendant City of League City's Plea to the Jurisdiction in the above-referenced matter:

1. "My name is Richard Muller. I am over twenty-one years of age, of sound mind, and capable of making this unsworn declaration. I hereby swear and affirm the facts stated in this declaration are within my personal knowledge and are true and correct.

2. I have been a licensed Texas attorney since 1997. Since 1998, I have exclusively practiced in the area of public finance. I have negotiated major development agreements between developers and municipalities, including representing developers and municipal utility districts across the State of Texas for over two decades.

3. In the course of my practice working with developers and municipalities, I have become familiar with and have an understanding of Chapter 395 of the Local Government Code. Chapter 395 sets out the process by which municipalities can implement capital improvement fees, or impact fees, on new development. Within the course of my practice, I have worked with clients on the effects of capital improvement fees and projects across the State of Texas, including capital improvement fees assessed against new residential development. Impact fees are defined by the Local Government Code as a "charge or assessment imposed by a political subdivision against new development in

---

[1] Tex. Civ. Prac. & Rem. Code § 132.001(a) ("Except as provided by Subsection (b), an unsworn declaration may be used in lieu of a written sworn declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order, or requirement adopted as provided by law.").

order to generate revenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development."

4. Residential developers develop their land into hundreds of individual lots, often thousands of lots, to eventually be sold to home buyers. Impact fees are assessed on a per lot basis. Impact fees, regardless of the amount of the fee assessed, are a cost of development that is passed on by the developer to the builder, and ultimately the home buyer.

5. Impact fees affect the price of the land that developers sell to home builders, and the price of the individual lots and homes that are eventually sold to home buyers. The impact fee cost is included in the price for each layer of residential land development from developer to home buyer. From this perspective, an impact fee is no different from the cost of the roof or the framing of a new house.

6. Chapter 395 of the local government contemplates the effect of impact fees on developers. Indeed, Chapter 395 requires that municipalities include stakeholders from the development industry on an advisory committee that oversees the impact fee process.

7. Chapter 395 also includes that "aggrieved parties" by a final decision of the municipality that have exhausted administrative remedies within the political subdivision, are entitled to a trial de novo. A final decision refers to a City's adoption of impact fees. Chapter 395 does not define "aggrieved parties", nor did the legislature otherwise limit what parties may file a lawsuit relating to impact fees.

8. I am a retained testifying expert for West FM 517, Ltd. ("West FM"), Plaintiff, in the above captioned lawsuit. I have read the pleadings on file and am familiar with the facts of this case. West FM has filed this lawsuit against the City of League City (the "City") in response to the City's adoption of increased impact fees in 2023. The City adopted the new and increased impact fees in June 2023 and the impact fees went into effect in December 2023.

9. Based on the deposition testimony of Tracy Goza, owner of West FM 517, Ltd., West FM 517, Ltd. has already seen a slowdown of home sales as a result of the City's new impact fees. Indeed, West FM is now selling individual lots to home builders across multiple developments that are burdened with a $11,000 – $14,000.00 + impact fee per lot. The City's impact fees will reduce in West FM's lot sale prices to home builders who will pay the impact fee and will increase to ultimate home price to home buyers.

10. Based on my decades of legal practice within public finance and my understanding of the Local Government Code, it is my opinion that West FM is an aggrieved party as provided by Chapter 395 of the Local Government Code. Impact fees are assessed against new development. All of West FM's developments in the City, from December 2023 through the present, have been burdened with increased impact fees that are at least 90-93% higher than the prior impact fees in the City."

Richard Muller

Executed in Fort Bend County, State of Texas, on the 14th day of May 2024.

EXHIBIT C





CAUSE NO. 23-CV-1501

WEST FM 517, LTD., ) IN THE DISTRICT COURT OF
)
Plaintiff, )
)
vs. ) 405th JUDICIAL DISTRICT
)
CITY OF LEAGUE CITY, )
)
Defendant. ) GALVESTON COUNTY, TEXAS

* * * * * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF
CHRISTOPHER SIMS
APRIL 3, 2024

* * * * * * * * * * * * * * * * * *

DEPOSITION OF CHRISTOPHER SIMS having been duly sworn by RICHELLE REEDER, Notary Public in and for the State of Texas. The witness appeared in person at City Hall, 300 W. Walker, League City, Texas, at 9:58 a.m., pursuant to Texas Rules of Civil Procedure and any provisions stated on the record or attached hereto.



APPEARANCES OF COUNSEL

On behalf of the Plaintiff, West FM 517, LTD.:
JEFFREY D. ROBERTS, ESQ.
JUSTIN L. SPEARS, ESQ.
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Boulevard
Floor 57
Houston, Texas 77056
713-840-1666
jroberts@rmwbh.com
jspears@rmwbh.com

On behalf of the Defendant, City of League City:
KELLY R. ALBIN, ESQ.
DENTON NAVARRO ROCHA BERNAL & ZECH P.C.
2517 North Main Avenue
San Antonio, Texas 78212
832-632-2102
kralbin@rampagelaw.com

MICHELLE VILLARREAL, ESQ.
CITY ATTORNEY'S OFFICE
300 West Walker Street
League City, Texas 77573
218-554-1016
michelle.villarreal@leaguecitytx.gov

Also Present:
Dennis Figeroa, Videographer
Tracy F. Goza, Plaintiff



INDEX TO EXAMINATION


| EXAMINATION | PAGE |
|---|---|
| Examination by Mr. Roberts | 6 |
| Examination by Ms. Albin | 113 |
| Further Examination by Mr. Roberts | 117 |


INDEX OF EXHIBITS


| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 20 | E-mail Dated December 7 from Christopher Sims | 110 |


(Exhibit 20 was retained. Additional exhibits referred to were marked previously.)



THE VIDEOGRAPHER: Today's date is April 3rd, 2024. The time is 9:58 a.m., and we're now on the record.

THE REPORTER: Okay. We are here to take the deposition of Christopher Sims in Cause Number 23-CV-1501 styled West FM 517, Limited versus City of League City in the 405th Judicial District Court, Galveston County, Texas.

My name is Richelle Reeder. I'm a Notary Public in the State of Texas. I am not a certified shorthand reporter. Would the parties stipulate on the record that I will be capturing the verbatim record of today's proceeding utilizing electronic audio equipment, a computer, and specialized recording software and that a certified reporter is not available?

MR. ROBERTS: Yes.

MS. ALBIN: City stipulates.

THE REPORTER: Thank you. Okay. And the witness is located in League City, Texas, and has confirmed his identity with Texas driver's license. Will everyone in attendance please identify yourselves for the record and state who you represent.

MR. ROBERTS: Jeff Roberts for plaintiff.

MR. SPEARS: Justin Spears for plaintiff.

Page 5

MS. ALBIN: Kelly Albin. Oh sorry, go ahead.
MR. GOZA: Tracy Goza, plaintiff.
MS. ALBIN: Kelly Albin for defendant League City.
MS. VILLARREAL: Michelle Villarreal, League City.
THE REPORTER: Okay. Thank you. Following the conclusion of this deposition, I will prepare a certificate that the witness was -- will be sworn that they -- excuse me -- that the complete testimony of the witness has been digitally recorded and that a written transcript of the deposition has been prepared and certified as a true and correct verbatim record of the proceeding. Esquire Deposition Solutions shall retain the original digital recording.
Absent any objection at this time, counsel and the witness agree to my administration of the oath to this witness and that the final transcript may be used for all purposes allowed by the Texas Rules of Civil Procedure. Hearing no objection, this shall constitute agreement and stipulation of such and I will now swear in the witness.
CHRISTOPHER SIMS,
having first been duly sworn, testified as follows:
THE REPORTER: Thank you, sir. Okay, counsel,

Page 6

you may begin.
EXAMINATION
BY MR. ROBERTS:
Q. Sir, can you state your full name for the record?
A. Christopher Whitney Sims.
Q. And where do you reside, sir?
A. I live in the Clear Lake area of Houston, 15219 Greenleaf Lane.
Q. And who do you reside with at that address?
A. Wife and kids.
Q. Your wife's name?
A. Heather.
Q. And kids?
A. Jacob and Zach.
Q. What is your educational background? Where did you go to high school?
A. I went to high school in Mississippi at Northeast Jones High School. I went to Jones County Junior College after that and then to Mississippi State University.
Q. And what did you get there? Did you get a Associate degree?
A. I did not get a degree at Jones. I just transferred to Mississippi State, and I got a Bachelor

Page 7

of Science for Civil Engineering.
Q. Do you hold any kind of a licensing in civil engineering?
A. I did have a license, professional engineering in Texas.
Q. And when did you obtain that license?
A. When I moved back to Texas in 2016.
Q. Did you hold any other type of license prior to 2016?
A. Yeah. So I was -- previously lived in San Antonio for roughly five years, and I was licensed with Texas at that time as well. I let that license lapse when I moved to Tennessee. I was in Tennessee for just shy of ten years. I was licensed in Tennessee as well. And that has since lapsed.
Q. So let's go back to the other direction. What year did you graduate?
A. High school?
Q. College.
A. College. '98. I'm sorry. That's not right. Yeah, that is right. '98.
Q. And then you -- once you obtained your bachelor's degree, what was your first job in?
A. The Mississippi DOT, Department of Transportation.

Page 8

Q. And what did you do for them?
A. Initially I was hired as their materials laboratory manager. It was over the testing of asphalt and materials related to asphalt roads.
Q. And how long did you do that?
A. I was there for maybe a year, rough -- roughly a year. And I transferred to a field office in Starkville, Mississippi, and was a field engineer at that time.
Q. You said engineer. Were you a licensed engineer at that time?
A. I was not. I was an EIT.
Q. And how long were you in that job?
A. I had that job -- I believe my wife graduated in 2002 when we left Starkville so I had it until 2002.
Q. Approximately three years?
A. Three and a half, something like that.
Q. And then what did you do next?
A. I went to work for M.W. Cude & Associates in San Antonio. We worked for developers land planning, designing public infrastructure.
Q. What made you decide to relocate to San Antonio?
A. Wife's job.

Page 49

Q. To get the highest fee possible?
A. We didn't set projects to be inordinate -- inordinately high. We did our math. Our consultants did the math, and that's the number that came up. So we're able, if I understand the -- the chapter right, you can do a 50 percent threshold or you can do kind of a deep dive analysis. And that analysis was part of their contract.
Q. Let's back up. When you said, we -- we set -- we set the numbers, what?
A. We set the numbers based off of the analysis.
Q. Who's we?
A. The CIAC and City Council.
Q. But you didn't set any numbers. You just told me that. The consultant did.
A. The consultants did the analysis. The analysis was presented to the CIAC and City Council.
Q. But you didn't check the numbers?
A. No, I did not.
Q. The CIAC didn't check -- check the numbers, and the city council did not check the numbers?
A. I couldn't answer if they checked anything or not on that. They did not ask me.
Q. But you, as the head of this department, if you chose, had the ability to go back and check their

Page 50

accuracy from prior predictions, correct?
A. We provided that information to them for their future analysis.
Q. Who's we and who's they?
A. We would be the engineering department, project management office, finance office. And them would be Freese and Nichols, NewGen, and Ardurra.
Q. So I'm going to talk to Mr. Weatherly tomorrow, but you would assume that he availed himself of all this data to test the accuracy of his prior predictions?
A. I would assume that he took the information and updated it so we're not using inaccurate numbers for existing and completed projects.
Q. But again, before we move on, whether he did that or not, he'll answer to that tomorrow. But nobody in your department or yourself ever checked the actual numbers that were spent against their predictions in the 2018 study, correct?
A. Not that I'm aware of.
Q. And nobody on the oversight committee or the city council ever asked you or your department to do that, did they?
A. Asked us to confirm the numbers from --
Q. Accuracy.

Page 51

A. Freese? No, we -- like I said, we -- we explained in those meetings kind of the same process where the -- that stuff is being updated every -- every time. But no, no one asked us.
Q. But your mandate from City Council was to get this number as high as possible, correct?
A. Our mandate from City Council was to ensure new development was paying their fair share.
Q. We can go to the e-mails.
A. Yes, sir.
Q. But you know there's e-mails out there, let's get this number as high as we can, correct?
MS. ALBIN: Objection. Form.
THE WITNESS: If it's legal to go, if we can prove it legally, that's what we -- we were tasked to do, is to get it as high as possible to ensure new development is paying their way.
BY MR. ROBERTS:
Q. But as far as whether you did that accurately, you being the city, you relied on the consultants because nobody checked it, correct?
A. We relied on the consultants because that is stuff that they're experts in, not us.
Q. Well, so are you. I mean, you do CIAC -- your department does CIPs all the time. Would that --

Page 52

A. We do not do the master planning. We don't do CRF analysis.
Q. CRF analysis determined impact fees?
A. That is correct.
Q. But you do CIPs all the time. The department does for projects that the city --
(Crosstalk)
THE WITNESS: Project management department handles the CIPs. We are involved with the plan reviews, we're involved with the construction inspection.
BY MR. ROBERTS:
Q. But internally when you do CIPs, there's a check and balance against that because you go back and check to see if the numbers you actually spent were accurate with the original CIPs? That's an on-going project you do with the city, correct?
A. I do not do that, no, sir.
Q. Someone underneath you does that.
A. Not in my department we don't.
Q. Which department does that?
A. I couldn't answer that. I mean, I don't know, but I know engineering does not.
Q. Okay. But we just did this earlier.
A. Right.

Page 117

project prior to July of 2022?
A. Yes, ma'am. There was.
Q. Okay. But we don't have those here in front of us today, do we?
A. No.
Q. Okay.
MS. ALBIN: I pass the witness.

FURTHER EXAMINATION

BY MR. ROBERTS:
Q. To go back on that quickly, you identified the grand bargain project included project number six, Exhibit 1, stamp 163. It included the segment of three, which is 24-inch pipe, 10,900 linear feet, correct?
A. That's correct. Yes, sir.
Q. And that was just the construction cost, not contingencies?
A. That is what that document is saying. Yes, sir.
Q. And then the construction cost for the rest of the project is reflected on page 168, CIP one, not counting contingencies, was $11,900,000?
A. Yes, sir.
Q. And these numbers -- these projected numbers were 2018 dollars, correct?

Page 118

A. That is my understanding. Yes, sir.
Q. But what you actually paid Mr. Goza was in 2022 dollars?
A. Yes, sir.
Q. Which you would expect to be higher than 2018 dollars?
A. I can't answer that. That's going to ebb and flow depending on the project.
Q. But have you done the math and gone back and compared apples to apples with what Mr. Goza charged versus what the estimates were in 2018 dollars?
A. I have not.
Q. And again, nobody ever asked you to do that as a check against 2018 estimates.
A. Not that I recall.
Q. But if someone had asked you to do it, you could pull them all out, put them side by side to see what they were?
A. That is correct.
Q. And you could do that on any of the 2018 estimates for projects that are complete?
A. I could get access to all of those. Yes, sir.
MS. ALBIN: Nothing further.
THE REPORTER: Okay. Before we go off the record, let me get the transcript orders.

Page 119

Mr. Roberts, will you be ordering the standard e-tran regular delivery today?
MR. ROBERTS: I have no idea what you're talking about. He's in charge of that.
MR. SPEARS: We're going to get e-transcript.
THE REPORTER: E-tran? Okay. Regular delivery is fine, instead of expedited?
MR. SPEARS: We'll get expedited.
THE REPORTER: How many -- date would you like it on?
MR. SPEARS: A week.
THE REPORTER: About a week? Okay. Perfect.
And then, Ms. Albin, will you be ordering a copy today?
MS. ALBIN: Yes.
THE REPORTER: And the standard e-tran. Do you want standard delivery?
MS. ALBIN: And we'll also do the expedited.
THE REPORTER: Expedited one week?
MS. ALBIN: Yeah.
THE REPORTER: Perfect. All right.
MR. ROBERTS: So I take it we agreed that the exhibits -- original exhibits will be retained by counsel?
THE VIDEOGRAPHER: Do you need a picture?

Page 120

THE REPORTER: I will take a picture of that. Thank you. Once we are off the record.
MR. ROBERTS: And your partner -- we talked yesterday about (indiscernible) so any exhibits you have go to him and he has to bring them to everybody. Or you can do that. I trust in you.
MS. ALBIN: I'm okay.
MR. ROBERTS: They're getting heavier.
MS. ALBIN: Well, I have to wear heels, so I feel like he's got better footwear for lugging around...
THE VIDEOGRAPHER: The time is 1:56 p.m. and we're off the record.
(The deposition concluded at 1:56 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: CHRISTOPHER SIMS ESQ. JOB NO. J11036718

DATE OF PROCEEDING: April 3, 2024

PAGE, LINE CHANGE REASON



I, CHRISTOPHER SIMS, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted on the previous page.

______________________
CHRISTOPHER SIMS

THE STATE OF TEXAS
COUNTY OF __________

Before me,____________________, on this day personally appeared CHRISTOPHER SIMS, known to me (or proved to me under oath or through _______________)to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of ______________, 2024.

___________________________
Notary Public in and for
the State of Texas



CAUSE NO. 23-CV-1501

WEST FM 517, LTD., ) IN THE DISTRICT COURT OF
)
Plaintiff, )
)
vs. ) 405th Judicial District
)
CITY OF LEAGUE CITY, )
)
Defendant. ) GALVESTON COUNTY, TEXAS

REPORTER'S CERTIFICATE
VIDEOTAPED DEPOSITION OF CHRISTOPHER SIMS
APRIL 3, 2024

I, RICHELLE REEDER, Digital Reporter and Notary Public for the State of Texas, hereby certify to the following:

That the witness, CHRISTOPHER SIMS, was duly sworn by me and that the testimony was accurately captured with annotations by me during the proceeding;

That the transcript was submitted on____________, 2024, to the witness or to the attorney for the witness for examination, signature, and returned to me by _______________, 2024;

That the amount of time used by each party at the proceeding was as follows:

Jeffrey D. Roberts, Esq. - 146 minutes
Kelly R. Albin, Esq. - 3 minutes

That $________is the proceeding officer's charges to Counsel for preparing the original proceeding transcript and any copies of exhibits;

That pursuant to information given to the proceeding officer at the time said testimony was taken, the following includes counsel for all parties of record:



Jeffrey D. Roberts, Esq., Attorney for Plaintiff
Justin L. Spears, Esq., Attorney for Plaintiff
Kelly R. Albin, Esq., Attorney for Defendant
Michelle Villarreal, Esq., Attorney for Defendant

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to 203 of TRCP will be certified to after they have occurred.

Certified to by me this 10th day of April, 2024.

RICHELLE REEDER
Notary Commission Texas 124536154
Commission Expires: February 16, 2028
Firm Registration No. 3

Page 125

FURTHER CERTIFICATION UNDER RULE 203 TCRP

The original proceeding was/was not returned to the proceeding officer on ____________________.

If returned, the attached Change and Signature page contains any changes and the reasons therefor.

If returned, the original proceeding transcript was delivered to JEFFREY D. ROBERTS, Esq., Custodial Attorney.

That $_______ is the proceeding officer's charges to the custodial party for preparing the original proceeding transcript and any copies of exhibits.

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _________________ and files with the Clerk.

Certified to by me this 10th day of April, 2024.

RICHELLE REEDER
Notary Commission Texas 124536154
Commission Expires: Feb. 16, 2028
Firm Registration No. 3

Page 126

CERTIFICATE OF TRANSCRIPTIONIST

I, Rebecca Mask, Legal Transcriptionist, do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter. As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 10th day of April 2024.

Rebecca Mask

Rebecca Mask

EXHIBIT D





CAUSE NO. 23-CV-1501

| | |
|---|---|
| WEST FM 517, LTD., Plaintiff | * IN THE DISTRICT COURT OF |
| VS. | * GALVESTON COUNTY, TEXAS |
| CITY OF LEAGUE CITY, Defendant | * 405TH JUDICIAL DISTRICT |

***********************************

THE ORAL VIDEOTAPED
DEPOSITION OF
TRACY GOZA
APRIL 1, 2024

***********************************

ORAL VIDEOTAPED DEPOSITION OF TRACY GOZA, produced as a witness at the instance of the DEFENDANT and duly sworn, was taken in the above-styled and numbered cause on the 1st of April, 2024, from 10:07 a.m. to 1:34 p.m., before Debbie Boothe, CSR, in and for the State of Texas, reported by machine shorthand at the offices of Roberts Markel Weinberg Butler Hailey, PC, 2800 Post Oak Blvd., 2nd Floor Conference Room, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated in the record or attached hereto.



A P P E A R A N C E S

FOR THE PLAINTIFF:

Mr. Jeffrey D. Roberts
Mr. Justin L. Spears
Roberts Markel Weinberg Butler Hailey, PC
2800 Post Oak Blvd.
Floor 57
Houston, Texas 77056
(713) 840-1666
jroberts@rmwbh.com
jspears@rmwbh.com

FOR THE DEFENDANT:

Ms. Kelly R. Albin
Denton Navarro Rodriguez Bernal Santee & Zech
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
(832) 632-2102
kralbin@rampagelaw.com

THE VIDEOGRAPHER:

Mr. Mike Davis
Lexitas

* * * * * *



INDEX

WITNESS: TRACY GOZA


| | PAGE |
|---|---|
| Appearances | 2 |
| Examination By Ms. Kelly R. Albin | 6 |
| 10:07 a.m. - 10:56 a.m. | |
| 11:04 a.m. - 11:50 a.m. | |
| 12:00 p.m. - 12:51 p.m. | |
| 12:58 p.m. - 1:12 p.m. | |
| 1:13 p.m. - 1:18 p.m. | |
| Examination By Mr. Jeffrey D. Roberts | 113 |
| 1:18 p.m. - 1:25 p.m. | |
| Further Examination By Ms. Kelly R. Albin | 119 |
| 1:25 p.m. - 1:33 p.m. | |
| Further Examination By Mr. Jeffrey D. Roberts | 125 |
| 1:33 p.m. - 1:34 p.m. | |
| Changes and Signature Page | 127 |
| Reporter's Certification | 129 |
| Reporter's Supplemental Certification | 131 |


* * * * * *



REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.

EXHIBIT INDEX


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 5 | Franchise Tax Account Status as of 4/1/2024 for Lingo West FM 517 GP, LLC | 9 |
| Exhibit 6 | Franchise Tax Account Status as of 3/29/2024 for West FM 517, Ltd. | 10 |
| Exhibit 7 | Franchise Tax Account Status as of 4/1/2024 for LPI Property Management, LLC | 10 |
| Exhibit 8 | Plaintiff West FM 517, Ltd.'s Answers to Defendant City of League City's First Set of Interrogatories | 39 |
| Exhibit 9 | Letter to City of League City From Lingo Properties, Inc., Mr. Goza 5/22/2023 | 48 |
| Exhibit 10 | Email to Mr. Baumgartner From Mr. Goza 6/9/2023, Attachments: Gulf Coast's Grand Bargain Pay Estimate #17 (Rev. 1) Final WO-CO RR (003).pdf | 67 |

EXHIBIT INDEX - (Continued)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Plaintiff West FM 517, Ltd.'s Responses to Defendant City of League City's Set of Requests for Admissions | 85 |

* * * * * *

ATTACHMENTS INDEX - (PREVIOUSLY MARKED EXHIBITS)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | City of League City Draft 2023 Water and Wastewater Capital Recovery Fee Update, Prepared by Freese and Nichols, Inc. 4/11/2023 | 45 |

* * * * * *



THE VIDEOGRAPHER: Okay. Today is Monday, April 1, 2024. We're going on the record at 10:07 a.m.

TRACY GOZA,

having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MS. KELLY R. ALBIN:

Q. Good morning, Mr. Goza.
**A. Good morning.**
Q. My name is Kelly Albin. I'm an attorney, and I represent the City of League City in a lawsuit styled West FM 517, Ltd. vs. City of League City. Do you understand that?
**A. Yes, ma'am.**
Q. And you're here today for your deposition in this case; is that right?
**A. Yes, ma'am.**
Q. Okay. Are you represented by counsel today?
**A. Yes, ma'am.**
Q. And are they here in the room with us?
**A. Yes, ma'am.**
Q. Excellent.
Have you ever had your deposition taken?
**A. Yes, ma'am.**
Q. When was the last time?
**A. 15 years ago.**



Q. Okay. I can't remember what I did last week, so I'm going to go over a few ground rules in case you've forgotten from 15 years ago. All right?
**A. Okay.**
Q. I'm going to be asking questions today. You may occasionally hear an objection from your lawyers. You can answer the question unless they direct you not to. Okay?
**A. Okay.**
Q. The court reporter is taking down all of the questions and your responses today, and it will be easier for her to do that if we try not to talk over each other. Okay?
**A. Okay.**
Q. So I will try to let you finish an answer before I start a question, and I would ask that you would allow me to finish a question even if you already know what the answer is and you're ready to start responding. Okay?
**A. Yes, ma'am.**
Q. The court reporter is not going to be able to take down head nods or head shakes. So to get a clean transcript, I would ask that you answer audibly. And if I prompt you to do that, I'm not trying to be rude. I'm just trying to make sure we have a nice clean record for



later on. All right?
**A. Yes, ma'am.**
Q. If you answer a question, I'm going to assume that you understood my question. Is that fair?
**A. Yes, ma'am.**
Q. And if you for any reason don't understand a question I've asked, I would request that you just let me know and give me a chance to clarify so that I can make sure your answer is something that we can rely on later on; is that fair?
**A. Yes, ma'am.**
Q. If you need to take a break anytime, that's perfectly fine for any reason. I would just ask that you let -- finish answering any question that's already on the table before we break. Okay?
**A. Okay.**
Q. Will you please state your full name for the record.
**A. My name is Tracy Franklin Goza.**
Q. Mr. Goza, the Plaintiff in this lawsuit is West FM 517, Ltd.; is that correct?
**A. Yes, ma'am.**
Q. What is your relationship to West FM 517?
**A. I am the owner of the general partner.**
Q. Who is the general partner?

Page 9

**A. Lingo West FM 517 GP, Inc.**
Q. Okay.
MS. ALBIN: I'll mark this.
(Exhibit 5 marked.)
Q. (BY MS. ALBIN) I'm going to pass you what's been marked as Exhibit 5 to today's deposition. This I'll represent to you is from -- printed off from the Office of the Comptroller. It's a franchise tax account status. And the date you can see in the top left corner is April 1, 2024, which is today's date. Do you agree with that?
**A. Yes, ma'am.**
Q. Okay. Is this the entity that you were just describing as owning?
**A. No, ma'am -- oh, excuse me. Yes, ma'am, it is. It says it up here at the top. Sorry, I missed it.**
Q. That's okay.
So this is Lingo West FM -- FM 517 GP, LLC; is that correct?
**A. Yes, ma'am.**
Q. Okay. And Lingo West, as I understood your testimony, is the general partner in West FM who's the Plaintiff in our lawsuit; is that correct?
**A. Yes, ma'am.**
Q. Okay.

Page 10

(Exhibit 6 marked.)
Q. (BY MS. ALBIN) I'm going to pass you what I'm marking as Exhibit 6 to today's deposition. This is also a document that appears to be from the Comptroller's Office. And here the entity is West FM 517. Do you see that?
**A. Yes, ma'am.**
Q. Okay. And the registered agent for both West FM and Lingo West is LPI Property Management according to this report. Do you see that?
**A. Yes, ma'am.**
Q. And do you have any affiliation with LPI?
**A. Yes, ma'am.**
Q. What is your affiliation with LPI?
**A. I am 60 percent owner.**
Q. And does LPI have any partnership in West FM 517?
**A. No, ma'am.**
Q. So LPI only serves as the registered agent?
**A. Yes, ma'am.**
(Exhibit 7 marked.)
Q. (BY MS. ALBIN) I'm going to pass you what I'm marking as Exhibit 7, similar to what we've been looking at from the Comptroller's Office. And, again, the entity here is listed as LPI Property Management, LLC,

Page 11

and if I understood your testimony correctly you're the 60 percent owner of this company; is that correct?
**A. Yes, ma'am.**
Q. Okay. So with regard to the Plaintiff in our lawsuit, which is West FM -- before I go farther with that question, when I say "West FM," do you understand what entity I'm talking about?
**A. Yes, ma'am.**
Q. Okay. Are there any other entities with which you're affiliated that have a name similar to West FM?
**A. No, ma'am.**
Q. Okay. So with regard to the Plaintiff in our lawsuit, West FM, LPI is the registered agent and Lingo West is the general partner; is that correct?
**A. Yes, ma'am.**
Q. Okay. Who are the other partners in the West FM organization?
**A. In West FM, Ltd., or We -- or Lingo West FM GP?**
Q. That's a good question. And for the purposes of today, if I say "West FM," I'm referring to West FM 517, Ltd.
**A. Okay.**
Q. Can we agree that that -- you'll understand --
**A. Yes.**
Q. -- what I mean?

Page 12

And if I refer to Lingo West, then I'm talking about Lingo West FM 517 --
**A. Okay.**
Q. -- GP; is that fair?
**A. Clear.**
Q. Okay.
**A. Yes, ma'am.**
Q. And my question was with regard to West FM, who are the other partners?
**A. There's three -- two other partners, Angel Brothers Enterprises and Cervelle Homes.**
Q. What type of organization is Angel Brothers?
**A. Angel Brothers is a -- a contractor, streets, water, sewer lines, things like that. They put those in.**
Q. And do you have any ownership interest in Angel Brothers?
**A. No, ma'am.**
Q. Does anybody in your family have an ownership interest in Angel Brothers?
**A. No, ma'am.**
Q. And Cervelle Homes, is that a homebuilder?
**A. Yes, ma'am.**
**It's Cervelle.**
Q. Cervelle?

Page 33

**A. It was Lingo Southfork, Ltd. The main defendant was Royce Homes.**
Q. And that is in Manvel; correct?
**A. Yes, ma'am.**
Q. All right. Do you know how that resolved?
**A. It resolved in mediation, and Royce Homes agreed to pay the plaintiff a bunch of money.**
Q. Do you know what the nature of the claim was?
**A. It was a work-related accident, one of their contractors.**
Q. Do you do any volunteer work in Galveston County?
**A. I have in the past. No.**
Q. Not right now?
**A. Not right now.**
Q. Okay. The organizations you've been associated with to volunteer in the past, what are the names of those?
**A. The Chamber of Commerce.**
Q. Any others?
**A. Mainly the Chamber of Commerce.**
Q. Do you know about how long ago that was?
**A. I'm currently a member of the Chamber of Commerce.**
Q. Okay. What does your volunteer work with the

Page 34

Chamber of Commerce entail?
**A. We'd sell raffle tickets for them, things like that, help them raise money. I also volunteer with the Friendswood Education Foundation.**
Q. What do you do for the Friendswood Education Foundation?
**A. Basically contribute money.**
Q. And that -- the Chamber of Commerce, is that Galveston County, City of Galveston?
**A. Friendswood.**
Q. Friendswood. Okay.
Do you have any developments in the City of Friendswood?
**A. Not at this time.**
Q. Okay. But you have in the past?
**A. Yes, ma'am.**
Q. What were the developments in Friendswood?
**A. I did a subdivision called Melodywood, and I did an addition to a subdivision called Friendswood Lakes.**
Q. Okay. Going back to the named developments, have we talked about all of the developments with which you've been associated in League City today?
**A. Did we mention one called Autumn Lakes?**
Q. I don't think so.

Page 35

**A. Okay. There is one more called Autumn Lakes.**
Q. And which company developed Autumn Lakes?
**A. Lingo Properties was the general partner, and the name of the company was Autumn Lakes, Ltd.**
Q. Is Autumn Lakes completed?
**A. Yes, ma'am.**
Q. When was it finished?
**A. Um, 2015.**
Q. Okay. Have we now covered all of the developments in --
**A. Yes, ma'am.**
Q. -- League City?
Thank you.
**A. Is it a good stopping point?**
Q. Sure.
MS. ALBIN: We can go off the record.
THE VIDEOGRAPHER: Off the record at 10:56.
(Recess from 10:56 a.m. to 11:04 a.m.)
THE VIDEOGRAPHER: Okay. Back on record at 11:04.
Q. (BY MS. ALBIN) All right, Mr. Goza. I'd like to talk a little bit about the lawsuit now that was filed by West FM 517, Ltd. Okay?
**A. Okay.**
Q. Just generally the lawsuit has to do with

Page 36

impact fees and park fees. Would you agree with that?
**A. Yes, ma'am.**
Q. All right. And specifically League City's increase to its impact fees which were adopted in 2023. Would you agree with that?
**A. Yes, ma'am.**
Q. All right. And do you agree that the park fees that are complained about in the lawsuit were adopted in 2021?
**A. Yes, ma'am.**
Q. Okay. Did any of the entities that we've talked about this morning pay impact fees to the City of League City since December 1, 2023?
**A. No, ma'am. I can clarify that a little bit for you.**
Q. Please.
**A. The builder pays the impact fees, not the developer.**
Q. Okay. So would that be -- in the case of Pedregal, would that be Cervelle Homes?
**A. Yes, ma'am.**
Q. Okay. So Cervelle Homes is the entity that has paid impact fees to the City of League City since December 1, 2023?
**A. Yes, ma'am.**

Page 113

witness.

EXAMINATION

QUESTIONS BY MR. JEFFREY D. ROBERTS:

Q. Just a couple points of clarification. I think you testified earlier you're a developer?

**A. That I'm a developer?**

Q. Yes, sir.

**A. Yes.**

Q. And you prepare land to be sold and lots to builders?

**A. Yes, sir.**

Q. And you also testified earlier that the builders pay this impact fee to the City?

**A. Yes, sir, they have.**

Q. The builder is paying the impact fee and not you as developer. If these impact fees are unreasonable, how are you aggrieved?

**A. Builders won't pay me as much for the lots as they would prior to the impact fee being increased.**

Q. What do you base that on?

**A. Experience. Ultimately the costs have to be passed on to somebody. I share it. The builder shares it. And then the homeowner at the end gets some of it. Everybody does.**

Q. So the increased costs of development whether

Page 114

you directly bear the cost, whether it's passed on to the builder or the homeowner affects everyone involved?

**A. Yes.**

Q. Earlier you talked about the Pedregal project as a project that you paid for and had been completed before this 2023 impact study?

**A. Yes.**

Q. How did it get included as a projected project in the 2023 impact study?

**A. I'm not sure how it got included. We designed the lift station to include all the areas south of us as part of a negotiation to get rid of some drill site locations on our property. That's why we accounted for it and that's why we increased the sizing of our lift station. I don't know why they would have included it in there.**

Q. Did anyone reach out to you from you the City or from Freese and Nichols and said, "Hey, what's the deal on this Ped -- Pedregal Lift Station"?

**A. No.**

Q. How much was it in the report?

**A. It was a million six in the report. The whole lift station didn't cost a million six.**

Q. So they projected a project that had already been done and they projected a cost to do a project that

Page 115

had already done in the amount of the project when it was done?

**A. Yes.**

Q. And then they're going to include that in a bond issuance and charge interest on top of that?

**A. Yes.**

Q. Okay. The 24-inch pipeline that you did, your calculation was 185 a foot on a greenfield 24-inch pipeline?

**A. Yes.**

Q. What does greenfield mean?

**A. Greenfield means out in the middle of a pasture with nothing to interrupt it.**

Q. So you brought that in as a contractor for the City at $185 a foot. And what type of contingency was allowed?

**A. 10 percent.**

Q. So at the time you finished that project, Freese and Nichols is calculating a 24-inch waterline pipeline greenfield at $400 a foot?

**A. Yes.**

Q. With a 30 percent contingency?

**A. Yes.**

Q. Did you see anything in the report documenting or supporting that?

Page 116

**A. No.**

Q. Did you see any bids or -- from anyone supporting that?

**A. No.**

Q. Now, you said earlier that you had personal knowledge about the 24-inch pipelines and about the Pedregal project. But there's many other projects in this report; correct?

**A. Correct.**

Q. And you don't have personal knowledge about all of them?

**A. No, sir.**

Q. But if you assume the one you did have personal knowledge of are that far off, you assume the other ones must be pretty far -- far off?

**A. Yes.**

Q. Even on the other ones, did you see a lot of detail or specs? For instance, there's a storage tank I think for a million dollars. Is there any specs to show what that tank is like, size, dimensions?

**A. No.**

Q. How would a reasonable person look at this and have any idea whether there's any accuracy?

**A. You wouldn't.**

Q. You said there was no meaningful committee.

Page 117

What does that mean?
**A. No committee input. The -- I don't recall a committee going back and forth with staff or even back and forth with me as a developer or even our engineers who work for the City from time to time. There's no back and forth between anybody.**
Q. Were there's supposed to be workshops?
**A. Supposed to be workshops. They're supposed to be talking about projects. There's supposed to be estimates. There's supposed to be some kind of justification for the cost, not just twice the number.**
Q. Do you know of any other developers who reached out and criticized this study of lack of input?
**A. I believe there were several, but I don't -- I don't know specifically who.**
Q. But you personally were never contacted by any committee or workshop?
**A. Never.**
Q. Did you do a rough calculation how many linear feet of 24-inch pipeline were in these proposals in this study?
**A. Yes. I believe it was -- what was the number? I forget what the footage was, but it was about -- you know, if you multiplied it times 200 or $215 a foot, it was like 12.9 million worth of overruns or costs over**

Page 118

**and above.**
Q. So if we just look at 24-inch pipeline?
**A. Just the waterline.**
Q. Don't even focus on all the other projects?
**A. Correct.**
Q. And based on your own personal experience, if they're that far off, you calculate that to be $12 million alone?
**A. Yes.**
Q. And, again, there has to be a bond issuance and interest charged over a long period of time for that?
**A. Yes. And you also keep saying my experience. It's the City's experience. It's their contract with me to install that waterline at $185 a foot.**
Q. Did the City ever ask you to come back and bid these other 24-inch waterlines?
**A. No. But I will.**
Q. Were they happy with the work you did?
**A. Yes.**
MS. ALBIN: Objection, form.
Q. (BY MR. ROBERTS) Have you ever heard from any other contractor that was ever asked to give a bid or an estimate for all these 24-inch pipelines?
**A. No.**
Q. Is there anything in the Freese and Nichols

Page 119

report that indicates where they got those numbers?
**A. No.**
MR. ROBERTS: Thank you. I'll pass the witness.

FURTHER EXAMINATION

QUESTIONS BY MS. KELLY R. ALBIN:
Q. Mr. Goza, you said that the -- essentially the cost to the builders you feel is then passed onto you when the impact fees are ere increased. Was that fair? Is that a fair summary of your testimony?
**A. Yes. They're going to pay me less for a lot when the impact fees are higher.**
Q. And has that happened since December 1, 2023?
**A. Yes.**
Q. Where?
**A. Everywhere.**
Q. Which -- which developments?
**A. Pedregal, The Commons at Sedona.**
Q. Any others?
**A. No, that's it. That's the only two in League City.**
Q. Okay. And what is the difference between what you were making before December 20 -- December 1, 2023, per lot and what you make now per lot?
**A. Well, it's the time. It's things like that**

Page 120

**slow down the sale of houses; right? So if houses sell slower, I don't make my money back as fast; therefore, I don't make as much.**
Q. So there's not a correlating percentage or dollar number that you can testify has changed from November 2023 to today?
**A. No.**
Q. Okay.
**A. Other than time. People buy houses based off a payment. The more they've got to pay for a house, the slower they sell.**
Q. So it's your belief that the impact fee causes home sales to slow?
**A. Yes.**
Q. Okay. And that it's that slowing that then causes there to be a change in what you can make per lot?
**A. And the marketability of the lots. If -- if I'm trying to sell them and they're building in the City of League City, they're going to equate or calculate into it that they have to pay an $18,000 impact fee. That's just part of it in building a house. So they can't pay me as much, they don't make as much and the homeowner ultimately pays more.**
Q. And you have sold lots to West FM 517, Ltd.,

Sedona the same as Pedregal, in that it runs until all the lots are sold?

**A. Yes.**

Q. Okay. The expansion on the Pedregal Lift Station, I believe you testified that was finished in 2020; is that right?

**A. Yes, ma'am.**

Q. All right. So when the estimated project total listed in here is 1.6 million, that's in 2023; right?

**A. Yes.**

Q. Okay. Would you expect the cost to go up or down from 2020?

**A. Up.**

MS. ALBIN: Pass the witness.

MR. ROBERTS: Just one follow-up.

FURTHER EXAMINATION

QUESTIONS BY MR. MR. JEFFREY D. ROBERTS:

Q. As far as a decision as the developer, where to develop and not develop, do reas -- unreasonable impact fees affect that?

**A. Absolutely.**

Q. Going forward in the City League City, if their impact fees are unreasonable, does that affect the decision-making process of developers, builders and ultimately home buyers as to where to go?



MS. ALBIN: Objection, form.

**A. Abs -- absolutely it does.**

MR. ROBERTS: All right. Thank you, sir.

THE VIDEOGRAPHER: Off the record at 1:34 p.m.

* * * * * *



CHANGES AND SIGNATURE

WITNESS NAME: DATE OF DEPOSITION:

TRACY GOZA APRIL 1, 2024

PAGE LINE CHANGE REASON

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________



I, TRACY GOZA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________

TRACY GOZA

JOB NO. 2024-931184

THE STATE OF ___________)

COUNTY OF ___________)

Before me, ________________________, on this day personally appeared TRACY GOZA, known to me (or proved to me under oath or through ______________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _______ day of _______________, _______.

______________________________

NOTARY PUBLIC IN AND FOR

THE STATE OF __________________

MY COMMISSION EXPIRES:

______________________________

CAUSE NO. 23-CV-1501

WEST FM 517, LTD., * IN THE DISTRICT COURT OF
Plaintiff *
*
VS. * Galveston County, TEXAS
*
CITY OF LEAGUE CITY, *
Defendant * 405TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF TRACY GOZA
APRIL 1, 2024

I, Debbie Boothe, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, TRACY GOZA, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ______________________________ to the witness or to the attorney for the witness for examination, signature and returned to me by ____________________________;

That the amount of time used by each party at the deposition is as follows:
Mr. Jeffrey D. Roberts - 0:08
Ms. Kelly R. Albin - 2:53

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:
Mr. Jeffrey D. Roberts and Mr. Justin L. Spears
Attorneys for the Plaintiff
jroberts@rmwbh.com
jspears@rmwbh.com

Ms. Kelly R. Albin - Attorney for the Defendant
kralbin@rampagelaw.com



I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 15th day of April, 2024.



DEBBIE BOOTHE, CSR
Texas CSR 4708
Expiration Date: 7-31-25
Lexitas
Firm Registration No. 95, Expires 1-31-25
13101 Northwest Freeway, Suite 210
Houston, Texas 77040
888-893-3767

JOB NO. 2024-931184



FURTHER CERTIFICATION BY THE COURT REPORTING FIRM
UNDER RULE 203 TRCP

The original deposition/signature page was/was not returned to the deposition officer signed/unsigned on ________________;

If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to ______________________________, Custodial Attorney;

That $__________ is the deposition officer's charges to the ____________________________________ for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _________________ and filed with the Clerk.

Certified to by me this _______ day of ___________, _______.



Lexitas
Firm Registration No. 95, Expires 1-31-25
13101 Northwest Freeway, Suite 210
Houston, Texas 77040
888-893-3767

JOB NO. 2024-931184

EXHIBIT E

# AGREEMENT OF LIMITED PARTNERSHIP OF WEST FM 517, LTD.

THIS AGREEMENT OF LIMITED PARTNERSHIP OF WEST FM 517, LTD. (this "Agreement") is entered into to be effective on February 1, 2017 (the "Effective Date"), by and among LinGo West FM 517 GP, LLC, a Texas limited liability company, as general partner (the "General Partner"), and each of the persons or entities whose names are set forth on Exhibit "A" attached hereto as limited partners (collectively, the "Limited Partners," and together with the General Partner, the "Partners").

## ARTICLE I – FORMATION

Organization

1.01 West FM 517, Ltd. (the "Partnership") was formed in 2015 as a limited partnership under and pursuant to the Texas Business Organizations Code (the "TBOC") by the General Partner and Cervelle Custom Homes, Ltd., a Texas limited partnership, as a limited partner. Angel Brothers Properties LLC, a Texas limited liability company, is becoming a Limited Partner as of the Effective Date.

Statutory Requirement

1.02 A Certificate of Formation of the Partnership was filed with the Secretary of State of the State of Texas on July 28, 2015. The General Partner is hereby authorized and empowered by the Limited Partners to prepare, file, and publish the original and any amended Certificate of Formation of the Partnership as may be necessary or desirable and each Limited Partner specifically designates and appoints the General Partner, for and on his or her behalf, as his or her attorney in fact for the exclusive purposes of signing and attesting to such original or amended Certificate of Formation of the Partnership; provided, however, that any amendment to the Certificate of Formation of the Partnership other than a required amendment as provided by Section 153.051 of the TBOC or a discretionary amendment as provided by Section 153.052(b) of the TBOC shall be approved by the Limited Partners prior to its effectiveness and filing with the Secretary of State of the State of Texas.

Purposes of the Partnership

1.03 The purpose of the Partnership shall be as follows: To buy, develop and sell, as appropriate, all real property, including improvements and personal property located thereon, more particularly described in Exhibit "B" attached hereto (the "Property").

## ARTICLE II - NAMES AND PLACE OF BUSINESS

Name of the Partnership

2.01 The name of the Partnership shall be West FM 517, Ltd. The business of the Partnership shall be conducted under that name and under such variations of the name as may be necessary to comply with the applicable laws of the other states in which the Partnership may do business; provided, however,

that the approval of the Limited Partners shall be required to approve the business of the Partnership being conducted in any state other than Texas unless the Partnership conducting business in such other state was approved by the Limited Partners.

The General Partner shall promptly execute and duly file, with the proper offices in each state in which the Partnership may conduct the activities authorized in this Agreement, one or more certificates or other filings as required by the Fictitious Name or Assumed Name Act or similar statute in effect as to each such state in which such activities are so conducted.

Location of Principal Place of Business of the Partnership

2.02 The principal place of business of the Partnership shall be located at 211 E. Parkwood, Suite 100, Friendswood, Texas 77546 and additional places of business may be located elsewhere as designated from time to time by the General Partner. The General Partner shall promptly notify the Limited Partners of any such additional place of business.

Names and Addresses or Places of Residence of Partners

2.03 (1) The name and address of the General Partner is:

LinGo West FM 517 GP, LLC
211 E. Parkwood, Suite 100
Friendswood, Texas 77546

There are no other General Partners of the Partnership and no other person or entity has any right to take part in the active management of the business affairs of the Partnership. Notwithstanding the foregoing, the approval of any action or agreement by the Limited Partners expressly provided in this Agreement or set forth in Section 153.103 of the TBOC shall not be deemed to be taking part in the active management of the business affairs of the Partnership.

(2) The names and addresses of the Limited Partners are set forth in Exhibit "A" attached hereto and by this reference made a part of this Agreement. There are no other Limited Partners of the Partnership other than those listed in the attached Exhibit "A."

ARTICLE III - TERM OF PARTNERSHIP

3.01 The Partnership shall commence as of the effective date of this Agreement and shall continue in existence until it is terminated, liquidated, or dissolved as provided in this Agreement and the relevant provisions of the TBOC.

ARTICLE IV - CONTRIBUTIONS OF CAPITAL

Initial Contributions

4.01 Each Partner has made all capital contributions to the Partnership that have been required to be made by such Partner through the Effective Date. The Capital Account balance for each Partner as

of the Effective Date shall be the amount set opposite its name in the attached Exhibit "A."

Future Contributions

4.02 (a) Without creating any rights in favor of any third party, each Limited Partner shall contribute to the Partnership, on written request by the General Partner, the Limited Partner's pro rata share (the Target Percentage Interest set opposite the name of each Limited Partner in Exhibit "A") of all costs, expenses, or charges for operation of the Partnership and the ownership, operation, development, maintenance, upkeep and sale of any Partnership property, including but not limited to ad valorem taxes, debt amortization (including interest payments), insurance premiums, repairs, professional fees, wages, and utility costs, to the extent such costs, expenses, or charges exceed the revenues, if any, of the Partnership and the proceeds of any loans made to the Partnership. Notwithstanding the foregoing, however, Angel Brothers Properties LLC may make its future capital contributions in the form of work performed for the Partnership, including but not limited to the construction of utilities and other infrastructure and the development of the Property (but excluding sand mining). The Partners agree that (i) the fair market value of any such work as of the time of contribution to the Partnership shall be the actual costs incurred by Angel Brothers Properties LLC therefor through such time plus 10% for overhead and (ii) such work done during a given calendar month shall be deemed contributed to the Partnership as of the end of such calendar month or at such other times as the Partners may agree. The General Partner's written request for future capital contributions shall set forth (i) the projected costs, expenses and charges of the Partnership for the next six months as well as the projected revenues of the Partnership and loan proceeds during such six-month period, (ii) the time period within which cash contributions shall be made to the Partnership which in no event shall be less than five business days from receipt of the written request, and (iii) the reasonable time period within which Angel Brothers Properties LLC shall perform the work relating to such future capital contributions which time period shall be consistent with the Master Plan and the most recent Annual Plan. If any Limited Partner fails or refuses to contribute the entire amount of the initial capital called for and/or the additional capital as called for (including Angel Brothers Properties LLC performing the work to be contributed as capital contributions as provided above) within the prescribed time period for the future capital contribution (which in the case of Angel Brothers Properties LLC, shall be a reasonable time period to complete the work to be contributed as such capital contribution), the General Partner may exercise, on notice to that Limited Partner (the "Delinquent Partner"), one or more of the following remedies:

(i) taking such action (including, without limitation, court proceedings) as the General Partner may deem appropriate to obtain payment by the Delinquent Partner of the portion of the Delinquent Partner's capital contribution that is in default, together with interest thereon at the lesser of the maximum rate of interest allowed by law or eighteen percent (18%) per annum (the "Default Interest Rate") from the date that the capital contribution was due (which in the case of Angel Brothers Properties LLC, shall be the last day of the reasonable time period to complete the work to be contributed as such capital contribution) until the date that it is received, all at the cost and expense of the Delinquent Partner, including performance of work for the Partnership by Angel Brothers Properties LLC;

(ii) permitting the General Partner and, to the extent the General Partner does not elect to do so, the other Partners in proportion to their Target Percentage Interests or in such other percentages as they may agree (the "Lending Partner" whether one or more), to advance the portion of the Delinquent Partner's cash capital contribution that is in default, with the following results:

(A) the sum advanced constitutes a loan from the Lending Partner to the Delinquent Partner and a capital contribution of that sum to the Partnership by the Delinquent Partner pursuant to the applicable provisions of this Agreement,

(B) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth day after written demand therefor by the Lending Partner to the Delinquent Partner,

(C) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Partner,

(D) all distributions from the Partnership that otherwise would be made to the Delinquent Partner (whether before or after dissolution of the Partnership) instead shall be paid to the Lending Partner until the loan and all interest accrued on it have been paid in full to the Lending Partner (with payments being applied first to accrued and unpaid interest and then to principal),

(E) the payment of the loan and interest accrued on it is secured by a security interest in the Delinquent Partner's Partnership Interest, and

(F) the Lending Partner has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Partner may deem appropriate to obtain payment by the Delinquent Partner of the loan and all accrued and unpaid interest on it, at the cost and expense of the Delinquent Partner; and

(iii) exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas.

(b) Each Limited Partner grants to the Partnership, and to each Lending Partner with respect to any loans made by the Lending Partner to that Limited Partner as a Delinquent Partner, as security, equally and ratably, for the payment of all capital contributions that Limited Partner has agreed to make and the payment of all loans and interest accrued on them made by Lending Partners to that Limited Partner as a Delinquent Partner, a security interest in and a general lien on its Partnership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas. On any default in the payment of a capital contribution or in payment of such a loan or interest accrued on it, the Partnership or the Lending Partner, as applicable, is entitled to all the rights and remedies of a secured party under the

Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Section 4.02(b). Each Limited Partner shall execute and deliver to the Partnership and the other Partners all financing statements and other instruments that the General Partner or the Lending Partner, as applicable, may reasonably request to effectuate and carry out the preceding provisions of this Section 4.02(b). Each Limited Partner further specifically designates and appoints the General Partner, for and on its behalf, as its attorney in fact for the exclusive purposes of signing and attesting to such financing statements and other instruments. At the option of the General Partner or a Lending Partner, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

4.03 A Partner is not entitled to the return of any part of its capital contributions or to be paid interest in respect of either its capital account or its capital contributions. An unrepaid capital contribution is not a liability of the Partnership or of any Partner. A Partner is not required to contribute or to lend any cash or property to the Partnership to enable the Partnership to return any Partner's capital contributions.

4.04 If the Partnership does not have sufficient cash to pay its obligations, the General Partner, or any other Partner(s) that may agree to do so with the General Partner's consent, may advance all or part of the needed funds to or on behalf of the Partnership. Payment by the General Partner on account of liability as a matter of law for Partnership obligations is deemed to be an advance under this Section 4.04. An advance described in this Section 4.04 constitutes a loan from the Partner to the Partnership, bears interest at the lesser of the "prime commercial rate" as quoted by Wall Street Journal or the maximum rate permitted by law, from the date of the advance until the date of payment, and is not a capital contribution.

Capital Accounts

4.05 A separate "Capital Account" shall be maintained for each Partner, and each Partner's Capital Account, as of any particular time, shall be an amount equal to the following:

(a) The cumulative amount of cash that has been contributed or deemed contributed to the Partnership by such Partner or on behalf of such Partner through such time; plus

(b) The agreed upon fair market value of any property, including the work performed by Angel Brothers Properties LLC for the Partnership in accordance with this Agreement, other than cash (net of any related assumed liabilities) that has been contributed to the Partnership by such Partner or on behalf of such Partner through such time; plus

(c) The cumulative amount of the Partnership's Profits that have been allocated to such Partner pursuant to Section 5.03 through such time; minus

(d) The cumulative amount of the Partnership's Losses that have been allocated to such Partner pursuant to Section 5.03 through such time; minus

(e) The cumulative amount of cash and the agreed upon net fair market value of any other property (net of any related assumed liabilities) that has been distributed by the Partnership to such Partner pursuant to Sections 5.04 and 12.03 through such time.

This definition of "Capital Account" is intended to conform with the rules in U.S. Treasury Regulations section 1.704-1(b)(2)(iv) and shall be interpreted consistently therewith.

## ARTICLE V - PROFITS AND LOSSES

The attached Tax Matters Schedule contains the definitions of certain terms used in this Article V as well as certain additional provisions relating to federal and (as applicable) state and local tax matters of the Partnership.

Special Payments to the General Partner

5.01 Upon the sale of a Developed Lot by the Partnership, the General Partner shall be entitled to receive from the Partnership a fee of $4,000 per Developed Lot. Any amounts paid or accrued pursuant to this Section 5.01 shall be treated as guaranteed payments by the Partnership to the General Partner under Section 707(c) of the Code. For the purposes of this Agreement, "Developed Lot" shall mean a lot on a plat approved by the City of League City and recorded in the real property records of Galveston County, Texas.

5.02 Angel Brothers Properties LLC shall remit to the Partnership on a monthly basis a statement of its revenues and expenses incurred for sand sales and payment for the net proceeds thereof. The Partnership shall pay from the net proceeds an amount equal to ten percent (10%) of such net proceeds to the General Partner, and the remaining amounts shall be for the benefit of the Partnership. Any amounts paid or accrued to the General Partner pursuant to this Section 5.02 shall be treated as guaranteed payments by the Partnership to the General Partner under Section 707(c) of the Code.

Allocation of Profits and Losses

5.03 After giving effect to the Regulatory Allocations set forth in Section 2 of the Tax Matters Schedule, Profits and Losses for each Allocation Year shall be allocated among the Partners as follows:

(a) Profits shall be allocated:

(i) Restoration of any Section 5.03(b)(iii) Losses. First, to the Partners in proportion to and to the extent of the excess, if any, of (A) the aggregate amount of any Losses previously allocated to each Partner pursuant to Section 5.03(b)(iii) for all prior Allocation Years, over (B) the aggregate amount of any Profits previously allocated to each Partner pursuant to this Section 5.03(a)(i) for all prior Allocation Years;

(ii) Restoration of any Section 5.03(b)(ii) Losses. Second, to the Partners in proportion to and to the extent of the excess, if any, of (A) the aggregate amount of any Losses previously allocated to each Partner pursuant to Section 5.03(b)(ii) for all prior Allocation Years, over (B) the aggregate amount of any Profits previously allocated to each Partner pursuant to this Section 5.03(a)(ii) for all prior Allocation Years; and

(iii) Cumulative Profits. Finally, to the Partners in accordance with their respective Target Percentage Interests.

(b) Losses shall be allocated:

(i) Loss of Cumulative Profits. First, to the Partners in proportion to and to the extent of the excess, if any, of (A) the aggregate amount of any Profits previously allocated to each Partner pursuant to Section 5.03(a)(iii) for all prior Allocation Years, over (B) the aggregate amount of any Losses previously allocated to each Partner pursuant to this Section 5.03(b)(i) for all prior Allocation Years;

(ii) Loss of Capital Contributions. Second, to the Partners in proportion to and to the extent of the excess, if any, of

(A) the excess, if any, of (x) the sum of the aggregate capital contributions of each Partner and the aggregate amount of any Profits previously allocated to each Partner pursuant to Section 5.03(a)(ii) for all prior Allocation Years over (y) the aggregate amount of distributions to date to each Partner pursuant to Sections 5.04 and 12.03, over

(B) the aggregate amount of any Losses previously allocated to each Partner pursuant to this Section 5.03(b)(ii) for all prior Allocation Years; and

(iii) Excess Losses. Finally, to the Partners in accordance with their respective Target Percentage Interests.

(c) Notwithstanding any other provision of this Section 5.03 (but subject to the Regulatory Allocations set forth in Section 2 of the Tax Matters Schedule), in the Allocation Year in which the Partnership liquidates (within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g)), items of gross income, gain, loss and deduction shall be allocated to the Partners in the proportions necessary to cause the Capital Accounts of the Partners to equal (as nearly as possible) the respective amounts to be distributed to the Partners pursuant to Section 12.03.

Interim Cash Distributions

5.04 Except as provided in Section 12.03 and below in Section 5.04(c), the General Partner shall determine when, if ever, cash distributions shall be made to the Partners. Cash distributions from the Partnership may be declared by the General Partner pursuant to this Section 5.04 without regard to the profits or losses of the Partnership from operations; provided, that no cash distributions shall be made that will impair the ability of the Partnership to pay its legal and valid debts as they mature. There shall be no obligation to return to the Partners any part of their capital contributed to the Partnership, for so long as the Partnership continues in existence. No Partner shall be entitled to any priority or preference over any other Partner as to cash distributions except as provided for in this Section 5.04. Any cash distributions declared by the General Partner in accordance with this Section 5.04 shall be distributed in the following priority:

(a) First, to the Limited Partner with the greater Capital Account balance until such Limited Partner's Capital Account balance is equal to the other Limited Partner's Capital Account balance; and

(b) Thereafter, to the Partners in accordance with their respective Target Percentage Interests.

(c) Notwithstanding any other provision of this Section 5.04, within sixty (60) days after the close of each calendar year and if funds are available, the Partnership shall distribute to each Partner the amount necessary, if any, that when added to all other distributions to such Partner made during such sixty (60) day period pursuant to this Section 5.04 equals the estimated U.S. federal income tax liability (using the highest individual marginal tax rate) of such Partner arising from the allocation of income from the Partnership for such calendar year.

5.05 No interest shall be paid to any Partner on the initial contributions to the capital of the Partnership or on any subsequent contributions of capital.

## ARTICLE VI - OWNERSHIP OF PARTNERSHIP PROPERTY

6.01 All real property, including all improvements placed or located thereon, and all personal property acquired by the Partnership shall be owned by the Partnership, such ownership being subject to the other terms and provisions of this Agreement. Each Partner hereby expressly waives the right to require partition of any Partnership property or any part thereof.

## ARTICLE VII - FISCAL MATTERS

### Partnership Accounting Year

7.01 The Partnership's books and records and all required income tax returns shall be made on a calendar year basis; provided, however, that Profits and Losses shall be allocated among the Partners pursuant to Section 5.03 and the Tax Matters Schedule at least once per calendar quarter. The General Partner shall, if possible, use the cash method of accounting in keeping the Partnership records.

### Books and Records

7.02 The General Partner shall keep at the principal place of business and make available to all Partners at any time during normal business hours, just and true books of account and all other Partnership records, including the records set forth in Section 153.551 of the TBOC. The copying by a Partner, or his designated agent, of any part or all of such records, at the personal expense of that Partner, is specifically authorized. Within not more than ninety (90) days after the close of each calendar year of the Partnership, the General Partner shall furnish to all Partners a year-end balance sheet for the Partnership and a full and detailed financial report on the business operations for and during the entire preceding year. The General Partner shall timely furnish to all Partners their federal and state income and franchise tax forms, including statements of the net distributable income or loss to each Partner from the operation of the Partnership. All of the above duties and services to be performed by the General Partner shall be deemed an expense of the Partnership, and the General Partner shall be compensated for such services as provided in Article XIV.

### Partnership Bank Accounts

7.03 The General Partner shall receive all monies of the Partnership (*i.e.*, all cash capital contributions, revenues and other Partnership funds) and shall deposit the same in one or more Partnership banking accounts. All expenditures by the General Partner shall be made by checks drawn

against the Partnership banking account.

ARTICLE VIII - MANAGEMENT OF PARTNERSHIP AFFAIRS

Control and Management

8.01 Subject to any limitations expressly set forth in this Agreement, the General Partner shall have sole and exclusive control of the Partnership. Subject to any limitations expressly set forth in this Agreement, the General Partner shall have the power and authority to take such action from time to time as the General Partner may deem to be necessary, appropriate, or convenient in connection with the management and conduct of the business and affairs of the Partnership, including without limitation the power to:

(1) Acquire or dispose of the Property for cash, securities, other property, or any combination of them, on such terms and conditions as the General Partner may, from time to time, determine (including, in instances where the Property is encumbered, on either an assumption or a "subject to" basis);

(2) Finance the Partnership's activities either with the seller of the Property or by borrowing money from third parties, all on such terms and conditions as the General Partner deems appropriate. In instances where money is borrowed for Partnership purposes, the General Partner shall be, and hereby is, authorized to pledge, mortgage, encumber, and grant security interests in Partnership properties for the repayment of such loans;

(3) Acquire, own, hold, develop, manage, and lease the Property;

(4) Employ, retain, or otherwise secure or enter into contracts with personnel or firms to assist in the acquisition, development, improvement, management, and general operation of the Partnership properties, including, but not limited to, real estate brokers or agents, supervisory, development and/or building management agents, attorneys, accountants, and engineers, all on such terms and for such consideration as the General Partner deems appropriate and advisable; and

(5) Take any and all other action which is permitted under the TBOC by Texas limited partnerships and which is customary or reasonably related to the acquisition, ownership, development, improvement, management, leasing, and disposition of real, personal, or mixed property.

Required Approvals of the Limited Partners

8.02 (a) From time to time, but no less frequently than monthly, the General Partner shall provide the Limited Partners with an oral overview of the Partnership's business. To the extent that the General Partner prepares any written plan or other document relating to the Partnership's business to file with or provide to a governmental authority or a financing source (including a potential financing source), the General Partner shall concurrently provide a copy of such plan or other document to the Limited Partners.

(b) Each of the events, actions or matters, as the case may be, listed below must be approved by a majority of the Limited Partners before the Partnership engages in any such event, action or matter:

(1) Conducts or otherwise transacts business in a state other than Texas;

(2) Any contract (or series of related contracts) and any modifications thereto between the Partnership and (A) any Partner , (B) an Affiliate of any Partner or (C) an officer, director or employee of any Partner or an Affiliate of a Partner;

(3) Any merger, consolidation, conversion or share exchange involving the Partnership or the sale of substantially all of the assets of the Partnership;

(4) Taking any action provided in Section 153.158 of the TBOC upon the voluntary withdrawal of the General Partner;

(5) Termination of the Partnership pursuant to Section 12.02;

(6) Appointment or designation of a Trustee in Liquidation in accordance with Section 12.03; and

(7) Direct the General Partner to sell property in accordance with Section 15.01.

As used in this Agreement, a majority of the Limited Partners means Limited Partners having in the aggregate a majority of the Target Percentage Interest of the Limited Partners in the Partnership as of the time of such (i) approval, (ii) withdrawal, (iii) notice of termination is executed or (iv) other event, as the case may be.

As used in this Agreement, “Affiliate” has the meaning ascribed to such term in Rule 405 promulgated under the Securities Act of 1933, as amended (the “Act”).

Responsibility of the General Partner

8.03 The General Partner shall exercise ordinary business judgment in managing the affairs of the Partnership. Unless fraud, deceit, bad faith, willful misconduct, gross negligence or a wrongful taking by the General Partner or a material breach of this Agreement by the General Partner shall be involved, the General Partner shall not be liable or obligated to the Limited Partners for any mistake of fact or judgment made by the General Partner in operating the business of the Partnership resulting in any loss to the Partnership or its Partners. The General Partner does not, in any way, guarantee the return of the Limited Partners' capital or a profit from the operations of the Partnership. Neither shall the General Partner be responsible to any Limited Partner because of a loss of its investment or a loss in operations, unless it shall have been occasioned by fraud, deceit, bad faith, willful misconduct, gross negligence or a wrongful taking by the General Partner or a material breach of this Agreement by the General Partner. The General Partner shall devote such attention and business capacity to the affairs of the Partnership as may be reasonably appropriate or necessary. In this connection, the parties hereby acknowledge that the General Partner may be the manager or general partner of other partnerships and may continue to manage other partnerships, and may continue to engage in other distinct or related business.

Nominees

8.04 The Partners recognize that sometimes there are practical difficulties in doing business as a limited partnership occasioned by outsiders seeking to satisfy themselves regarding the capacity of the General Partner to act for and on behalf of the Partnership, or for other reasons. Therefore, the Limited Partners hereby specifically authorize the General Partner to acquire all real and personal property, arrange all financing, enter contracts, and complete all other arrangements needed to effect the purposes of the Partnership, either in the General Partner's own name or in the name of a nominee, without having to disclose the existence of the Partnership. If the General Partner decides to transact the Partnership's business in its own name or in the name of a nominee, the General Partner shall promptly (i) notify the Limited Partners in writing and (ii) place a written declaration of trust in the Partnership books and records that acknowledges the capacity in which the General Partner or the nominee, as the case may be, acts and the name of the Partnership as true or equitable owner.

Removal of General Partner

8.05 The General Partner may be removed by the affirmative vote of each Limited Partner. The written notice of a General Partner's removal shall be served on the General Partner by certified mail. The notice shall set forth the day on which the removal is to be effective, which date shall not be less than thirty (30) days after the service of the notice on the General Partner. On the removal of the General Partner, the Limited Partners shall elect a new General Partner at a special meeting called for that purpose. The removal of a General Partner shall cause the General Partner's interest in the Partnership to be converted to a Limited Partner interest but shall not alter or change the rights or responsibilities pursuant to Sections 11.02 and 11.03 of this Agreement and, further, shall not change the General Partner's rights as set forth in Article V.

Restrictions on Limited Partners

8.06 Except for the rights expressly set forth in this Agreement or the TBOC, the Limited Partners shall not have either the obligation or the right to take part, directly or indirectly, in the active management of the business. No Limited Partner is authorized to do or perform any act or deed in the name of, for, or on behalf of either the General Partner or the Partnership. No Limited Partner is authorized to, nor shall be permitted to, do any act or deed that will cause the Limited Partner to be classified as a General Partner of the Partnership.

## ARTICLE IX - LIABILITIES

Liability of Partners

9.01 The liability of the General Partner arising from carrying on the business affairs or operations of the Partnership or for the debts of the Partnership is unrestricted. The liability of the Limited Partners with regard to the Partnership in all respects is restricted and limited to the amount of the actual capital contributions that each Limited Partner makes.

Loans to the Partnership

9.02 Nothing in this Agreement shall prevent or act against a loan of funds from the General Partner or a Limited Partner to the Partnership on a promissory note or similar evidence of indebtedness, for a reasonable rate of interest. Any Partner lending money to the Partnership shall have the same rights regarding the loan as would any person or entity making the loan who was not a Partner of the Partnership.

ARTICLE X - PROHIBITED TRANSACTIONS

10.01 During the existence of the Partnership, neither the General Partner nor the Limited Partners shall do any of the following:

(1) Use the name of the Partnership, or any substantially similar name, or any trademark or trade name adopted by the Partnership, except in the ordinary course of the Partnership business;

(2) Disclose to any non-Partner any of the Partnership business practices, trade secrets, or any other information not generally known to the business community;

(3) Do any other act or deed with the intention of harming the business operations of the Partnership;

(4) Do any act contrary to this Agreement, except with the prior express approval of all Partners;

(5) Do any act which would make it impossible to carry on the intended or ordinary business of the Partnership;

(6) Confess a judgment against the Partnership;

(7) Abandon or wrongfully transfer or dispose of Partnership property, real or personal; or

(8) Admit another person or entity as a General or Limited Partner, except as specifically provided in Article XI.

Further, the General Partner shall not use, directly or indirectly, the assets of the Partnership for any purpose other than for carrying on the business of the Partnership, for the full and exclusive benefit of all its Partners.

ARTICLE XI - RESTRICTIONS ON TRANSFERS

Prohibition Against Transfer

11.01 Except as set forth below, no Limited Partner shall sell, assign, transfer, encumber, or otherwise dispose of any interest in the Partnership without the written consent of the General Partner.

Permitted Sales

11.02

(1) In the event a Limited Partner receives a bona fide offer for the purchase of all or a part of its interest in the Partnership, the Limited Partner shall either refuse the offer or give the General Partner written notice setting out full details of the offer, which notice shall, among other things, specify the name of the offeror, the percentage of interest in the Partnership covered by the offer, terms of payment, including whether the offer is for cash or credit, and, if on credit, the time and interest rate, as well as any and all other consideration to be received or paid in connection with the proposed transaction, as well as any and all other terms, conditions, and details of the offer.

(2) Upon receipt of the notice with respect to the offer, the other Limited Partner shall have the exclusive right and option, exercisable at any time during the period of sixty (60) days from the date of the notice, to purchase the interest in the Partnership covered by the offer at the same price and on the same terms and conditions of the offer as set out in the notice. The General Partner shall notify in writing the other Partners regarding the terms of the offer. Should any individual Limited Partner or group of Limited Partners decide to exercise the option of purchase, notification of this decision shall be given in writing to the General Partner to be transmitted in writing to the selling Limited Partner within the time period provided above for notification of a Limited Partner's exercise of the option, and the sale and purchase shall be closed within thirty (30) days thereafter. If none of the Limited Partners elects to exercise this option, the selling Limited Partner shall be so notified in writing by the General Partner and shall be free to sell the interest in the Partnership covered by the offer. The sale, if permitted, shall be made strictly upon the terms and conditions and to the person described in the required notice.

(3) Any Assignment made to anyone not already a Partner shall be effective only to give the assignee the right to receive the share of profits to which the assignor would otherwise be entitled, shall not relieve the assignor from liability for contributions of capital, shall not relieve the assignor from liability under the provisions of this Agreement, and shall not cause the assignee to become a substituted Limited Partner nor give the assignee the right to become a substituted Limited Partner. Neither the General Partner nor the Partnership shall be required to state the tax consequences to a Limited Partner or to a Limited Partner's assignee arising from the assignment of a Limited Partner interest in the Partnership. The Partnership shall continue with the same basis and capital amount for the assignee as was attributable to the former owner who assigned the Limited Partner interest in the Partnership. The Partnership interest of the General Partner cannot be voluntarily assigned or transferred except when such an assignment or transfer occurs by operation of law.

(4) Notwithstanding the foregoing, a Limited Partner may sell or otherwise transfer all or any portion of a Partnership Interest to the spouse or any direct ascendants or descendants of

the Limited Partner or to a trust, corporation, partnership, or other entity in which all of the beneficial interest is held by or for the Limited Partner, spouse, ascendants, or descendants, provided the transfer would not result in a termination of the Partnership.

Death of Limited Partner

11.03 On the death of a Limited Partner, his or her successor in interest shall succeed to the decedent's Partnership Interest, and shall be liable for the obligations of the decedent, but shall not become a substituted limited partner until compliance with the terms and provisions of Section 11.04 for admitting substitute limited partners.

11.04 The person acquiring a Limited Partner interest pursuant to any of the provisions of Section 11.03 may become a substitute Limited Partner with the consent of the General Partner and shall bear all costs and expenses necessary to effect a transfer of that Partnership Interest including, without limitation, reasonable attorney's fees incurred in preparing amendments to this Agreement and the Certificate of Formation of the Partnership to reflect the transfer or acquisition and the cost of filing the amendments with the appropriate governmental officials.

ARTICLE XII - TERMINATION OF THE PARTNERSHIP

Termination Upon Withdrawal, Bankruptcy, Death or Incapacity of the General Partner

12.01 The General Partner, effective as of the last day of any calendar year of the Partnership, may voluntarily withdraw from the Partnership as General Partner, provided, however that the General Partner has provided the Limited Partners with written notice of such withdrawal no later than September 30 of such calendar year. In connection with any such withdrawal, a majority of the Limited Partners may take the actions provided for in Section 153.158 of the TBOC. The bankruptcy, death, incapacity, or resignation of the General Partner shall result in the termination of the Partnership as of the close of business on the last day of the calendar year in which the event occurs.

Voluntary Termination: Effect of Death or Incapacity of Limited Partner

12.02 The Partnership may be terminated on any date specified in a notice of termination signed by the General Partner and a majority of the Limited Partners. The death or incapacity of a Limited Partner shall have no effect on the life of the Partnership, which shall continue.

Effect of a Termination of the Partnership

12.03 On the termination of the Partnership, regardless of how it is terminated, the affairs of the Partnership shall be wound up by the General Partner. If for any reason there is no General Partner, or if the General Partner refuses to serve or is incapable of serving, a majority of the Limited Partners may appoint or designate a Trustee in Liquidation who shall serve to wind up the affairs of the Partnership. The Trustee in Liquidation need not be a commercial corporate trustee, need not be bonded, and may be a Limited Partner. Whoever serves to wind up the affairs of the Partnership, the following procedure shall be followed:

On termination, the assets of the Partnership shall be applied to payment of the outstanding Partnership liabilities, although an appropriate reserve may be maintained and the amount determined by the General Partner or Trustee in Liquidation for any contingent liability, until that contingent liability is satisfied. The balance of the reserve, if any, shall be distributed together with any other sum remaining after payment of the outstanding Partnership liabilities to the Partners as follows:

(a) Recovery of Unreturned Capital Contributions. First, to the Partners in proportion to and to the extent of the excess, if any, of (i) the sum of the aggregate capital contributions of each Partner over (ii) the aggregate amount of previous distributions to each Partner pursuant to Section 5.04 and this Section 12.03; and

(b) Excess. Thereafter, to the Partners in accordance with their respective Target Percentage Interests.

Nothing contained in this Agreement shall defeat the right of any Partner to require and to obtain a court-supervised winding up, liquidation, and dissolution of the Partnership. No Partner shall be entitled to demand a distribution be made in Partnership property, but the General Partner may make or direct property distributions to be made, using the property's fair market value as of the time of distribution as the basis for making the distribution.

## ARTICLE XIII - REPRESENTATIONS AND WARRANTIES OF LIMITED PARTNERS

13.01 Each Limited Partner warrants and represents the following:

(1) That such Limited Partner recognizes that Section 4(2) of the Act exempts the issue and sale of securities from registration under the Act in transactions not involving any public offering, and that such Limited Partner is purchasing the Partnership interest for its own account, for investment, and with no present intention of distributing, reselling, pledging, or otherwise disposing of the interest.

(2) That such Limited Partner is a citizen of the United States of America and is the beneficial owner of the interest standing in its name, and that such Limited Partner has no intention of reselling the interest to any persons other than residents of the United States of America.

(3) That such Limited Partner is a sophisticated investor and the nature and amount of the capital contributions its agrees to make hereunder is consistent with its investment program, and that it has sufficient liquid assets to meet promptly all calls for additional contributions and to absorb the loss of the entire investment in the Partnership.

(4) That such Limited Partner has been furnished with sufficient written and oral information about the Partnership, the General Partner, and the Property to allow such Limited Partner to make an informed investment decision prior to purchasing an interest in the Partnership, and has been furnished access to any additional information that such Limited Partner may require.

(5) That such Limited Partner is fully familiar with the business proposed to be conducted by the Partnership and with the Partnership's use and proposed use of the proceeds of the sale of the Partnership interests.

(6) That the offer and sale of such Limited Partner interest in the Partnership have been made in the course of a negotiated transaction involving direct communication between the Limited Partner and the General Partner on behalf of the Partnership.

(7) That such Limited Partner has either (a) had experience in business enterprises or investments entailing risk of a type or to a degree substantially similar to those entailed in an investment in the Partnership; or (b) obtained independent financial advice with respect to the investment in the Partnership.

(8) That such Limited Partner has been advised that the Partnership interest may not be sold, transferred, or otherwise disposed of in the absence of either an effective registration statement covering the interest under the Act, or an opinion of counsel reasonably satisfactory to the Partnership and its counsel that registration is not required under the Act, and that such Limited Partner will have no rights to require registration of the interest under the Act, and, in view of the nature of the transaction, registration is neither contemplated nor likely.

(9) That such Limited Partner agrees to hold the General Partner and the Limited Partners or any person controlling the Partnership and their respective successors, assigns, or other controlling persons harmless and to indemnify them against all liabilities, costs, and expenses incurred by them as a result of any sale or distribution by him or her in violation of the Act. All representations, warranties, and indemnities made by such Limited Partner with reference to the Act shall be deemed to be equally applicable in connection with the applicable securities law of the State of Texas or any other state of the United States of America.

## ARTICLE XIV - COMPENSATION OF GENERAL PARTNER

14.01 The General Partner, or its assignees, shall be entitled in consideration of the General Partner's expenses and services in the location, purchase, and ultimate sale of the Partnership's property, to be paid an amount per month equal to the actual expenses incurred by the General Partner in furtherance of the Partnership's business. The General Partner shall timely provide the Limited Partners (but in no event later than the last day of such month) with a report setting forth the actual expenses incurred by the General Partner in furtherance of the Partnership's business during the prior month and the amount of compensation paid to the General Partner (or its assignees) with respect to such expenses.

## ARTICLE XV - LIMITED PARTNERS' RIGHT TO SELL PARTNERSHIP PROPERTY

15.01 The General Partner may be directed to sell property as described in Article I, Section 1.03 on written instructions executed by a majority of the Limited Partners.

## ARTICLE XVI - MISCELLANEOUS PROVISIONS

Amendment

16.01 This Agreement may be amended or modified by the Partners from time to time only by a written instrument executed by all of the Partners.

Notices

16.02 Except, as may otherwise be specifically provided in this Agreement, all notices required or permitted under this Agreement shall be in writing and shall be deemed to be delivered when deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested, addressed to the parties at the respective addresses set forth in Exhibit "A" or at such other addresses as may have been specified by written notice delivered in accordance with this Section.

Law and Venue

16.03 This Agreement shall be construed under and in accordance with the laws of the State of Texas. All obligations of the parties created hereunder are performable in Galveston County, Texas, and the undersigned parties consent to venue for resolution of any dispute between the parties hereunder in Galveston County or Harris County, Texas.

Other Instruments

16.04 The parties covenant and agree that they will execute such other and further instruments and documents as are or may become necessary or convenient to effect and carry out the Partnership created by this Agreement.

16.05 Time is of the essence with respect to all terms and provisions of this Agreement. This Agreement sets forth all of the terms and provisions of the agreement between the undersigned parties concerning the subject matter hereof. There are no other agreements or understandings, oral or written, between the undersigned parties concerning the subject matter hereof. This Agreement shall be construed as a whole. In the event any term or provision hereof is deemed unenforceable or contrary to law, such term or provision shall be disregarded and all other terms and provisions hereof shall be enforced as written.

IN WITNESS WHEREOF, the parties have hereunto set their hands and signatures effective as of the date aforesaid.

GENERAL PARTNER

**LINGO WEST FM 517 GP, LLC,**
**a Texas limited liability company**

By: ________________
Name: Tracy P. Groza
Title: President

LIMITED PARTNERS

**CERVELLE CUSTOM HOMES LTD.,**
**a Texas limited partnership,**

**By: CERVELLE HOMES, INC.,**
**a Texas corporation,**

By: ________________
Name: Jeffrey P. Payson
Title: Presiden
Cervelle Home INC
General Partner

**ANGEL BROTHERS PROPERTIES LLC,**
**a Texas limited liability company,**

By: ________________
Name: Greg Angel
Title: President

**Exhibit "A"**

| Partners: | Capital Account Balance* | Target Percentage Interest |
|---|---|---|
| **General Partner:** | | |
| LinGo West FM 517 GP, LLC<br>211 E. Parkwood, Suite 100<br>Friendswood, Texas 77546 | $ 1,000.00 | 1.0% |
| **Limited Partner:** | | |
| Cervelle Custom Homes, Ltd.<br>207 E. Edgewood<br>Friendswood, Texas 77546 | $6,993,954.59 | 49.5% |
| Angel Brothers Properties LLC<br>P.O. Box 570<br>Baytown, Texas 77522-0570 | $0.00 | 49.5% |

* As of the Effective Date

**Exhibit "B"**

**Property Description**

## TAX MATTERS SCHEDULE

Notwithstanding any provision of this Agreement to the contrary, this Tax Matters Schedule shall govern with respect to all federal and (as applicable) state and local tax matters of the Partnership.

1. **Definitions**. Capitalized terms not defined in this Tax Matters Schedule shall have the meanings set forth in this Agreement. For purposes of this Tax Matters Schedule, the following terms have the following meanings.

"***Adjusted Capital Account Deficit***" shall mean, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments: (i) credit to such Capital Account the Partner's share of Minimum Gain; (ii) credit to such Capital Account the Partner's share of Partner Minimum Gain; and (iii) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6). This definition of Adjusted Capital Account Deficit is intended to comply with, and shall be interpreted consistently with, Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

"***Allocation Year***" means, unless otherwise required by this Agreement, the Code or the Treasury Regulations, (a) the period commencing on the effective date of this Agreement and ending on December 31, 2017, (b) any subsequent twelve (12) month period ending on December 31 or (c) any portion of a period described in clauses (a) or (b) for which the Partnership is required to allocate Profits, Losses, or other items of income, gain, loss, deduction or credit.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended.

"***Depreciation***" shall mean, for each Allocation Year, an amount equal to the depreciation, amortization, depletion, or other cost recovery deduction allowable with respect to an asset, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of the period, Depreciation shall be an amount that bears the same ratio to the beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for the period bears to the beginning adjusted tax basis; provided that if the federal income tax depreciation, amortization, depletion, or other cost recovery deduction for the period is zero, Depreciation shall be determined with reference to the beginning Gross Asset Value using any reasonable method selected by the Partners.

"***Gross Asset Value***" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except that:

(a) the initial Gross Asset Value of any asset contributed to the Partnership by a Partner shall be the gross fair market value of the asset, as determined by the contributing Partner and the Partnership;

(b) the Gross Asset Value of all of the Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the Partners, at the following times: (i) the acquisition of an additional Partnership interest by any new or existing Partner in exchange for more than a *de minimis* capital contribution, (ii) the distribution by the Partnership to a Partner of more than a *de minimis* amount of Partnership assets as consideration for a Partnership interest, (iii) the liquidation of the Partnership within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), and (iv) the grant of

an interest in the Partnership (other than a *de minimis* interest) in consideration for the provision of services to or for the benefit of the Partnership or any other event to the extent determined by the Partners to be necessary to properly reflect the Gross Asset Values in accordance with the standards set forth in Treasury Regulations Section 1.704-1(b)(2)(iv)(q); provided that any adjustments pursuant to clause (i) or (ii) above shall be made only if the Partners reasonably determine that the adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(c) the Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of the asset on the date of distribution, as determined by Partners; and

(d) the Gross Asset Value of all of the Partnership assets shall be increased or decreased to reflect any adjustments to the adjusted basis of the assets pursuant to Section 734(b) or Section 743(b) of the Code but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided that Gross Asset Value shall not be adjusted pursuant to this subparagraph (d) to the extent that the Partners determine that the adjustment pursuant to subparagraph (b) is necessary or appropriate in connection with a transaction that otherwise would result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (a) or (b) above, the Gross Asset Value thereafter shall be adjusted by Depreciation taken into account with respect to the asset for purposes of computing Profits and Losses.

"***Minimum Gain***" shall mean the aggregate gain, if any, that would be realized by the Partnership for purposes of computing income or loss with respect to each Partnership asset if each Partnership asset were disposed of by the Partnership in a taxable transaction in full satisfaction of all nonrecourse liabilities of the Partnership secured by such asset. Minimum Gain with respect to each Partnership asset shall be further determined in accordance with the rules of Treasury Regulations Section 1.704-2(d) and any subsequent rule or regulation governing the determination of minimum gain. A Partner's share of Minimum Gain at the end of any Allocation Year shall equal the aggregate Nonrecourse Deductions allocated to such Partner (or its predecessors in interest) up to that time, less such Partner's (and its predecessors') aggregate share of decreases in Minimum Gain determined in accordance with Treasury Regulations Section 1.704-2(g).

"***Nonrecourse Deductions***" shall have the meaning given to that term in Treasury Regulations Section 1.704-2(b)(1) and shall be determined in accordance with the principles of Treasury Regulations Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for an Allocation Year is determined in accordance with Treasury Regulations Section 1.704-2(c) and generally equals the net increase, if any, in the amount of Partnership Minimum Gain during that Allocation Year, determined pursuant to Treasury Regulations Section 1.704-2(d).

"***Partner Minimum Gain***" shall mean the aggregate of the partner nonrecourse debt minimum gain amounts of the Partnership computed in accordance with Treasury Regulations Section 1.704-2(i)(3).

"***Partnership Minimum Gain***" shall mean the aggregate of the minimum gain amounts of the Partnership computed in accordance with Treasury Regulations Section 1.704-2(d).

"***Partner Nonrecourse Deductions***" shall mean an amount determined in accordance with the principles of Treasury Regulations Section 1.704-2(i)(1). The amount of Partner Nonrecourse Deductions for any Allocation Year is determined in accordance with Treasury Regulations Section 1.704-2(i)(2) and generally equals the net increase, if any, in the amount of Partner Minimum Gain during that Allocation

Year, determined pursuant to Treasury Regulations Section 1.704-2(i)(3).

"***Profits***" and "***Losses***" shall mean, for each Allocation Year, an amount equal to the Partnership's taxable income or loss for the period determined in accordance with Section 703(a) of the Code, including items required to be separately stated pursuant to Section 703(a)(1) of the Code, subject to the following adjustments:

(a) any income or deductions for tax purposes attributable to an election under Section 754 of the Code shall be disregarded;

(b) there shall be added to taxable income the amount of any income that is permanently excluded from gross income by the Code, but that is not a capital contribution, loan proceed, recovery of capital, or part of a nonrecognition exchange;

(c) there shall be subtracted from taxable income or loss any cost that is not currently deductible or capitalized for tax purposes under Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i));

(d) in lieu of the depreciation, amortization, depletion, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for the period;

(e) gain or loss resulting from any disposition of any Partnership asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of the asset differs from its Gross Asset Value;

(f) in the event the Gross Asset Value of any Partnership asset is adjusted pursuant to the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain (if the adjustment increases the Gross Asset Value of the Partnership asset) or loss (if the adjustment decreases the Gross Asset Value of the Partnership asset) from the disposition of the asset for the purpose of computing Profits and Losses;

(g) to the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Partner's interest in the Partnership, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(h) there shall not be taken into account any items that are specially allocated pursuant to Section 2 of this Tax Matters Schedule.

"***Regulatory Allocations***" shall have the meaning given to that term in Section 2 of this Tax Matters Schedule.

"***Treasury Regulations***" shall mean the regulations promulgated by the United States Department of the Treasury under the Code.

**2. Regulatory Allocations**. Notwithstanding the allocations set forth in Section 5.03, the following special allocations ("***Regulatory Allocations***") shall be made:

(a) Losses allocated to a Partner pursuant to Section 5.03 shall not exceed the maximum amount of Losses that can be so allocated without causing the Partner to have an Adjusted Capital Account Deficit at the end of the Allocation Year. All Losses in excess of the limitation set forth in this subparagraph (a) shall be allocated to the Partners who do not have Adjusted Capital Account Deficits in proportion to their Capital Account balances but only to the extent that the Losses do not cause any Partner to have an Adjusted Capital Account Deficit.

(b) In the event a Partner receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Partnership income and gain shall be specially allocated to such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible unless such deficit is otherwise eliminated pursuant to Section 2(d) or Section 2(e). This Section 2(b) is intended to constitute a qualified income offset described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(c) In the event a Partner has an Adjusted Capital Account Deficit at the end of any Allocation Year, such Partner shall be specially allocated items of Partnership gross income and gain in the amount and manner sufficient to eliminate, to the extent required by Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; provided, however, that an allocation pursuant to this Section 2(c) shall be made only if and to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided in this Section 2 (other than Section 2(b)) have been tentatively made as if Section 2(b) and this Section 2(c) were not in this Agreement.

(d) Notwithstanding any other provision of this Agreement, but subject to the exceptions set forth in Treasury Regulations Sections 1.704-2(f)(2), (3), (4), or (5), if there is a net decrease in Partnership Minimum Gain during any Allocation Year, items of income and gain for the Allocation Year and, if necessary, subsequent years first shall be allocated to each Partner in proportion to, and to the extent of, an amount equal to the Partner's share of the net decrease in Minimum Gain, as determined in accordance with Treasury Regulations Section 1.704-2(g)(2). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6), 1.704-2(g)(2) and 1.704-2(j)(2)(i), or any successor provisions. This Section 2(d) is intended to comply with, and shall be interpreted consistently with, the minimum gain chargeback provisions of the above-referenced sections of the Treasury Regulations.

(e) Notwithstanding any other provision of this Agreement (other than Section 2(d)), but subject to the exceptions referenced in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Partner Minimum Gain during any Allocation Year, items of income and gain for the year and, if necessary, subsequent years first shall be allocated to each Partner with a share of that Partner Minimum Gain in proportion to, and to the extent of, an amount equal to the Partner's share of the net decrease in Partner Minimum Gain, as determined in accordance with Treasury Regulations Section 1.704-2(i)(4). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(4), or any successor provision. This Section 2(e) is intended to comply with, and shall be interpreted consistently with, the partner nonrecourse debt minimum gain chargeback provisions of the above-referenced Treasury Regulations.

(f) Nonrecourse Deductions for any Allocation Year shall be allocated among the Partners in the same manner as are the other Profits and Losses of the Partnership for the year. However, the Partners are authorized to revise this method of allocation if they determine that Nonrecourse Deductions must be allocated in different ratios in order to be allocated in a manner that is reasonably consistent with some other significant allocation attributable to the property securing the nonrecourse debt, as required by the Treasury Regulations under Section 704(b) of the Code. Partner Nonrecourse Deductions for any Allocation Year should be allocated among the Partners in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g) The Regulatory Allocations in this Section 2 are intended to comply with certain provisions of Treasury Regulations Sections 1.704-1 and 1.704-2. Notwithstanding any other provisions of this Agreement (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Profits and Losses and other items of income and deduction among the Partners so that, to the extent possible, the net amount of the allocations of Profits and Losses and other items of income and deductions and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to the Partner if the Regulatory Allocations had not occurred.

**3. Income Tax Allocations.**

(a) Except as otherwise provided in this Section 3, each item of income, gain, loss and deduction of the Partnership for federal income tax purposes shall be allocated among the Partners in the same manner and proportions as such items are allocated under Section 5.03 and Section 2 of this Tax Matters Schedule.

(b) Items of income, gain, loss, and deduction with respect to property that has a Gross Asset Value different than its adjusted tax basis shall be allocated, for tax purposes only, among the Partners using any permitted method selected by the Partners under Section 704(c) of the Code and the related Treasury Regulations so as to take into account any variation between the basis of the property to the Partnership and its Gross Asset Value at the time of contribution. If the Gross Asset Value of any Partnership property is adjusted in accordance with clause (c) or (d) of the definition of Gross Asset Value, then subsequent allocations of income, gain, loss and deduction shall take into account any variation between the adjusted basis of such property for federal income tax purposes and its Gross Asset Value as provided in Code Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to such allocations shall be made by the Partners in any manner that reasonably reflects the purposes and intention of this Agreement.

(c) If any deductions for depreciation or cost recovery are recaptured as ordinary income upon the disposition of any Partnership assets, the ordinary income amount of the gain from such transfer shall be allocated among the Partners in the same ratio as the deductions giving rise to such ordinary income were allocated.

**4. Assignments and Issuance of Additional Interests.** The Partnership shall allocate taxable items attributable to an interest that is assigned or newly issued during an Allocation Year between the assignor and the assignee of such interest or the existing Partners and the new Partners by closing the books of the Partnership as of the end of the day prior to the day in which such interest is assigned or issued.

**5. Miscellaneous Tax Matters.**

(a) In the event state, local or foreign income taxes become applicable, any

references to federal income taxes or to "income taxes" contained herein shall refer to federal, state, local and foreign income taxes. References to the Code or Treasury Regulations promulgated thereunder shall be deemed to refer to corresponding provisions that may become applicable under state, local or foreign income tax statutes and regulations.

(b) For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Partners using any method that is permissible under Section 706 of the Code and the Treasury Regulations thereunder.

(c) The General Partner is designated as the tax matters partner ("TMP") of the Partnership as described in Code Section 6231(a)(7). The designation of TMP shall be effective only for operations conducted by the Partners pursuant to this Agreement. For taxable years beginning after December 31, 2017, the TMP shall additionally be designated the "partnership representative" within the meaning of Code Section 6223(a) but shall still be referred to as the TMP under this Agreement. The Partners agree to negotiate in good faith when and as necessary to determine the method of paying any imputed underpayment resulting from any Partnership adjustment pursuant to Code Section 6221, and if no agreement can be reached, the Partnership shall pay any imputed underpayment with respect to such adjustment in the adjustment year as provided by Code Section 6225(a).

(d) The TMP shall not, without the prior written consent of the Limited Partners (which consent shall not be unreasonably withheld), (i) file a "petition for readjustment of the partnership items" within the meaning of Section 6226 of the Code, (ii) agree to extend the period for assessing any tax imposed by subtitle A of the Code with respect to any partnership item (or affected item), or (iii) settle or compromise any tax audit or controversy on behalf of the Partnership. The TMP shall promptly notify the Limited Partners of any new tax audit or controversy involving the Partnership and shall keep the Limited Partners reasonably apprised of any material action required to be taken or which may be taken by the TMP with respect to such tax audit or controversy.

EXHIBIT F

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD. *Plaintiff*, | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| v. | § | 405TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| CITY OF LEAGUE CITY, | § | |
| *Defendant*. | § | GALVESTON COUNTY, TEXAS |

**UNSWORN DECLARATION UNDER TEXAS CIVIL PRACTICES & REMEDIES CODE 132.001[1] OF TRACY GOZA**

STATE OF TEXAS §
COUNTY OF BRAZORIA §

Tracy Goza submits this unsworn declaration in support of Plaintiff West FM 517's Response to Defendant City of League City's Plea to the Jurisdiction in the above-referenced matter:

1. "My name is Tracy Goza. I am over twenty-one years of age, of sound mind, and capable of making this unsworn declaration. I hereby swear and affirm the facts stated in this declaration are within my personal knowledge and are true and correct.

2. I am the owner of LinGo West FM 517 GP, Inc., ("Lingo West") General Partner of West FM 517, Ltd. West FM 517, Ltd. ("West FM") is the Plaintiff in the above-captioned lawsuit. West FM is a Texas limited partnership and a developer of residential lots within the City of League City (the "City"). West FM prepares undeveloped land within the City for sale to home builders. West FM has been in the development business since 2015.

3. I have worked as a developer within the City for over fifteen years. As a developer, I am familiar with the entire process of new development, from land development, home building, and home buying. As a developer, I am also familiar with capital improvement fees, also commonly referred to as impact fees.

4. Impact fees are assessed by municipalities against new development to assist in the development of infrastructure necessary for development. From my

[1] Tex. Civ. Prac. & Rem. Code § 132.001(a) ("Except as provided by Subsection (b), an unsworn declaration may be used in lieu of a written sworn declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order, or requirement adopted as provided by law.").

experience as a developer, I understand that impact fees affect the entirety of new development. Impact fees are paid by the home builder, yet costs are borne by all parties. In my experience, impact fees affect each layer of development – from developer to home builder to home buyer. Impact fees can make land harder to sell from developer to home builder and from home builder to home buyer. Each layer of development pays increased prices. Simply put, all parties share the cost.

5. West FM filed the above-captioned lawsuit in response to the City's June 2023 ordinance adopting a roughly 90-93% increase in impact fees. The development community and other stakeholders attempted to persuade the City to reconsider the proposed ordinance increasing impact fees, to no avail. Subsequently, the City's increased impact fees went into effect in December 2023.

6. Since the City's impact fees went into effect in December 2023, I have noticed a slowdown in the takedown of lots at West FM's development within the City, The Commons at Sedona. Home sales have slowed. As an experienced developer, I attribute the slowdown at The Commons at Sedona to the City's increased impact fees which are burdening this new development. West FM has been affected by the City's increased impact fees and will continue to be affected."

TRACY GOZA

Executed in Brazoria County, State of Texas, on the 15th day of May 2024.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sarah Taylor on behalf of Justin Spears
Bar No. 24117086
staylor@rmwbh.com
Envelope ID: 87794886
Filing Code Description: Response
Filing Description: Plaintiff West FM 517's Response to Defendant City of League City's Partial Plea to the Jurisdiction
Status as of 5/16/2024 9:28 AM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 5/15/2024 6:36:46 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 5/15/2024 6:36:46 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 5/15/2024 6:36:46 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 5/15/2024 6:36:46 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 5/15/2024 6:36:46 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 5/15/2024 6:36:46 PM | SENT |
| Debbie Alvarez | | dalvarez@rampagelaw.com | 5/15/2024 6:36:46 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 5/15/2024 6:36:46 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 5/15/2024 6:36:46 PM | SENT |

Received 5/15/2024 6:38 PM

Envelope No. 87794974

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*, | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | 405TH JUDICIAL DISTRICT |
| CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§<br>§ | GALVESTON COUNTY, TEXAS |

**ORDER DENYING DEFENDANT CITY OF LEAGUE CITY'S PARTIAL PLEA TO THE JURISDICTION**

On this day, the Court considered Defendant City of League City's Partial Plea to the Jurisdiction ("Plea to the Jurisdiction"). The Court, having considered the Plea to the Jurisdiction, Response, Reply (if any), and arguments of counsel, finds that the Plea to the Jurisdiction should be **DENIED**. It is therefore,

**ORDERED** that Defendant City of League City's Partial Plea to the Jurisdiction is **DENIED**.

Signed this __ day of ____________, 2024.

______________________________
JUDGE PRESIDING

APPROVED AND ENTRY REQUESTED:

**Roberts Markel Weinberg Butler Hailey PC**

__________________________________
Jeffrey D. Roberts
TBA No. 17008800
jroberts@rmwbh.com
Justin L. Spears
TBA: 24117086
jspears@rmwbh.com
2800 Post Oak Blvd., Floor 57
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF**
**WEST FM 517, LTD.**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sarah Taylor on behalf of Justin Spears
Bar No. 24117086
staylor@rmwbh.com
Envelope ID: 87794974
Filing Code Description: Proposed Order
Filing Description: order denying Defendants partial plea to the Jurisdiction
Status as of 5/16/2024 9:36 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 5/15/2024 6:38:39 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 5/15/2024 6:38:39 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 5/15/2024 6:38:39 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 5/15/2024 6:38:39 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 5/15/2024 6:38:39 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 5/15/2024 6:38:39 PM | SENT |
| Debbie Alvarez | | dalvarez@rampagelaw.com | 5/15/2024 6:38:39 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 5/15/2024 6:38:39 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 5/15/2024 6:38:39 PM | SENT |

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*,<br><br>v.<br><br><br>CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br><br>405TH JUDICIAL DISTRICT<br><br><br><br>GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD.'S MOTION TO QUASH DEFENDANT'S NOTICE OF INTENT TO TAKE THE ORAL AND VIDEO DEPOSITIONS OF ANGEL BROTHERS DESIGNEE, DANIEL MARCHELI, JAMES TRIPPON, JEFF PAYSON, JOHN CROMPTON, AND RICHARD MULLER**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff West FM 517, LTD. ("Plaintiff"), in the above-referenced and styled case and files this, its Motion to Quash Defendant City of Leage City's ("Defendant") Notice of Intent to Take the Oral and Video Depositions ("Motion") of Angel Brothers Designee, Daniel Marcheli, James Trippon, Jeff Payson, John Crompton, and Richard Muller, and in support thereof, would show the Court the following:

## I. BACKGROUND

On April 12, 2024, Defendant unilaterally noticed the depositions of Angel Brothers Designee, Daniel Marcheli, James Trippon, Jeff Payson, John Crompton, and Richard Muller. Defendant's counsel sent an email proposing deposition dates on April 11, 2024, but did not receive confirmation from undersigned counsel on the dates and times contained in the Notices of Deposition. Further, Defendant's counsel did not confer if the witnesses and the undersigned counsel are available on the dates

and times contained in the Notices of Depositions. There also was no agreement on location of the depositions.

## II. ARGUMENTS & AUTHORITIES

Pursuant to Texas Rule of Civil Procedure 199.4, if a party files a motion to quash the notice of a deposition, objecting to the deposition, by the third business day after service of the notice of deposition, the oral deposition is automatically stayed.[1]

Plaintiff West FM 517, LTD. timely filed this Motion as the Notices were served on April 12, 2024. This Motion is being filed within three business days after service of the Notices. Consequently, the depositions are automatically stayed until the Motion can be determined by the Court.

## III. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff West FM 517, LTD. respectfully requests the Court enter an order granting this Motion to Quash their depositions, and for such other and further relief to which the Plaintiff may show itself to be justly entitled.

Respectfully submitted,

**Roberts Markel Weinberg Butler Hailey PC**

Jeffrey D. Roberts
TBA No. 17008800
jroberts@rmwbh.com
Justin L. Spears

[1] TEX. R. CIV. P. 199.4.

TBA: 24117086
jspears@rmwbh.com
2800 Post Oak Blvd., Floor 57
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on this 16th day of April 2024.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Scott M. Tschirhart
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
2517 N. Main Avenue
San Antonio, Texas 78212



JUSTIN L. SPEARS

Filed: 4/16/2024 5:01 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 86734619
By: Shailja Dixit
4/17/2024 8:17 AM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD., Plaintiff** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

**DEFENDANT CITY OF LEAGUE CITY' S MOTION TO QUASH DEPOSITIONS OF PAUL MAAZ AND CHRIS DODSON AND MOTION FOR PROTECTIVE ORDER**

MAY IT PLEASE THE COURT:

COMES NOW THE CITY OF LEAGUE CITY ("City") and files this Motion to Quash the Depositions of Paul Maaz and Chris Dodson, and Motion for Protective Order in connection therewith, and would show the following:

## I. BACKGROUND

Counsel for parties held a phone conference to discuss proposed dates for upcoming Depositions, which the undersigned summarized in an email to Plaintiff's counsel on April 11, 2024. Defendant was served with deposition notices for Paul Maaz and Chris Dodson almost immediately thereafter, indicating agreement to the outlined schedule. The following day, Defendant similarly noticed depositions based on the outlined schedule.

Now, Plaintiff moves to quash all of the depositions noticed by Defendant, stating that "Defendant's counsel sent an email proposing deposition dates on April 11, 2024, but did not receive confirmation from undersigned counsel on the dates and times contained in the Notices of Deposition. Further, Defendant's counsel did not confer if the witnesses and the undersigned counsel are available on the dates and times contained in the Notices of Depositions." Plaintiff's MTQ Notice of Inten to take the Oral and Video Depositions of Angel Brothers Designee, Daniel Marcheli, James Trippon, Jeff Payson, John Crompton, and Richard Muller.

Thus, it appears that despite the verbal discussion about availability, email summary, and Plaintiff's notices of depositions that were consistent with the two conferences, there has not been an agreement as to the dates and times for the upcoming depositions, which would include the depositions for Paul Maaz and Chris Dodson. Therefore, Defendant moves to quash the notice of intent to take their respective depsotions.

## II. ARGUMENTS & AUTHORITIES

Pursuant to Texas Rule of Civil Procedure 199.4, if a party files a motion to quash the notice of a deposition, objecting to the deposition, by the third business day after service of the notice of deposition, the oral deposition is automatically stayed. Leage City timely files this Motion as the Notices were served on April 11, 2024 and this Motion is being filed within three business days after service of the Notices. Consequently, the depositions are automatically stayed until Motion can be determined by the Court.

## III. PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant League City respectfully requests the Court enter an order granting this Motion to Quash their depositions, and for such other and further relief to which the Plaintiff may show itself to be justly entitled.

SIGNED on the 16th day of April 2024.

Respectfully submitted,

DENTON NAVARRO ROCHA BERNAL & ZECH
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
210/227-3243
210/225-4481 Fax
lfdenton@rampagelaw.com

By: ______________________________
LOWELL F. DENTON

State Bar No. 05764700
SCOTT M. TSCHIRHART
State Bar No. 24013655

RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com
DENTON NAVARRO ROCHA
BERNAL & ZECH, P.C.
701 E. Harrison, Ste. 100
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com
DENTON NAVARRO ROCHA
BERNAL & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

*Attorneys for Defendant League City*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 16th day of April 2024.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

LOWELL F. DENTON
RICHARD J. NAVARRO
KELLY R. ALBIN

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Ricardo Navarro
Bar No. 14829100
ggwilliams@rampagelaw.com
Envelope ID: 86734619
Filing Code Description: Motion
Filing Description: Deft City of League City's Motion to Quash the Depositions of Paul Maaz and Chris Dodson and Motion for Protective Order
Status as of 4/17/2024 8:18 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 4/16/2024 5:01:48 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 4/16/2024 5:01:48 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 4/16/2024 5:01:48 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 4/16/2024 5:01:48 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 4/16/2024 5:01:48 PM | SENT |
| Rachel Valdez | | rvaldez@rmwbh.com | 4/16/2024 5:01:48 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 4/16/2024 5:01:48 PM | SENT |
| Debbie Alvarez | | dalvarez@rampagelaw.com | 4/16/2024 5:01:48 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 4/16/2024 5:01:48 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 4/16/2024 5:01:48 PM | SENT |

Filed 4/15/2024 10:39 AM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 86648997
By: Shailja Dixit
4/15/2024 10:47 AM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD.,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

**NOTICE OF ORAL HEARING**

Please take notice that Defendant City of League City's Partial Plea to the Jurisdiction is set for an oral hearing on **Monday, May 20, 2024, at 10:00 a.m.**, before the 405th Judicial District Court sitting in Galveston, Texas, Galveston County Justice Center, 600 59th Street, Galveston, Texas 77550.

SIGNED this 15th day of APRIL 2024.

Respectfully submitted,

DENTON NAVARRO RODRIGUEZ BERNAL
SANTEE & ZECH
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
210/227-3243
210/225-4481 Fax
lfdenton@rampagelaw.com



By: ______________________

LOWELL F. DENTON
State Bar No. 05764700
SCOTT M. TSCHIRHART
State Bar No. 24013655

RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com
DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH, P.C.
701 E. Harrison, Ste. 100
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com
DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

*Attorneys for Defendant City of League City*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 15th day of April 2024.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

Ricardo J. Navarro
LOWELL F. DENTON
RICARDO J. NAVARRO
KELLY R. ALBIN

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Ricardo Navarro
Bar No. 14829100
ggwilliams@rampagelaw.com
Envelope ID: 86648997
Filing Code Description: Notice of Hearing or Trial Setting
Filing Description: Notice of Oral Hearing- Plea to the Jurisdiction
Status as of 4/15/2024 10:47 AM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 4/15/2024 10:39:33 AM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 4/15/2024 10:39:33 AM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 4/15/2024 10:39:33 AM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 4/15/2024 10:39:33 AM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 4/15/2024 10:39:33 AM | SENT |
| Rachel Valdez | | rvaldez@rmwbh.com | 4/15/2024 10:39:33 AM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 4/15/2024 10:39:33 AM | SENT |
| Justin Spears | | jspears@rmwbh.com | 4/15/2024 10:39:33 AM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 4/15/2024 10:39:33 AM | SENT |
| Debbie Alvarez | | dalvarez@rampagelaw.com | 4/15/2024 10:39:33 AM | SENT |

Filed: 4/5/2024 5:22 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 86372127
By: Lisa Kelly
4/8/2024 8:20 AM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD.,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

---

# DEFENDANT CITY OF LEAGUE CITY'S PARTIAL PLEA TO THE JURISDICTION

---

TO THE HONORABLE JUDGE:

COMES NOW DEFENDANT CITY OF LEAGUE CITY and files this Partial Plea to the Jurisdiction and moves the Court to dismiss Plaintiff's claims regarding the City's impact fees.

## I. BACKGROUND AND SUMMARY OF ARGUMENT

1. This is an action brought under the Uniform Declaratory Judgment Act seeking to have City of League City's impact fees declared unreasonable. An impact fee is defined under Chapter 395 of the Texas Local Gov't Code as "a charge or assessment imposed by a political subdivision against new development in order to generate revenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development." Tex. Loc. Gov't Code § 395.001(4). Impact fees are grounded in the theory that new growth should share in the cost of new growth. Specifically, local governments may recoup some of the costs associated with new-growth driven infrastructure and capital improvements from the developers advancing the new growth.

3. Plaintiff ("Developer") is a "developer that owns and develops property in League City for residential purposes." Pl.'s Original Pet. ¶ 7. In this declaratory judgment action, Developer asks the Court to declare that the impact fees in League City are unreasonable and excessive and that City of League City's park fees are illegal. Pl.'s Original Pet. ¶¶ 11-12.In this action, testimony from Tracy Goza, the owner of West FM 517, LTD's General Partner, testified that Plaintiff has never actually paid impact fees, however, and does not expect to pay impact fees in League City. As a result, Plaintiff lacks standing to have the fees declared unlawful. City's Exhibit A.[1]

## II. PLEA TO THE JURISDICTION STANDARD

Plaintiff bears the burden to affirmatively demonstrate the trial court's jurisdiction. *See Heckman v. Williamson Cnty*., 369 S.W.3d 137, 150 (Tex. 2012). A court considering a plea to the jurisdiction begins with the live pleadings and must evidence submitted to negate jurisdiction when necessary to resolve the jurisdictional issue. *Id*. A plea must be granted if the defendant presents undisputed evidence that negates the existence of the court's jurisdiction. *Id*.

## III. ARGUMENTS AND AUTHORITIES

**Standing is a Jurisdictional Requirement**

Standing is a constitutional prerequisite to suit. A court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it. If the plaintiff lacks standing to bring one of his claims, the court must dismiss the claim for want of jurisdiction. *Id.*

"For standing, a plaintiff must be personally aggrieved; his alleged injury must be concrete and particularized, actual or imminent, not hypothetical. A plaintiff does not lack standing simply because he cannot prevail on the merits of his claim; he lacks standing because his claim

[1] Goza's deposition was taken on April 1, 2024, and the official copy is pending, therefore, Defendant is attaching the rough draft of the deposition.

of injury is too slight for a court to afford redress." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304-05 (Tex. 2008). Thus, to show standing and, therefore, establish the court's jurisdiction, a plaintiff must show:

> (1) an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical;
>
> (2) that the injury is fairly traceable to the defendant's challenged action; and
>
> (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692 (Tex. 2021) (citing *Heckman*, 369 S.W. 3d at 154-55.

An "injury-in-fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Perez v. Turner*, 653 S.W.3d 191, 198 (Tex. 2022) (citing *Heckman*, 369 S.W.3d at 154–55).

An injury is concrete where there is "threatened or actual"—not hypothetical—injuries flowing. *See Grassroots Leadership, Inc. v. Tex. Dep't of Family and Protective Services*, 646 S.W.3d 815, 820 (Tex. 2022) (citing *Farmers Tex. Cnty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 241 (Tex. 2020). The U.S. Supreme Court has observed that a substantial risk may satisfy the concrete-injury requirement for injunctive relief, if that risk is based on a reasonable inference from specifically alleged, current facts. *TransUnion LLC v. Ramirez*, ––– U.S. ––––, 141 S. Ct. 2190, 2210, 210 L.Ed.2d 568 (2021); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (noting that standing can derive from " 'substantial risk' that the harm will occur," but that plaintiffs must plead and prove "concrete facts showing that the defendant's actual action has caused the substantial risk of harm").

An injury is "particularized" for standing purposes if it "affect[s] the plaintiff in a personal and individual way." *Data Foundry, Inc*., 620 S.W.3d at 696 (citing *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (additional citations omitted). "Standing requires an injury-in-fact that is fairly traceable to the defendant's conduct and likely to be redressed by a decision in the plaintiff's favor." *Abbott v. Harris Cnty*, 672 S.W.3d 1, 8 (Tex. 2023).

**Plaintiff Lacks Standing to Seek a Declaration that the City's Impact Fees are Unreasonable**

Here, Plaintiff does not pay the impact fees of which it complains and, therefore, lacks standing in this declaratory judgment action to have the fees (that it does not pay) declared unreasonable. Exhibit A.

First, Plaintiff has no "injury-in-fact." Plaintiff has not pleaded and cannot plead that it has a legally protected interest in this matter. Since Plaintiff does not pay the fees at issue and does not foresee having to pay the fees at issue, Plaintiff would have to show that it has a cognizable interest in having *some other entity* not pay the City's impact fees. Plaintiff has not and cannot show same.

Second, Plaintiff fails to plead that it has a concrete interest in some other entity's impact fee assessments. That is, the pleadings and jurisdictional evidence do not establish a threatened or actual violation of its legally protected interest—an impossibility, of course, given that the predicate interest is absent. So, too, Plaintiff fails to show a particularized injury because the impact fees do not affect the plaintiff in a personal and individual way because it does not and will not pay the fees.

For the same reason, Plaintiff cannot show that the relief sought—a declaration that the fees are unreasonable—will afford it any relief. Said another way, if the Court were to declare the

impact fees improper or unreasonable, it would not alleviate Plaintiff from an injury incurred in paying the fees (because it does not pay the fees).

As a result, Plaintiff has not and cannot show that it has standing to pursue a declaration that the impact fees are unreasonable, depriving the Court of jurisdiction over that claim. Accordingly, the City respectfully moves for dismissal of the claim.

## VI.
## PRAYER

WHEREFORE PREMISES CONSIDERED, Defendant City of League City respectfully requests that the Court grant this Partial Plea to the Jurisdiction and enter final judgment dismissing Plaintiff's declaratory judgment action claim with prejudice and for such other and further relief to which they may show themselves justly entitled.

Signed on this the 5th day of April 2024.

Respectfully submitted,

DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
210/227-3243
210/225-4481 Fax
lfdenton@rampagelaw.com

By: ______________________________
LOWELL F. DENTON
State Bar No. 05764700
SCOTT M. TSCHIRHART
State Bar No. 24013655

RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com
DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH, P.C.
701 E. Harrison, Ste. 100
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com
DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

*Attorneys for Defendant League City*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 5th day of April 2024.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

LOWELL F. DENTON

# EXHIBIT A

(This unedited rough draft of the proceedings was produced in Realtime and is not certified. The rough draft transcription may not be cited or used in any way or at any time to rebut or contradict the certified transcription of proceedings. There will be discrepancies in this form and the final form because this Realtime transcription has not been edited, proofread, corrected, finalized, indexed or certified. There will also be a discrepancy in page numbers appearing on the unedited rough draft and the edited, proofread, corrected and certified final.)

THE VIDEOGRAPHER: Okay. Today is Monday, April 1, 2024. We're going on the record at 10:07 a.m.

TRACY GOZA,

10:07 having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MS. KELLY R. ALBIN:

Q. Good morning, Mr. Goza.

A. Good morning.

10:07 Q. My name is Kelly Albin. I'm an attorney, and I represent the City of League City in a lawsuit styled West FM 517, Ltd. vs. City of League City. Do you understand that?

A. Yes, ma'am.

10:07 Q. And you're here today for your deposition in



this case; is that right?
A. Yes, ma'am.
Q. Okay. Are you represented by counsel today?
A. Yes, ma'am.
10:07 Q. And are they here in the room with us?
A. Yes, ma'am.
Q. Excellent.
Have you ever had your deposition taken?
A. Yes, ma'am.
10:08 Q. When was the last time?
A. 15 years ago.
Q. Okay. I can't remember what I did last week, so I'm going to go over a few ground rules in case you've forgotten from 15 years ago. All right?
10:08 A. Okay.
Q. I'm going to be asking questions today. You may occasionally hear an objection from your lawyers. You can answer the question unless they direct you not to. Okay?
10:08 A. Okay.
Q. The court reporter is taking down all of the questions and your responses today, and it will be easier for her to do that if we try not to talk over each other. Okay?

10:08 A. Okay.



Q. So I will try to let you finish an answer before I start a question, and I would ask that you would allow me to finish a question even if you already know what the answer is and you're ready to start
10:08 responding. Okay?
A. Yes, ma'am.
Q. The court reporter is not going to be able to take down head nods or head shakes. So to get a clean transcript, I would ask that you answer audibly. And if
10:09 I prompt you to do that, I'm not trying to be rude. I'm just trying to make sure we have a nice clean record for later on. All right?
A. Yes, ma'am.
Q. If you answer a question, I'm going to assume
10:09 that you understood my question. Is that fair?
A. Yes, ma'am.
Q. And if you for any reason don't understand a question I've asked, I would request that you just let me know and give me a chance to clarify so that I can
10:09 make sure your answer is something that we can rely on later on; is that fair?
A. Yes, ma'am.
Q. If you need to take a break anytime, that's perfectly fine for any reason. I would just ask that

10:09 you let -- finish answering any question that's already



on the table before we break. Okay?
A. Okay.
Q. Will you please state your full name for the record.
10:09 A. My name is Tracy Franklin Goza.
Q. Mr. Goza, the Plaintiff in this lawsuit is West FM 517, Ltd.; is that correct?
A. Yes, ma'am.
Q. What is your relationship to West FM 517?
10:10 A. I am the owner of the general partner.
Q. Who is the general partner?
A. Lingo West FM 517 GP, Inc.
Q. Okay.
MS. ALBIN: I'll mark this.
10:10 (Exhibit 5 marked.)
Q. (BY MS. ALBIN) I'm going to pass you what's been marked as Exhibit 5 to today's deposition. This I'll represent to you is from -- printed off from the Office of the Comptroller. It's a franchise tax account
10:11 status. And the date you can see in the top left corner is April 1, 2024, which is today's date. Do you agree with that?
A. Yes, ma'am.
Q. Okay. Is this the entity that you were just

10:11 describing as owning?



A. No, ma'am -- oh, excuse me. Yes, ma'am, it is. It says it up here at the top. Sorry, I missed it.

Q. That's okay.

So this is Lingo West FM -- FM 517 GP, LLC;
10:11 is that correct?

A. Yes, ma'am.

Q. Okay. And Lingo West, as I understood your testimony, is the general partner in West FM who's the Plaintiff in our lawsuit; is that correct?

10:11 A. Yes, ma'am.

Q. Okay.

(Exhibit 6 marked.)

Q. (BY MS. ALBIN) I'm going to pass you what I'm marking as Exhibit 6 to today's deposition. This is
10:12 also a document that appears to be from the Comptroller's Office. And here the entity is West FM 517. Do you see that?

A. Yes, ma'am.

Q. Okay. And the registered agent for both
10:12 West FM and Lingo West is LPI Property Management according to this report. Do you see that?

A. Yes, ma'am.

Q. And do you have any affiliation with LPI?

A. Yes, ma'am.

Q. What is your affiliation with LPI?



A. I am 60 percent owner.

Q. And does LPI have any partnership in West FM 517?

A. No, ma'am.

Q. So LPI only serves as the registered agent?

A. Yes, ma'am.

(Exhibit 7 marked.)

Q. (BY MS. ALBIN) I'm going to pass you what I'm marking as Exhibit 7, similar to what we've been looking at from the Comptroller's Office. And, again, the entity here is listed as LPI Property Management, LLC, and if I understood your testimony correctly you're the 60 percent owner of this company; is that correct?

A. Yes, ma'am.

Q. Okay. So with regard to the Plaintiff in our lawsuit, which is West FM -- before I go farther with that question, when I say "West FM," do you understand what entity I'm talking about?

A. Yes, ma'am.

Q. Okay. Are there any other entities with which you're affiliated that have a name similar to West FM?

A. No, ma'am.

Q. Okay. So with regard to the Plaintiff in our lawsuit, West FM, LPI is the registered agent and

10:14 Lingo West is the general partner; is that correct?



A. Yes, ma'am.
Q. Okay. Who are the other partners in the West FM organization?
A. In West FM, Ltd., or We -- or Lingo West FM GP?
10:15 Q. That's a good question. And for the purposes of today, if I say "West FM," I'm referring to West FM 517, Ltd.
A. Okay.
Q. Can we agree that that -- you'll understand --
10:15 A. Yes.
Q. -- what I mean?
And if I refer to Lingo West, then I'm talking about Lingo West FM 517 --
A. Okay.
10:15 Q. -- GP; is that fair?
A. Clear.
Q. Okay.
A. Yes, ma'am.
Q. And my question was with regard to West FM, who
10:15 are the other partners?
A. There's three -- two other partners, Angel Brothers Enterprises and Cervelle Homes.
Q. What type of organization is Angel Brothers?
A. Angel Brothers is a -- a contractor, streets,

10:16 water, sewer lines, things like that. They put those



in.

Q. And do you have any ownership interest in Angel Brothers?

A. No, ma'am.

10:16 Q. Does anybody in your family have an ownership interest in Angel Brothers?

A. No, ma'am.

Q. And Cervelle Homes, is that a homebuilder?

A. Yes, ma'am.

10:16 It's Cervelle.

Q. Cervelle?

A. Yes, ma'am.

Q. Thank you.

Do you have an ownership interest in

10:16 Cervelle?

A. No, ma'am.

Q. Do you know if anybody in your family has an ownership interest in Cervelle?

A. No, ma'am, they don't.

10:17 Q. So the three partners for West FM 517 are Angel Brothers, Cervelle Homes and Lingo Properties. Did I get that right?

A. It's not Lingo Properties. It's Lingo West.

Q. Excuse me, Lingo West.

10:17 A. Okay.



Q. But otherwise that's a correct statement?
A. Yes, ma'am.
Q. Okay. Is there another entity that is named Lingo Properties?
10:17 A. Yes, ma'am.
Q. Okay. And are you affiliated with Lingo Properties?
A. Yes, ma'am.
Q. What's your affiliation with Lingo Properties?
10:17 A. I'm 100 percent owner of it.
Q. But Lingo Properties is not affiliated with West FM?
A. No, ma'am.
Q. What does Lingor -- Lingo Properties do?
10:18 A. Lingo Properties is a development company. We develop residential subdivisions.
Q. And what does Lingo West FM 517 do?
A. Lingo West FM 517 GP is the general partner in West, Ltd. West, Ltd., is our partnership that we
10:18 developed a subdivision under.
Q. And West, Ltd., is different from West FM 517?
A. West FM 517 -- no, it's not different. Can you ask it again because --
Q. Sure.

10:19 I was just trying to understand the -- what



type of business Lingo West FM 517 is in, and I -- I think you're saying that it's the --
A. It's the general --
Q. -- general partner --
10:19 A. -- partner for West, Ltd. West, Ltd., is a development company.
Q. Okay. And you -- can you look at Exhibit 6 for me, please.
A. Yes, ma'am.
10:19 Q. So when you say West, Ltd., is this the entity that you're talking about that's identified in Exhibit 6?
A. Yes, ma'am.
Q. Okay. Does it make more sense to you if I call
10:19 it West, Ltd., instead of West FM?
A. Yes, ma'am.
Q. Okay. There's a lot of businesses here. So I'm trying to make sure we keep them all straight, and I -- I don't confuse you.
10:20 Okay. And I think you were explaining that West, Ltd., is a -- develops property?
A. Yes, ma'am.
Q. Okay. Is West, Ltd., limited in its development to the League City area?

10:20 A. Yes, ma'am.



Q. What developments in League City has West, Ltd., developed?
A. Only one, and it's called Pedregal.
Q. When did that development start?
10:20 A. In 2020.
Q. Is it finished?
A. No, ma'am.
Q. Do you have an expected date by which that should be finished?
10:21 A. Probably 24 more months.
Q. Has all the platting been done and it's just the construction that remains, or are there -- does the platting still need to be finished?
A. There are two more sections to be platted, and
10:21 all of the construction for the platted sections has been done.
Q. Do you know about how many units are expected in the two remaining sections to be platted?
A. Off the top of my head, I think it's about 250.
10:21 Q. 250 total or 250 per remaining section?
A. 250 total to be constructed.
Q. Does all of the Pedregal development fall within the League City boundaries?
A. Yes, ma'am.

10:22 Q. What companies are West, Ltd., using for the



construction of the Pedregal subdivision?
A. A lot of companies. You'd have to be specific as to which section. We've done about four or five sections. We've had three or four contractors in each.
10:22 So...
Q. Do you know who is -- who your contractors are anticipated to be for the remaining two sections?
A. No, I don't, really. We will go out and bid those when the drawings are done.
10:23 Q. So this has not been bid yet?
A. No, ma'am.
Q. Okay. How about the most recent completed section, do you remember any of the contractors that worked --
10:23 A. Yes, ma'am.
Q. -- on that?
Okay. Can you give me the names of those?
A. Fellers & Clark was the underground contractor, and Beyer Construction was the paving contractor.
10:23 Q. I'm sorry, Fellers & Clark, and what was the second one?
A. Beyer, B-E-Y-E-R.
Q. And were those companies actually putting the houses up or were they building more of the

infrastructure, or both?



A. They were building the infrastructure.

Q. Okay. And do you use separate contractors for the actual homes themselves?

A. I actually sell the lots to a builder and they build the homes. I don't have anything to do with the home building.

Q. So then what you sell to a builder is a -- a lot that can have a home built on it, but there's no construction yet, is that fair, no home construction?

A. Yes, ma'am, that's fair.

Q. Okay. And is Cervelle Homes the homebuilder in Pedregal?

A. Yes, ma'am.

Q. Are they the exclusive homebuilder in Pedregal?

A. Yes, ma'am.

Q. So West FM is selling a lot that has the infrastructure built to one of its partners, Cervelle Homes; is that correct?

A. Yes, ma'am.

Q. And does Angel Brothers -- has Angel Brothers done any contracting work in Pedregal?

A. Yes, ma'am.

Q. But it wasn't in the most recently finished section; correct?

10:25 A. Correct.



Q. And I believe you testified it was about -- you've had about four or five sections finished; is that right?
A. Yes, ma'am.
10:25 Q. Of those, do you know how many Angel Brothers worked on?
A. Two.
Q. Do you remember which sections those were?
A. Sections 1 and Section 5.
10:26 Q. In Sections 1 and Sections 5 of the Pedregal subdivision, what did Angel Brothers -- what was the work they performed?
A. They performed the underground installation and the paving.
10:26 And I'll correct an answer. It's actually, three sections, and it's Sections 1, 5 and 3. Sorry.
Q. That's okay. Thank you for that clarification. And please feel free to do that anytime today. If you have answered something and you need to go back to it,
10:26 just let me know, and we can -- I want to get a correct and complete answer. Okay?
A. Okay.
Q. So, I'm sorry, you said that Angel Brothers did the underground installation and what else was --

10:26 A. The paving.



Q. Paving.
So was that arrangement that West, Ltd., entered into a contract with one of its partners to perform the underground work on Sections 1, 3 and 5?
10:27 A. Yes, ma'am.
Q. Okay. Can you look at Exhibit 5 for me, please.
A. Yes, ma'am.
Q. I just want to make sure I'm clear on this. 10:28 The entity that's identified in Exhibit 5, which is Lingo West, that's the 60 percent partner in West, Ltd.; correct?
A. No, ma'am. That's the 1 percent partner in West, Ltd., as the general partner.
10:28 Q. The general partner. Okay.
A. Just that's what the letters GP in there stand for. So...
Q. And you mentioned Lingo Properties, and we do not have an exhibit right now for Lingo Properties; is 10:29 that correct?
A. Yes, ma'am, you don't.
Q. Does Lingo Properties do developments only in League City as well?
A. No, ma'am. We do it all over.

Q. Okay. Beyond Galveston County?



A. Yes, ma'am.
Q. Anywhere outside of Texas?
A. No, ma'am.
Q. Okay. Is it mostly in the Gulf Coast area?
A. Yes, ma'am.
Q. Okay. Does Lingo Properties have any subdivisions in League City?
A. No, ma'am.
Q. Have -- has Lingo Properties ever developed in League City?
A. Yes, ma'am.
Q. What are the names of the developments that Lingo Properties has developed in League City?
A. Clear Creek Meadows and The Meadows.
Q. Are those -- is -- are Clear Creek Meadows and The Meadows both completed?
A. Yes, ma'am.
Q. When were they finished?
A. Clear Creek Meadows, probably 15 years ago, and The Meadows, probably 10 years ago.
Q. Does Lingo Properties have any planned developments in the City of League City right now?
A. No, ma'am.
Q. Okay. And if you'll look at Exhibit 7 for me.

10:31 This is LPI Property Management, which is the registered



agent on West, Ltd., and Lingo West FM 517 GP; correct?
A. Yes, ma'am.
Q. All right. What does LPI Property Management do?
10:31 A. It's a residential HOA property management company.
Q. What is your affiliation with LPI Property Management?
A. I'm a 60 percent owner. That's the one I'm a
10:32 60 percent owner.
Q. Other than being the registered agent for West, Ltd., does LPI Property Management do any business with West, Ltd.?
A. Not with West, Ltd.
10:32 Q. Okay. Does LPI Property Management do business with any of the other entities we've talked about this morning?
A. Yes, ma'am. LPI Property Management manages the HOAs if one is formed in any of the subdivisions we
10:33 develop.
Q. So for Pedregal, do they not have an HOA there?
A. They do.
Q. They do? Okay.
A. Yeah.

Q. Does LPI Property Management manage --



A. Yes, ma'am.

Q. -- those?

Okay. I -- I know you can tell what I'm about to ask, but if -- we're going to get kind of crosstalk a little bit. So when I'm asking a question, I know I'm walking the questions very slowly and you're so quick I can tell you're ready to answer, but just let me finish the question. Otherwise, we're going to have a lot of talking over each other. Okay?

A. Yes, ma'am.

Q. Thank you.

I believe your answer was to indicate that LPI Property Management manages the HOA for Pedregal; is that correct?

A. Yes, ma'am.

Q. Thank you.

Does LPI Property Management have a contract with West, Ltd., to provide the HOA management for Pedregal?

A. No, ma'am.

Q. How is that arrangement made?

A. LPI Property Management has a contract with the Pedregal HOA.

Q. Are you involved in the Pedregal HOA at all?

10:35 A. Yes, ma'am, I am.



Q. How are you involved with the Pedregal HOA?
A. I am the president of the HOA.
Q. Are you the president on any other HOAs?
A. Yes, ma'am.
10:35 Q. Which other HOAs do you serve as the president for?
A. The Commons at Sedona, and I believe that's it.
Q. Do you know whether The Commons at -- the HOA for The Commons at Sedona contracts with LPI Property
10:36 Management to manage the HOA?
A. It does.
Q. Did West, Ltd., develop The Commons at Sedona?
A. No, ma'am.
Q. Did any of the entities we've talked about this
10:36 morning develop The Commons at Sedona?
A. No, ma'am.
Q. Okay. We talked about four different entities so far this morning, not counting the HOAs. L -- we talked about LPI Property Management; correct?
10:37 A. Yes, ma'am.
Q. And West, Ltd.; correct?
A. Yes, ma'am.
Q. And Lingo West FM 517 GP; correct?
A. Yes, ma'am.

10:37 Q. And Lingo Properties; correct?



A. Yes, ma'am.
Q. Are you affiliated with any other development-related businesses?
A. Yes, ma'am.
10:37 Q. What -- what are the names of those businesses?
A. Lingo S7, Ltd.
Q. That's Lingo S, like Sam, 7, the number --
A. Um-hum.
Q. -- Ltd.?
10:37 A. Um-hum.
Q. Okay. Any others?
A. Lingo Southfork, Ltd.
Q. Any others?
A. Lingo Southfork GP, Inc., and I think that's
10:38 it.
Q. Okay. Let's start with Lingo S7, Ltd. What is your affiliation with that entity?
A. I'm part owner of that entity.
Q. What does Lingo S7, Ltd., do?
10:38 A. We developed The Commons at Sedona.
Q. When were The Commons at Sedona finished?
A. Mid '23.
Q. And when you say it developed The Commons at Sedona, did Lingo S7, Ltd., put the houses up or do the

10:39 infrastructure, or both?



A. Did the infrastructure.
Q. Okay. Who was the homebuilder for The Commons at Sedona?
A. K. Hovnanian.
10:39 Q. Who are the other owners of Lingo S7, Ltd.?
A. Greg Angel and Gary Angel.
Q. I bet I know the answer to my own question, but are Greg Angel and Gary Angel associated with Angel Brothers?
10:40 A. Yes, ma'am.
Q. Okay. All right. How about Lingo Southfork, Ltd., what is your affiliation with Lingo Southfork, Ltd.?
A. I am a part owner.
10:40 Q. Who are the other owners?
A. My father, L.F. Goza, another man by the name of Ignatius Leonard, Brenda Osborn and Gwen Osborn.
Q. What does Lingo Southfork, Ltd., do?
A. Lingo Southfork, Ltd., developed a subdivision
10:41 off 288 called Southfork.
Q. Does the subdivision have a name?
A. Southfork.
Q. It's just Southfork. Okay.
Is that in League City?

10:41 A. No, ma'am.



Q. What city is that located in?
A. Manvel.
Q. When was Southfork completed?
A. Parts of it are still ongoing.
10:42 Q. Do you -- are you able to estimate the -- about how much has been completed?
A. Like 98 percent.
Q. Who's the homebuilder there?
A. There were multiple homebuilders.
10:42 Q. Okay. Do you know the names of any of them?
A. Royce Homes was one. Cervelle was one. Kimball Hill was one. And there were more. I just forget their names.
Q. Who built out the infrastructure for the 10:43 Southfork development?
A. I can't recall the name of all the contractors. It was in a MUD district. So everything had to be bid. So whoever was the low bidder built it.
Q. All right. And Lingo Southfork GP, what is 10:43 your affiliation with that entity?
A. I'm the owner.
Q. And is Lingo Southfork GP a partner in another entity?
A. No, ma'am.

10:43 Q. Okay. What does Lingo Southfork GP do?



A. It's the general partner for Lingo Southfork, Ltd.

Q. Okay. Have we talked about all the businesses with which you are affiliated today?

10:44 A. I believe so.

Q. If you think of any more throughout the day, will you just let me know?

A. Yes, ma'am.

Q. Thank you.

10:44 All right. Turning back to West, Ltd., you are the president of that organization; correct?

A. I'm -- to be clear, I'm the president of the general partner.

Q. Thank you.

10:45 And as the president of the general partner of West, Ltd., do you have authority to speak on behalf of the organization today?

A. Yes, ma'am.

Q. In filing this lawsuit, was there any kind of 10:46 vote or meeting to discuss the lawsuit?

A. Yes, ma'am.

Q. Was that done in person or on-line?

A. It was a phone call.

Q. Phone call. Okay.

10:46 Who was involved in that phone call?



A. Cervelle Homes and myself.
Q. But not Angel Brothers?
A. No, ma'am.
Q. Who from Cervelle Homes was involved in the
10:46 decision to file the lawsuit?
A. Jeff Payson.
Q. Can spell his last name?
A. P-A-Y-S-O-N.
Q. Thank you.
10:47 Mr. Goza, do you hold any professional licenses?
A. Yes, ma'am.
Q. What are those?
A. I'm a licensed real estate broker.
10:47 Q. Any others?
A. No, ma'am.
Q. Did you go to college?
A. Yes, ma'am.
Q. Where did you go to college?
10:47 A. Multiple places, but I ended up graduating from the University of Houston.
Q. What year?
A. '93 or '94, I don't remember.
Q. What type of degree did you get from the

10:47 University of Houston?



A. Petroleum landman, land management.
Q. And have you worked in the petroleum land management field?
A. No, ma'am.
10:48 Q. Okay. So like the rest of us, you got a degree and then did something else? Okay.
A. Yes, ma'am.
Q. That's fair.
Anything after U of H?
10:48 A. No, ma'am.
Q. Do you live in Galveston County?
A. Yes, ma'am.
Q. Are you married?
A. Yes, ma'am.
10:48 Q. What's your wife's name?
A. Kim.
Q. Do you have any adult children that live --
A. Yes.
Q. -- in Galveston County?
10:48 A. Not that live in Galveston County.
Q. Okay. Does Kim work outside of the home?
A. No, ma'am.
Q. Do any of your children work in Galveston County?

10:48 A. Yes, my daughter does.



Q. What is her name?

A. Kendall.

Q. Where does Kendall work?

A. Kendall works at Friendswood ISD, for the

10:49 school.

Q. I know you mentioned you had your deposition taken about 15 years ago. Was that in a lawsuit in which you were the plaintiff or a defendant?

A. No, ma'am. It was -- I was just providing

10:49 testimony for something. I wasn't the plaintiff or the defendant.

Q. Okay. You were just a witness in that lawsuit?

A. Yes, ma'am.

Q. Do you recall generally what the nature of the

10:49 lawsuit was?

A. It -- it had to do with real estate and individuals buying houses and inflating the value and borrowing more than they needed to and then not paying it back.

10:49 Q. Okay. Who were the parties to the lawsuit, if you remember?

A. I don't remember.

Q. All right. Have you been a plaintiff in any other lawsuit?

10:50 A. No, ma'am.



Q. And when I say "you," I mean you as Tracy Goza, not in your capacity with any of the entities we talked about today. Do you understand that?

A. Now that you said that, I've never been the
10:50 plaintiff in a lawsuit, whether myself or involved in any of my entities.

Q. Okay. This is the first one?

A. Yes, ma'am.

Q. Are you employed with any organization other
10:50 than those that we talked about this morning?

A. No, ma'am.

Q. What was the last entity that you worked for that you were not somehow an owner or an owner of a business that was the general partner, something outside
10:51 of those organizations?

A. The last entity was Strago Petroleum.

Q. Okay. And when that was?

A. That was in '94. And I did accounting for them.

10:51 Q. Okay. But not as an accountant; correct?

A. No, ma'am.

Q. All right.

Have you been an owner or partner of a business that has ever filed for bankruptcy?

10:51 A. No, ma'am.



Q. Have you been the owner or partner of a business that's ever been sued by somebody else?
A. No, ma'am.
Q. Are you --
10:52 A. I --
Q. Sorry, go ahead.
A. We've been listed as a -- I guess a co-person, but we weren't really involved.
Q. And was this within the last ten years?
10:52 A. No, ma'am.
Q. Okay. Which entity was it?
A. It was Lingo Southfork, Ltd. The main defendant was Royce Homes.
Q. And that is in Manvel; correct?
10:52 A. Yes, ma'am.
Q. All right. Do you know how that resolved?
A. It resolved in mediation, and Royce Homes agreed to pay the plaintiff a bunch of money.
Q. Do you know what the nature of the claim was?
10:53 A. It was a work-related accident, one of their contractors.
Q. Do you do any volunteer work in Galveston County?
A. I have in the past. No.

10:53 Q. Not right now?



A. Not right now.
Q. Okay. The organizations you've been associated with to volunteer in the past, what are the names of those?
10:53 A. The Chamber of Commerce.
Q. Any others?
A. Mainly the Chamber of Commerce.
Q. Do you know about how long ago that was?
A. I'm currently a member of the Chamber of
10:53 Commerce.
Q. Okay. What does your volunteer work with the Chamber of Commerce entail?
A. We'd sell raffle tickets for them, things like that, help them raise money. I also volunteer with the
10:54 Friendswood Education Foundation.
Q. What do you do for the Friendswood Education Foundation?
A. Basically contribute money.
Q. And that -- the Chamber of Commerce, is that
10:54 Galveston County, City of Galveston?
A. Friendswood.
Q. Friendswood. Okay.
Do you have any developments in the City of Friendswood?

10:54 A. Not at this time.



Q. Okay. But you have in the past?
A. Yes, ma'am.
Q. What were the developments in Friendswood?
A. I did a subdivision called Melodywood, and I
10:55 did an addition to a subdivision called Friendswood Lakes.
Q. Okay. Going back to the named developments, have we talked about all of the developments with which you've been associated in League City today?
10:55 A. Did we mention one called Autumn Lakes?
Q. I don't think so.
A. Okay. There is one more called Autumn Lakes.
Q. And which company developed Autumn Lakes?
A. Lingo Properties was the general partner, and
10:56 the name of the company was Autumn Lakes, Ltd.
Q. Is Autumn Lakes completed?
A. Yes, ma'am.
Q. When was it finished?
A. Um, 2015.
10:56 Q. Okay. Have we now covered all of the developments in --
A. Yes, ma'am.
Q. -- League City?
Thank you.

10:56 A. Is it a good stopping point?



Q. Sure.

MS. ALBIN: We can go off the record.

THE VIDEOGRAPHER: Off the record at 10:56.

(Recess from 10:56 a.m. to 11:04 a.m.)

10:56 THE VIDEOGRAPHER: Okay. Back on record at 11:04.

Q. (BY MS. ALBIN) All right, Mr. Goza. I'd like to talk a little bit about the lawsuit now that was filed by West FM 517, Ltd. Okay?

11:05 A. Okay.

Q. Just generally the lawsuit has to do with impact fees and park fees. Would you agree with that?

A. Yes, ma'am.

Q. All right. And specifically League City's

11:05 increase to its impact fees which were adopted in 2023. Would you agree with that?

A. Yes, ma'am.

Q. All right. And do you agree that the park fees that are complained about in the lawsuit were adopted in

11:05 2021?

A. Yes, ma'am.

Q. Okay. Did any of the entities that we've talked about this morning pay impact fees to the City of League City since December 1, 2023?

11:06 A. No, ma'am. I can clarify that a little bit for



you.

Q. Please.

A. The builder pays the impact fees, not the developer.

11:06 Q. Okay. So would that be -- in the case of Pedregal, would that be Cervelle Homes?

A. Yes, ma'am.

Q. Okay. So Cervelle Homes is the entity that has paid impact fees to the City of League City since

11:06 December 1, 2023?

A. Yes, ma'am.

Q. West, Ltd., has not paid any impact fees to the City of League City since December 1, 2023?

A. That's correct.

11:07 Q. And based on your earlier testimony, it's my understanding that there are no other active developments that are owned by West FM 517, Ltd., in League City right now; is that correct?

A. That's correct.

11:07 Q. Pedregal is the only one?

A. Yes, ma'am.

Q. Okay. Are there any anticipated developments from West, Ltd., for which you expect to pay the new impact fees to the City of League City?

11:08 A. No, ma'am.



Q. Now, you're not affiliated yourself with Cervelle Homes; correct?

A. Correct.

Q. Okay. Are the -- the account -- accounting

11:08 records for West, Ltd., Cervelle Homes, Lingo West and Angel Brothers kept in such a way that you can tell which entity paid the City of League City impact fees?

A. Can you rephrase that or ask that again because I didn't quite get that?

11:09 Q. Let me see if I can do better.

Is there a way to look through just Cervelle Homes' accounting records to see that they paid League City the impact fees as opposed to West, Ltd., paying impact fees?

11:09 A. I have no idea about Cervelle's accounting records. I'm not affiliated with Cervelle.

Q. Okay. So West, Ltd.'s records, then, would be kept separately from its partners' records; is that fair?

11:09 A. Yes, ma'am.

Q. Okay. So if the City were to ask for accounting records for the last year from West, Ltd., we're not going to see payments for impact fees in those records. Does that sound right?

11:10 A. Yes, ma'am, that's correct.



Q. All right. Do you know when the last time West, Ltd., paid impact fees to the City of League City, if ever?

A. West, Ltd., has never paid impact fees to the
11:10 City of League City.

Q. And that's because those impact fees come from the developer -- the homebuilder; correct?

A. Yes, ma'am.

Q. And West, Ltd., has never acted as a
11:10 homebuilder; is that --

A. You're correct --

Q. -- correct?

A. -- yes, ma'am.

Q. Okay.

11:11 Has Lingo Properties paid any impact fees to the City of League City since December 1, 2023?

A. No, ma'am.

Q. And, again, Lingo Properties is not the homebuilder. So they would not pay those fees; correct?

11:11 A. You're correct.

Q. All right. Do you know whether the homebuilders in Autumn Lakes, The Meadows or Clear Creek Meadows paid impact fees?

A. Did the homebuilders pay impact fees?

11:12 Q. Yes.



A. I'm sure they did.
Q. But you're not aware?
A. I'm not aware. I don't pay impact fees.
Q. What about the park fees, let's talk about that
11:12 for a second. Has West FM, Ltd., paid park fee -- park fees since 2021?
A. Yes, ma'am.
(Exhibit 8 marked.)
Q. (BY MS. ALBIN) I'm handing you what I've marked
11:12 as Exhibit 8 to today's deposition. These are a copy of the interrogatory responses that we received. Look those over for a minute.
A. Okay.
Q. Do you recall working on these interrogatory
11:13 responses?
A. Yes, ma'am.
Q. All right. And if you'll turn to the last page, 5 of 5.
A. Okay.
11:13 Q. So first I want to direct you to Inter -- Interrogatory Number 9 that asks about "the amount, if any, of impact fees Plaintiff has paid to the City since December 1, 2023." And the answer there is "Plaintiff will supplemental." Do you see that?

11:13 A. Yes, ma'am.



Q. Is there anything to supplement on that answer?
A. Not that I'm aware.
Q. Okay. On Interrogatory Number 10 regarding park fees, the answer here is that "Plaintiff has paid
11:14 $1,186,000 in park fees since March 1, 2021"; is that correct?
A. Yes, ma'am.
Q. All right. And as you sit here today, does that number still sound accurate?
11:14 A. Yes, ma'am.
Q. All right. What is your understanding of how the park fees are assessed, or how they've been assessed since March 2021 in League City?
A. They're based on a per lot basis, $2,000 per
11:14 lot. $3,000 per lot is how they were assessed, sorry.
Q. That's okay.
And is it your contention that the $3,000 per lot is -- should be less?
A. Yes, ma'am.
11:14 Q. Okay. What do you think an appropriate amount per lot would be?
A. Zero.
Q. What do you base that answer on?
A. I don't think a park fee is legal? I don't --

I don't think it's legal.



Q. Okay. So you don't have some alternative number that you think the City should adopt. You just think it should be zero because you don't think that the fee should be applied at all; is that fair?
A. Yes, ma'am.
Q. All right. The lawsuit also talks about the -- the land dedication. Do you remember including that in your lawsuit?
A. Yes, ma'am.
Q. All right. And would you agree with me that currently the City of League City requires 1 acre per 75 units. Does that sound right?
A. Yes, ma'am.
Q. Okay. And do you contend that that should also not be applied?
A. No.
Q. So you agree with that --
A. Yes, ma'am.
Q. Let me just make sure I get the question all the way out, please.
So you agree that the City can require some land dedication; is that fair?
A. Yes.
Q. And do you contend that the 1 acre per 75 units

11:16 is unreasonable?



A. No, ma'am.
Q. So your complaint in this lawsuit is not about the land dedication. It's only about the $3,000-per-unit fee; is that correct?
11:16 A. Yes, ma'am.
Q. Okay. And I know here in Interrogatory Number 10 we've got a dollar amount paid by West, Ltd.; correct?
A. Yes, ma'am.
11:16 Q. And is it also true that West, Ltd., has donated or complied with the 1 acre per 75 unit requirement as well?
A. Yes, ma'am.
Q. Okay. Has West, Ltd. -- well, never mind.
11:17 Strike that.
Have any of the developments with which you -- you are one of the businesses that we talked about today have been affiliated not done the land dedication?
11:17 A. No, ma'am. It's not an option.
Q. Are any of your -- the businesses we talked today affiliated with Bay Colony in League City?
A. Lingo S7 is in the Bay Colony MUD.
Q. Did Lingo S7 sell any of the -- the lots or do

11:18 any of the infrastructure work in Bay Colony?



A. Can you ask that question again?

Q. Is Lingo -- is Lingo Southfork, Ltd., has it developed any part of Bay Colony?

A. Lingo Southfork, Ltd., is in Manvel.
11:18 Bay Colony is in League City. They're not close.

Q. So they're in the same MUD?

A. No.

Q. They're not? Okay.

A. No. The original question you asked me was
11:18 about Lingo S7, which is different than Lingo Southfork. Lingo S7 is in the Bay Colony MUD.

Q. Thank you.

Has Lingo S7 developed any part of the Bay Colony development?

11:19 A. Not the development; but the MUD, yes.

Q. Okay. I'm going to want to walk through some of these interrogatory answers, and they talk a lot about the impact fee study in 2023. Okay?

A. Okay.

11:20 Q. So I'm just going to hand you a copy of it and make it a little easier to talk about it.

MS. ALBIN: I did not print three copies of this. Do you-all have the impact fee --

MR. SPEARS: 2023?

11:20 MS. ALBIN: The new one, yeah.



MR. ROBERTS: Um-hum.

MS. ALBIN: I figured you might. Okay. Good.

MR. SPEARS: I think that's --

11:20 MR. ROBERTS: Exhibit --

MR. SPEARS: That is Exhibit 3.

MS. ALBIN: Okay. Do you want me to remark it today, or you just want to use it?

MR. ROBERTS: No. That's a whole --

11:20 MS. ALBIN: Okay.

MR. ROBERTS: We don't need six copies of it in the record.

MS. ALBIN: Right.

MR. ROBERTS: It's Exhibit 3 we utilized in

11:20 Baumgartner's deposition.

MS. ALBIN: Perfect. Do you have a marked copy for him, or do you want me to give him the copy I ran off today?

MR. ROBERTS: I have my copy. It's all got

11:21 notes on it.

MS. ALBIN: Okay. Well, I will represent to you this is the report with the ordinance attached, which is how it came to us.

THE WITNESS: Okay.

11:21 (Exhibit 3 previously marked.)



Q. (BY MS. ALBIN) Okay. So I'm going to hand you what was previously marked as Exhibit 3 to John Baumgartner's deposition. Feel free to take a minute and look at that.

11:21 MS. ALBIN: Let me ask you-all, on Baumgartner's was the ordinance attached to the -- to the --

MR. ROBERTS: No.

MS. ALBIN: -- study? Okay.

11:21 Q. (BY MS. ALBIN) Mr. Goza, if you'll take off just the front two pages, just so it's not any different than what you guys did before. Thank you.

Okay. So you have in front of you what was previously marked as Exhibit 3 to John Baumgartner's

11:22 deposition, and this is titled "City of League City 2023 Water and Wastewater Capital Recovery Fee Update." Do you see that?

A. Yes, ma'am.

Q. Okay. Are you familiar with this report?

11:22 A. Yes, ma'am.

Q. When do you recall first seeing a copy of this report?

A. Sometime in 2023.

Q. And what is your understanding of the purpose

11:22 of the capital recovery fee update?



A. It's to make adjustments to the amount of impact fees. It lays out all the future projects, what they should cost and through mathematical formulas comes up with what the new impact fee should be.

11:22 Q. And if you could, just in your own words what do you understand the impact fee to be?

A. The impact fee is something the City used to bill builders, developers, mostly builders, for the use of the existing services and upgrades to those, upgrades

11:23 to services.

Q. And when you say "services," are you talking about any particular set of services?

A. Water and sewer, roads.

Q. Okay. Prior to 2023, had you ever seen an

11:23 impact fee study that was being done in anticipation of the fees being increased?

A. Yes, ma'am.

Q. What -- and was that in League City as well?

A. Yes, ma'am.

11:23 Q. When was that?

A. I probably couldn't recall the date.

Q. Does -- 2018 or 2019, does that sound about right?

A. Somewhere around there.

11:24 Q. Okay. Anytime prior to that?



A. Not that I remember.
Q. All right. And going back even in 2018 or 2019, none of the entities with which you're affiliated that we talked about today would have paid the impact
11:24 fees because they're not the builder; is that right?
A. You're right.
Q. Okay. And are you familiar with the firm Freese and Nichols, Inc.?
A. Yes, ma'am.
11:24 Q. What's your understanding of what Freese and Nichols, Inc., does?
A. They're an engineering firm.
Q. Okay. And in any of the projects that we've mentioned today, or maybe even some we haven't, has --
11:24 have Freese and Nichols prepared any capital recovery fee reports?
A. For any of the entities that I'm associated with?
Q. For any of the cities where you have an entity
11:25 that would have been affected by the impact fees?
A. Yes.
Q. Okay. And where else would that?
A. Friendswood, Manvel, League City. I can't say specifically, but I know they are a firm that does a lot

11:25 of these.



Q. And have you gone to City Council to talk at all about the -- a report prepared by Freese and Nichols?
A. Yes, ma'am. I actually sent a letter to
11:25 council concerning this report.
Q. Okay. Did you attend the City Council meeting?
A. No, I didn't. I was out of town.
Q. Okay. I might as well get that out now, too.
(Exhibit 9 marked.)
11:26 Q. (BY MS. ALBIN) I'm passing you what I've marked as Exhibit 9 to today's deposition.
MS. ALBIN: Sorry, I didn't mean to throw that at you.
Q. (BY MS. ALBIN) You just mentioned that you sent
11:26 in a letter to council regarding what was marked Exhibit 3. Is this the letter that you're talking about?
A. Yes, ma'am.
Q. Okay. Great.
11:26 And this appears to have been sent by Lingo Properties, Inc.; is that correct?
A. Yes, ma'am.
Q. All right. Did you write this letter?
A. Yes, ma'am.

11:26 Q. Were -- were you assisted by anybody in



preparing this letter?
A. No, ma'am.
Q. Okay. All right. Turning back to your interrogatory responses; so if you'll look on Page 3,
11:27 Interrogatory Number 2.
A. Okay.
Q. And just to summarize, this question asks about why you believe the City did not comply with Chapter 395. Do you see that?
11:27 A. Yes, ma'am.
Q. Okay. Do you -- as you sit here today, is it your contention that the City did not comply with on of the steps that's spelled out in Chapter 395 for adopting impact fees?
11:28 A. Yes, ma'am.
Q. Okay. And which part of the chapter is it that you think League City did not comply with?
A. I don't believe they used reasonable estimates of cost. I don't believe that they formed a committee.
11:28 Q. Anything else?
A. No, ma'am.
Q. Okay. Let me start with the second part of your answer. You don't believe they formed a committee. Are you referencing the Capital Impact Advisory

11:28 Committee?



A. Yes, ma'am.
Q. Okay. And it's your belief that the City of League City doesn't have a Capital Impact Advisory Committee?
11:29 A. It's my belief that they don't --
Q. Okay.
A. -- or they didn't.
Q. It's your belief that they did not have one in 2023 at the time this report was adopted; is that --
11:29 A. Yes, ma'am.
Q. -- your testimony? Okay.
And the first part of your answer a moment ago was that you don't believe they used reasonable estimate of costs; is that fair?
11:29 A. Yes, ma'am.
Q. All right. Can you explain a little bit what you mean by that?
A. I think the numbers in this report are overinflated and not valid.
11:29 Q. Which numbers are you talking about?
A. Specifically everywhere it talks about a -- a 24-inch water line, but if they're wrong, I would assume all of them are wrong.
Q. What is it about the numbers related to a

11:30 24-inch water line that you think are wrong?



A. They're twice the amount they should be.
Q. When you're talking about a 24-inch water line, are you talking about water, wastewater or both?
A. Water.
11:31 Q. Water. Okay.
So that would be Section 3 of this report; would you agree with that? If you look at the Table of Contents, 1 is "Background"; 2 is "Land Use Assumptions"; 3, "Capital Improvement Plans" -- I'm
11:31 sorry -- 4 is "Water and Wastewater Capital Recovery Fee Analysis" and 5 is "Capital Recovery Fee Adoption."
So the 24-inch water line you're talking about would then be under Section 4 in this report?
A. No. It would be under Section 3.1, the Capital
11:31 Improvement Plans or --
Q. Okay.
A. -- the projects.
Q. The projects. All right. Let's take a look at those.
11:31 MR. ROBERTS: I think you're referring to Appendix B, is that right --
THE WITNESS: Yeah.
MR. ROBERTS: -- Appendix B?
THE WITNESS: Yeah.

11:31 A. Sorry, Appendix B.



Q. (BY MS. ALBIN) Appendix B. Okay.
A. It's these pages where they list the projects (indicating). It's deeper in the report than that.
Q. Do -- can you see down at the bottom, is
11:32 there --
A. There's not a page number.
Q. There's no page number or anything. Page numbers would be too much to ask for.
MR. ROBERTS: We'll ask Mr. Weatherly about
11:32 that.
MS. ALBIN: I sure will, believe me.
A. It is under Appendix B, though. So you're not quite -- your --
Q. (BY MS. ALBIN) Yeah.
11:32 A. -- your bottom finger is close --
Q. I just passed A.
A. -- because I can see it. That's where they start.
Q. Okay. Thank you. Sorry about that.
11:32 So we're looking in Appendix B of Exhibit 3. Can you direct me to a page that contains information about a 24-inch water line that you contend is --
A. The CIP Project, Number 3, and it's got a

11:33 little number with a circle in it.



Q. Thank you. That helps.
Okay. This is what I'm looking at (indicating). Is that the same page you're looking at?
A. Yes, ma'am.
11:33 Q. Okay. Great.
And just for the record, this is in Appendix B. It indicates CIP Project Number 3, and it is describing a "New 24-Inch Water Line to West Side." Do you see that?
11:33 A. Yes, ma'am.
Q. So we're talking about the same page?
A. Yes, ma'am.
Q. All right. So if you could, walk me through this table down here that's got "Quantity," "Unit Price"
11:33 and a "Total," and then it also says "Contingency" and "ENG/Survey" -- I assume that means engineering, but tell me if you think it's something different. Can you identify the parts of this table that you contend are not correct?
11:34 A. Yes, ma'am. The unit price of $400 per foot is not correct.
Q. Okay. Any other parts?
A. The contingency is not correct.
Q. And how about the engineering/survey?

11:34 A. That's pretty close to correct.



Q. Okay. What is it that you contend is incorrect about the unit price of $400 here?
A. It's about 210, $215 over market price.
Q. And when you say market price, are you talking
11:35 about the market price today?
A. No. I'm talking about the market price then.
Q. Market price in --
A. 2023.
Q. Right. And this has a date of April 11, 2023,
11:35 at the kind of top right of this box. Do you see that?
A. Yes.
Q. Okay. So it's your testimony that around the time this report was produced in 2023 the market price for a unit -- each unit of a 24-inch water line would be
11:35 roughly half of what's identified here?
A. Yes, ma'am.
Q. Okay. So about $200?
A. Yes, ma'am.
Q. All right. And tell me what it is about the
11:35 contingency of 30 percent that you think is not correct.
A. I've -- I've never heard of a 30 percent contingency. Industry standard is between 3 and 10 percent. So 30 percent is unheard of.
Q. What is your understanding of what the

11:36 contingency fee is covering or describing?



A. The contingency fee would cover things that weren't -- that weren't -- that were unknown.
Q. Can you give me an example?
A. Hmm, you run into a gas line in the middle of a
11:36 field, maybe that was unknown. It shouldn't be, but it could be.
Q. And so the contingency fee, then, makes up or anticipates that there's going to be unknown expenses that need to be covered; is that fair?
11:36 A. That would be fair.
Q. All right. And just so I'm clear, it's the percentage here that you're saying is wrong, which of course impacts the total number at -- at the back end, but it's really the percentage that you're focusing; is
11:36 that correct?
A. Yes.
Q. Okay. And you're also not challenging the quantity here of 7,600; is that correct?
A. No, ma'am, I'm not --
11:37 Q. All right.
A. -- challenging that.
Q. Okay. What is your understanding of the -- when we're talking about a CIP project number and they have 1, 2, 3, 4, what is your understanding of what

11:37 those -- what that is?



A. It's just a reference to a project.
Q. Okay. And are you familiar with all of the projects in a Appendix B in this report?
A. Not 100 percent of them; but some of them, yes.
11:38 Q. Okay. And is the one that we just talked about, CIP Project 3, is that one that was in any of the subdivisions that was developed by one of the entities we've talked about today?
A. No. These are future projects, not projects
11:38 that have been done. So it wasn't done by any of our entities.
Q. Okay. And do you know whether that project has started now as we're sitting here in April of 2024?
A. No, ma'am, I don't.
11:38 Q. Okay. Are there any other specific projects in Appendix B that you think the unit price for contingency is not correct?
A. Number 6, Number 7, Number 12, Number 13, Number 14, 15.
11:39 Q. 6, 7, 12?
A. 13, 14 and 15.
Q. 13, 14 and 15.
All right. A lot of these, even ones you haven't talked about today, have the contingency of

11:40 30 percent in them. Okay? Does your opinion change



about the contingency change from project to project, or is it that any project that has a 30 percent the 30 percent is wrong?

A. No. Any project that has a 30 percent, the
11:40 30 percent is wrong.

Q. Okay. Then let's turn to 6. So I'm looking at CIP Project 6, 24-inch water line on Bay Area Boulevard Segment 2. Do you see that?

A. Yes, ma'am.

11:41 Q. Are we looking at the same page?

A. Yes, ma'am.

Q. And is -- or you tell me, what is it in this chart that you contend is wrong other than the contingency. I already understand that.

11:41 A. Unit price.

Q. Okay. And do you contend that -- that the market price in 2023 should have been roughly half of this 400?

A. Yes, ma'am.

11:41 Q. Okay. Same as with Number 3?

A. Yes, ma'am.

Q. All right.

A. Going forward, they would all be the same.

Q. Okay. So you have the same answer for

11:41 CIP Project Number 7, Maple Leaf water line extension



Phase 1.
A. Yes, ma'am.
Q. The unit price is in the report is listed at 400, and you contend it should be about half that; is
11:41 that --
A. Yes, ma'am.
Q. Okay. And that's the same answer for CIP Project Number 12, which is the FM 517 water line extension from Landing Boulevard to Maple Leaf
11:42 Drive; correct?
A. Yes, ma'am.
Q. All right. And is that also the same answer on CIP Project Number 13, described as a 24-inch Bay Area Boulevard water line extension?
11:42 A. Yes, ma'am.
Q. Okay. And is your testimony the same for CIP Project Number 14, Muldoon Parkway water line extension Phase 2 to West Boulevard, that the $400 unit price should be roughly half?
11:42 A. Yes, ma'am.
Q. Okay. And is that the same answer for CIP Project Number 15, Maple Leaf water line extension to FM 517?
A. Yes, ma'am.

11:42 Q. Okay. All right. The following appendix is



Appendix C, and that is the wastewater capital recovery fee, eligible CIP. Do you see that?
A. Yes, ma'am.
Q. All right. Are there any projects in the
11:43 wastewater section that you contend were not projected correctly?
A. Yes, ma'am. Number 3.
Q. All right. Okay. And Number 3 is described as expansion of Pedregal lift station to 1.5 MGD firm
11:43 capacity. Are we looking at the same page?
A. Yes, ma'am.
Q. All right. What is it in this table here that you contend is not correct?
A. All of it.
11:43 Q. And are you talking about just the numbers or the project description and the project drivers?
A. All of it.
Q. Okay. Let's start with the project description. What is it that you think is not correct
11:43 about the project description?
A. It's already been done.
Q. When was this done?
A. In 2020.
Q. So it's your testimony that in 2020 the

11:44 Pedregal lift station was expanded to 1.5 MGD firm



capacity?
A. Yes, ma'am.
Q. Okay. And the project drivers here, what is it about that statement that you think is incorrect?
11:44 A. The drivers, there's nothing wrong with it. But it was already done. So there would be no drivers from this point. It's built to account to for the 1.5 million gallons per day.
Q. Okay. Looking at Item Number 1, Pedregal LS
11:45 replacement pumps, unit price and total, do you contend those are wrong?
A. The individual items listed here, I -- I'm not going to contend that they were right or wrong. But what I do know is the whole lift station that we put in
11:45 that includes this 1.5 million gallons per day cost less than this number here.
Q. Okay. Who paid for the Pedregal lift station?
A. West, Ltd.
Q. And did you -- did -- or did West, Ltd., pay a
11:46 contractor directly to do that work or did West, Ltd., pay the City and then the City hired somebody to perform the work?
A. We paid a contractor directly.
Q. Who was the contractor?

11:46 A. I forget the name of the contractor.



Q. Is that normally how the -- these types of projects are done, the -- the developer pays the contractor directly as opposed to having it go through the City and then the City does the development?
11:46 A. Normally the contractors work for the developer, yes.
Q. Okay. Do you think that there's any difference in the pricing that a developer can get as opposed to a city?
11:47 A. Yes.
Q. And can you describe what the difference would be?
A. I would imagine the city's would be a little bit higher.
11:47 Q. That it would cost the City a little bit more to have that work done?
A. Yes.
Q. Okay. Do you have any explanation for why that might be?
11:47 A. Takes longer to get paid.
Q. Okay.
A. More people to deal with.
Q. So if we wanted to figure out exactly what was paid on this project, the City could ask West, Ltd., for

11:47 an agreement and an invoice with the contractor that



expanded the Pedregal lift station in 2020? Would that be a question that would get those documents?
A. Yes, ma'am.
Q. Okay. Did you provide that to the City at any
11:48 time?
A. No, ma'am.
Q. Okay. So when this rep -- report was prepared and you saw that that was included, it's your testimony that you did not provide anything to the City showing
11:48 that it was already done?
A. No, ma'am, I didn't.
Q. Why not?
A. Didn't have time.
Q. Okay. Is there anything else in Appendix C,
11:48 any other projects that you contend are incorrect?
A. No, ma'am.
Q. All right.
A. Other than the contingency on all of them.
Q. Yes. I understand that.
11:49 A. And my assumption would be if one is overpriced they're all overpriced.
Q. Let's look at Number 4 on the wastewater. This has a -- I'm looking at CIP Project Number 4. Project name is "New southwest 48-inch gravity line extension

11:49 and force main reroute." Are we looking at the same

page?
A. Yes, ma'am.
Q. Okay. They got a -- Item Number 1 is a 48-inch pipe 8 to 16 feet deep, and it's got a unit price of
11:49 864. Do you see that?
A. Yes, ma'am.
Q. Okay. As you sit here today, do you have any reason to believe, other than your assumption, that that number is wrong?
11:50 A. Not specifically that number, no.
Q. Okay. And is that true of all of the unit pricing in the remainder of Appendix C?
A. Yes, ma'am.
Q. Okay.
11:50 MR. ROBERTS: When you're at a good spot, can we take a little break?
MS. ALBIN: Sure. We can do that now.
MR. ROBERTS: Okay. Good.
THE VIDEOGRAPHER: Okay. Off the record at
11:50 11:50.
(Recess from 11:50 a.m. to 12:00 p.m.)
THE VIDEOGRAPHER: Okay. Back on record at 12:00 p.m.
Q. (BY MS. ALBIN) Mr. Goza, we're back on the

12:01 record after a short break. And we had been looking



Appendixes -- Appendices B and C of the 2023 water and wastewater capital recovery fee update. I just have one follow-up question.

If you'll look back at Appendix B, the very
12:01 first CIP project we talked about, Number 3.

A. Okay.

Q. And the unit price, if you'll recall, was $400 in the report, and I believe it was your testimony it should have been roughly half. Do you recall that?

12:01 A. Yes, ma'am.

Q. Okay. Do you have any understanding of how Freese and Nichols came up with the $400 unit price?

A. No, I don't.

Q. Okay. And what is it that you base your
12:01 estimate that it should have been roughly half on?

A. We have an existing project that I have a contract with the City and I have a contract with a contractor to install 21,000 feet of 24-inch water line for the City and the total cost of the water line
12:02 including all the valves, fire hydrants and everything is $185 per foot. The project is currently ongoing. The final bills haven't been paid yet.

Q. And that's in the City of League City?

A. Yes, ma'am.

12:02 Q. You said 21,000 feet of water line?



A. 24-inch water line, yes, ma'am. It's a city project.
Q. Okay. And that's not included in the -- this report that we're looking at today; correct?
12:02 A. No, ma'am.
Q. Is -- does that have a project name?
A. Yes.
Q. What is the project name?
A. They refer to it as the "Grand Bargain."
12:02 THE REPORTER: Grand?
THE WITNESS: Grand Bargain.
Q. (BY MS. ALBIN) When did that project start?
A. In 2020.
Q. And is the work itself finished?
12:03 A. The work itself is completed, yes.
Q. When was it completed?
A. The fall of '23.
Q. Was the water line purchased prior to the fall of 2023, when it was completed? Let me see -- your face
12:03 tells me I need to ask a better question?
A. Yes, ma'am.
Q. Okay. If the project -- the work was actually complete in the fall of 2023, were the materials already purchased prior to the completion?

A. Yes, ma'am.



Q. Okay. When were the materials, including the 24-inch water line, when was it purchased?
A. In between 2020 and 2023.
Q. And on Grand Bargain, did you sort of buy the materials as you finished sections? Or how -- how did you go about purchasing the 21,000 feet?
A. I hired a contractor. So the contractor purchased the materials, but...
Q. And do you have an understanding of whether that purchase was done all at once or if they would buy say, I don't know, 5,000 feet, finish the project and buy another 5,000 feet? Do you know one way or the other?
A. I don't specifically know one way or another. But it would be unheard of if they bought all the materials and sat them out there on-site and expected them not to get stolen.
Q. Who was the contractor?
A. Angel Brothers. And it completed under Gulf Coast.
Q. When you say "completed under," what do you mean by that?
A. Angel Brothers sold to Gulf Coast.
Q. Okay. And is that the same Angel Brothers

12:05 that's a partner in West, Ltd.?



A. Yes, ma'am.
Q. So Angel Brothers is no longer a partner then; correct?
A. Angel Brothers is a partner. Angel Brothers is
12:05 no longer a contractor.
Q. Okay. Understand.
(Exhibit 10 marked.)
Q. (BY MS. ALBIN) Okay. I'm going to pass you what I'm marking as Exhibit 10 to today's deposition.
12:06 A. Okay.
Q. It's an email that appears to be sent from you and have a -- an attachment. And I'll represent to you the printed pages that go along with it are the attachment.
12:06 A. Okay.
Q. Okay?
MS. ALBIN: There you go.
MR. ROBERTS: Thank you.
MS. ALBIN: Sure.
12:06 Q. (BY MS. ALBIN) Do you recognize this email?
A. Yes.
Q. Okay. Did you send this email?
A. Yes.
Q. All right. And we were just talking about

12:07 Grand Bargain. And this title, this appears to be



Grand Bargain Pay Estimate Number 17. Do you see that?
A. Yes, ma'am.
Q. Okay. Is this the same project that we were just talking about?
12:07 A. Yes, ma'am.
Q. All right. And this appears to have been sent June 9, 2023, to John Baumgartner. Do you agree with that?
A. Yes, ma'am.
12:07 Q. All right. And who do you understand John Baumgartner to be?
A. City manager of the City of League City.
Q. All right. And you copy here Garrett Goza with Gulf Coast and Angie Steelman. So who is Garrett Goza?
12:07 A. That's my son.
Q. All right.
A. He works for Gulf Coast.
Q. Okay. And who do you understand Angie Steelman to be?
12:07 A. She's the chief financial officer for the City of League City.
Q. All right. And does -- does Garrett Goza have any ownership in Gulf Coast?
A. No, ma'am.

12:08 Q. Okay. He's just -- he's an employee?



A. Yes, ma'am.
Q. All right. Do you know what his title is?
A. Estimator.
Q. Estimator?
12:08 A. Um-hum.
Q. Okay. What does that mean?
A. He estimates the cost of projects.
Q. Okay. And do you understand his estimations to include materials and labor or just one or the other?
12:08 The whole thing?
A. All.
Q. Everything. Okay.
How long has he been an estimator?
A. Ten years.
12:08 Q. Has he done any work as an estimator for any projects with which one of the entities we described earlier today was responsible?
A. He may have estimated one section of Pedregal and this Grand Bargain.
12:09 Q. And would the section of Pedregal be the lift station that we talked about?
A. No, ma'am.
Q. Okay. What -- what would that have been then?
A. It would have been Section 5. And Gulf Coast

12:09 didn't do the lift station. It was another company. So



he wouldn't have estimated it.
Q. Okay. This probably sounds like a silly question, but what's the purpose of having -- for Section 5 of Pedregal, for example, what's the purpose
12:09 of having an estimator?
A. So you can get an idea of what you're costs are going to be.
Q. Okay. Are those ever wrong?
A. All the time.
12:10 Q. What are some of factors that can cause an estimate to be wrong?
A. Hmm, different ground conditions, a gas line in the way as we discussed earlier.
Q. Do the cost of materials ever fluctuate such
12:10 that the estimate is wrong?
A. No.
Q. You've never had a project where the cost of the materials has gone up and changed the estimate?
A. No.
12:10 Q. Okay. What about the cost of labor?
A. Yes.
Q. And how does the -- in your experience, how has the cost of labor changed in a way that has made the initial estimate wrong?

12:11 A. Are we talking about the -- the $400-a-foot



water line or this project or --

Q. Let's -- let's start -- we'll talk about Grand Bargain since we've got that out. Did the cost of labor ever change from 2020 to 2023?

12:11 A. No, because the labor and the materials were all pre-bid. The materials changed, not the price of the materials but the quantity of the materials changed.

Q. Why is that?

A. Because the information given to us by the City

12:11 was inaccurate.

Q. Were more materials or less materials needed?

A. More.

Q. Okay. What information was inaccurate?

A. The City provided us with the schematics of the

12:11 major wastewater treatment plant that they have on the far west side of town. They showed that we were going to be tying our sanitary sewer into just a -- a manhole that had nothing else going to it. But when we got there, there were two -- I think there were two -- I

12:12 think they were 20-inch lines, grav -- not gravity lines but two 20-inch force mains shooting into this manhole. So we had to change the scope of our work.

Q. Okay. So I'm -- I'm still looking at Exhibit 10, but I'm looking to the attachment now.

12:12 A. Okay.



Q. Does this appear to be -- correctly represent the attachment to that email?
A. It appears to be. I think there were several Number 17s. This one says Revision 1. That would
12:12 indicate there's a Revision 2, maybe.
Q. Where are you seeing "Revision"?
A. Where it says "Application for payment number" underneath Dannenbaum Engineering's name, it says Number 17 and it says "Rev. 1."
12:12 Q. Okay. Thank you. I see that.
All right. And this indicates a period of July 2022 -- 2022 through February of 2023. Do you see that?
A. Yes.
12:13 Q. So was this intended to be a -- an invoice for just a piece of the overall project?
A. Yes, ma'am.
Q. Okay. And is there anywhere on here that we can see the cost of a 24-inch water line?
12:13 A. Yes, ma'am.
Q. Can you point me to that, please?
A. On Page 2, right below where it says Section C, "Water Distribution System," Line Number 2 says "24-inch PVC water line, $108 a foot," and there was

12:13 21,585 linear feet of it.



Q. Okay.
A. $185 a foot that I told you earlier includes all of these items (indicating).
Q. And are these Items 1 through -- it looks like
12:13 1 through 11.
A. Um-hum.
Q. Are Items 1 through 11 all components of the water line?
A. Yes, ma'am.
12:14 Q. Okay. So is it fair to say that when the -- before the project began the -- the unit prices were all locked in?
A. Yes, ma'am.
Q. Okay. So that would have been before -- before
12:14 or in 2020?
A. Yes, ma'am.
Q. Okay.
A. Towards the end.
Q. And the agreement that the contractor had would
12:14 not have allowed for a change in the price of the materials; is that correct?
A. Yes, ma'am.
Q. All right. So what we're seeing here really in this invoice with the 108 as the water line, plus the

12:14 other components that you said would come to 185, those



are 2020 prices; correct?
A. Yes, ma'am.
Q. Or perhaps even earlier than that, depending on when the bid was done; right?
12:15 A. Yes.
Q. Okay. Do you know when the bid for the -- that project was done?
A. I know that the contract was signed around October of 2020.
12:15 Q. Okay. Other than your experience with the Grand Bargain project, do you have any other reason to believe that the $400 unit price was incorrect?
A. No, ma'am.
Q. All right. I'm going to turn your attention
12:16 back to Exhibit 8.
A. Okay.
Q. The interrogatory responses.
Before I ask my question, do you have an understanding of what the components are that are used
12:16 to calculate an impact fee?
A. Yes.
Q. Okay. And based on the petition, it's my understanding that you contend the -- what Freese and Nichols did in calculating the impact fee was wrong; is

that fair?



A. Yes, ma'am.

Q. All right. And we talked about the -- you don't think they used reasonable estimate of costs; correct?

A. Yes, ma'am.

Q. Okay. Interrogatory Number 3 asks why you believe the methodology used to calculate impact fees was flawed. And so I'd like to ask you now: Is there manage other than the estimate of costs that you contend was in correct in Freese and Nichols methodology?

A. I would believe that the growth rates were wrong. They're showing residential and commercial growing at the same rate. And based on my experience and a lot of other people's, commercial follows residential; they don't grow at the same rate.

Q. Did you -- have you looked at the land use assumptions that are in this report?

A. Yes, ma'am.

Q. Okay. Why don't we take a look at them. I think they start in Section 2. Are you there?

A. Yes, ma'am.

Q. All right. Under Section 2.2, it's titled "Land Use Assumptions Update," and there's a little table in the center of that, Table 2-1.

12:18 A. Okay.



Q. All right. And this appears to represent the histor -- historical population of League City dating from 2011 to 2022. Do you see that?

A. Yes, ma'am.

12:18 Q. All right. Is there anything about these specific growth rates that you contend are incorrect?

A. No, ma'am.

Q. Okay. And if you'll turn to the next page, it's a map, should be colored with a blue color.

12:19 A. Yes, ma'am.

Q. And this Figure 2-1, it says "Water and wastewater, water CRF service area."

A. Okay.

Q. Is there anything about this service area that 12:19 you contend is incorrect?

A. No. That looks like the City of League City boundaries.

Q. Okay. And then the same question on the next page, which is colored sort of green in the center. And 12:19 this one appears to be the wastewater, CRF service area?

A. Yes, ma'am.

Q. Do you have any belief about whether this map is incorrect?

A. No, ma'am.

12:20 Q. Okay. Are there any specific pages in the land



use section that you have looked at and believe are -- state something incorrectly or have a map that is not accurate?
A. No. I just remember reading it back then that
12:20 it had specific -- well, not specific, but it made some assumptions about some commercial development that's not happening.
Q. And do you recall that there was a name of the commercial development or --
12:21 A. It's not the name. It's just the general theory. There's no --
Q. Okay.
A. Commercial doesn't grow as fast as residential.
Q. Okay. So that's the -- that's the basis for
12:21 your belief --
A. Yes, ma'am.
Q. -- that the land assumptions are off?
A. Yes, ma'am.
Q. Okay. And going back to
12:21 Interrogatory Number 3, which is part of Exhibit 8.
A. Um-hum.
Q. Is there any other component in the methodology that you contend is incorrect?
A. No, ma'am.

12:21 Q. Okay. Let's look at Number 4,



Interrogatory Number 4, "Which, if any, construction costs, including contingency and inflation, in the capital improvement plan you contend are unreasonable." And part of this answer directs us to the letter, which
12:22 is Exhibit 9, I believe that's correct?

A. Yes.

Q. Okay.

A. It's Exhibit 9.

Q. Let me ask a better question. The response to
12:22 Interrogatory Number 4 references a letter. Is that letter what we've identified as Exhibit 9 today?

A. Yes.

Q. Okay. And the -- the response here says "Letter Mr. Goza delivered on or about May 23, 2023."
12:22 We can see the letter in Exhibit 9 stated May 22, 2023. Was there a separate letter, or is this the one?

A. No. That's the letter.

Q. Okay.

A. It was delivered on the 23rd.

12:22 Q. Okay. And there were no other letters?

A. No, ma'am.

Q. So in response to Interrogatory Number 4, which is asking about the construction costs that you contend are not reasonable, the answer refers us to Exhibit 9.

12:23 And can you -- where in Exhibit 9 have you identified a



basis for believing that the construction costs are unreasonable?
A. Well, about middle of the page, it says, for example, "The estimates used to anticipate costs should
12:23 reflect a worst case scenario and unjustified inflammatory and contingency factors."
Q. Okay. And the -- what's stated in this letter that unjustified inflationary and contingency factors, is that referencing what we've already talked about when
12:24 we looked at the CIP Project Number 3, where you indicated you thought the cost should have been about half and that the contingency of 30 percent was too high?
A. Yes, ma'am.
12:24 Q. Okay. Is there anything else?
A. No, ma'am.
Q. And on the top of Page 4, it kind of finishes your answer to Interrogatory Number 4.
A. Um-hum.
12:24 Q. "Goza has knowledge of correct or reasonable pricing on capital improvement projects at issue as Plaintiff and Mr. Goza worked on a project included in the 2023 capital impact fee study." My question is: What is that project?

12:25 A. Well, the one that we -- we worked on was the



Pedregal lift station improvement. But the other project kind of talked about there is the Grand Bargain.

Q. And the Pedregal lift station expansion is the one that we already talked about --

12:25 A. Yes, ma'am.

Q. -- correct? All right.

And is there -- are there any other projects other than the Pedregal lift station and the Grand Bargain that you base your belief on about the

12:25 costs of the projects being too high?

A. No, ma'am.

Q. Interrogatory Number 5, this asks about why you contend the finance costs are unreasonable. Do you have -- as you sit here today, are you contending that

12:26 the finance costs in the report are unreasonable?

A. I am. And I can go back and look through these again, but, I mean, it's -- I believe that they are unreasonable. I believe they're talking about issuing a bunch of bonds that don't necessarily need -- need to be

12:26 issued. They're charging finance costs now, and they're not issued now. So they're unreasonable.

Q. Okay. Is there any -- other than what you just described, is there any other reason that you're contending --

12:26 A. No, ma'am.



Q. -- the finance costs are unreasonable?

A. Well, other than you started with bad data. So everything would be bad going forward.

Q. Right. You contend that the overall costs is

12:26 wrong. So that's part of it?

A. Yes.

Q. And you're also, if I understand, saying that your belief is the City was going issue bonds unnecessarily that then impacts the -- the finance

12:27 cost --

A. Yes.

Q. -- is that correct? Okay.

Interrogatory Number 6, if you'll look at that. I'll summarize. It's asking what you contend the

12:27 maximum fee should have been, if you have a -- a belief about that. As you sit here today, do you have an idea of what you think the maximum fee per unit should have been?

A. I don't have an actual number, but what I have

12:27 is a belief that if you start with the correct data and you go through this process you'll come out with a correct answer. But what they're doing is starting with numbers that are twice what they should be, and you're never going to get there. So it's not fair.

12:28 MS. ALBIN: Objection, nonresponsive.



Q. (BY MS. ALBIN) I think my question is just a little bit different.

A. Okay.

Q. Do -- do you have a -- do you have a number

12:28 that you think would have been appropriate --

A. No, ma'am.

Q. -- for the maximum impact fee?

A. No, ma'am --

Q. Okay.

12:28 A. -- I don't. I believe that it can be calculated based off real information.

Q. But as you're sitting here today, you haven't done those calculations. So you can't testify what you think is --

12:28 A. No, ma'am. I'm not an engineer, and I don't pretend to have this much knowledge. But what I'm telling is you start with bad data, you end with bad data.

Q. If you'll look at Number 7. And this asks

12:28 whether you're contending that any of the projects were improperly included in the impact fee calculation. Do you understand that question?

A. That were improperly included, yes.

Q. Okay. And this identifies Projects 3 through 7

and 12 through 15 and then Capital Improvement Project



Number 3. Do you see that?
A. Yes, ma'am.
Q. Okay. My first question is: The -- the second part of that answer where it says "and Capital Improvement Project Number 3," is that water or wastewater?
A. That's wastewater.
Q. Wastewater. Okay.
A. That would be the Pedregal lift station.
Q. And you've already testified about your belief that that was already finished?
A. Yes, ma'am.
Q. And then is that why you think it should not have been included in the study?
A. Yes, ma'am.
Q. Okay. And then I believe 3 through 7 and 12 through 15, these are all water; is that correct?
A. Yes, ma'am.
Q. Okay. If it's helpful, we can look back at the table to see the projects.
Back in Appendix B of the -- of Exhibit 3, this is described as the new 24-inch water line to west side?
A. Yes, ma'am.

12:30 Q. All right. Why do you contend that should not



have been included in the study?

A. Maybe I misunderstood the question. I contend the number that they used shouldn't have been included in the study because it as was inaccurate, the cost.

12:30 Q. Okay. On CIP Project Number 23, the 24-inch water line to west side, you're not -- you don't believe that was already done like you do the Pedregal station; right?

A. Correct.

12:31 Q. Okay. You just think that the number they came up with was wrong?

A. Absolutely.

Q. Okay. And is that the same on Projects 4, 5, 6 and 7?

12:31 A. And 12 through 15.

Q. Okay. I want to make sure I'm understanding your testimony correctly. You're not contesting those projects being included in the study; correct?

A. No, ma'am I'm not contesting that.

12:31 Q. Okay. You just think the -- the estimate project total on those projects is wrong?

A. Yes, ma'am.

Q. Thank you.

Interrogatory Number 8 asks about the land

12:31 use assumptions. I'll let you look at that answer, and



then my question is just whether there's anything that you would add to the testimony you've already given about why you think the land use assumptions are incorrect?
12:32 A. No, ma'am.
Q. Nothing new?
A. Nothing new.
Q. All right.
(Exhibit 11 marked.)
12:32 Q. (BY MS. ALBIN) I'm going to pass you what I'm marking as Exhibit 11 to today's deposition. These appear to be West FM 517 Ltd.'s responses to the city's request for admissions. Do you see that?
A. Yes, ma'am.
12:33 Q. Did you participate in answering these admissions?
A. Yes, ma'am.
Q. All right. Starting with Request for Admission Number 2, "Admit that the projections to land use in the
12:33 land use assumption report prepared by Freese and Nichols, dated April 11, 2023, were reasonable," you denied. Is the denial for any reason other than the ones you've already testified about today?
A. No, ma'am.

12:34 Q. In the other capital improvements recovery fee



updates that you've seen, are those normally prepared by engineers?

A. Yes, ma'am.

Q. Okay. Do you think it's appropriate for an

12:34 engineer to prepare those?

A. Do I think it's?

Q. Appropriate?

A. Yes.

Q. Okay. And in this case are you familiar with

12:34 Richard Weatherly, the engineer who prepared this?

A. Not really.

Q. Do you know anything about his background or qualifications?

A. No.

12:34 Q. And as you sit here today, do you have any specific reason that you think he's not qualified?

A. No.

Q. And I should -- should have finished that, not qualified to prepare a capital recovery fee update?

12:35 A. No.

Q. And you haven't worked with him -- not with him but worked in any other cities or with any other developments where he prepared the report?

A. Not off the top of my head, I can't answer

that.



Q. Okay. Well, I'll represent to you that Freese and Nichols and Richard Weatherly were involved in the study in League City prior to this one. Okay?
A. Okay.
Q. Do you recall having any interactions or interactions with Mr. Weatherly at that time about the prior report?
A. No, ma'am.
Q. Okay. And did you challenge the prior report?
A. No, ma'am.
Q. All right. I'm going to turn you to Number 16.
A. Okay.
Q. "Admit the Plaintiff did not submit a written request indicating that the City had an unperformed duty under Chapter 395," and your response was "Deny." What is the basis for the denial?
A. The letter.
Q. Is that Exhibit 9?
A. Yes.
Q. Okay. Number 17, "Admit that the City follow the process outlined in Chapter 395 for amending impacts -- impact fees," and you denied. What is the basis for that denial?
A. The committee.

12:36 Q. And that's the Capital --



A. Yeah, CIAC.
Q. Thank you.
And more specifically your testimony earlier that you don't believe the City had a committee
12:37 in 2023; is that right?
A. Not a -- a -- a participating committee, no, they didn't.
Q. Okay. So participating committee is a little different than not having a committee at all.
12:37 A. I don't know exact word that -- the committee didn't do anything.
Q. Okay. I understood your testimony earlier to be that there was no committee. Okay?
A. There wasn't a separate committee appointed by
12:37 Council to do this. The P&Z did it.
Q. Okay.
A. But it was basically a rubber-stamp of the Freese and Nichols report.
Q. Did you attend the meetings where this report
12:37 was discussed by the committee or the P&Z?
A. No.
MR. ROBERTS: I'm sorry, objection to the form of the question.
Q. (BY MS. ALBIN) So if you didn't attend the

12:38 meeting, what -- what do you base your belief on that



the -- that the committee rubber-stamped the report?
A. There was -- there was no -- there was no meetings.
Q. So it's your belief the committee never met?
12:38 A. I don't believe so, not on this.
Q. Okay. Have you seen the letter that the committee sent to City Council recommending approval of the report?
A. No.
12:38 Q. Okay. If, in fact, there is a letter from the committee to the council recommending that the council approve the report, would that change your opinion at all about whether or not there was a committee and they --
12:38 A. No.
Q. It wouldn't change your opinion?
A. No.
Q. Okay. Do you know any of the committee members?
12:39 A. There was not a committee. It was the Planning and Zoning Commission.
Q. Do you know any of planning and zoning --
A. Yes.
Q. -- Commission?

12:39 Okay. Who do you know on the Planning and



Zoning Commission?
A. I don't recall their name. But there's a lady named Kathy on there. I know one lady named Kathy.
Q. Did she ever talk to you about the report?
12:39 A. No.
Q. Anybody else?
A. No.
Q. Did you ever email the members to discuss the report?
12:39 A. No. There was never communication between me and the members.
Q. Okay.
A. Other than the letter, which they didn't answer.
12:39 Q. Are you talking about your letter --
A. Yes.
Q. -- Exhibit 9?
A. Yes.
Q. Okay. Is there any other reason for the denial
12:39 of Number 17?
A. No, ma'am.
Q. All right. Number 18, "Admit that Plaintiff did not exhaust administrative remedies prior to filing this lawsuit," and this was denied. What is the basis

12:40 for the denial?



A. I mean, I asked questions that are -- are presented, my concerns in the letter and didn't get an answer.

Q. Okay. Is there any other reason?

12:40 A. No.

Q. Okay. Number 19 is kind of a long admission -- so I'm not going to read it to you -- but generally this asks for you to admit that the report contained a description of existing capital improvements in the 12:41 service area, cost to upgrade, update, improve, expand or replace to meet existing needs and usage for regulatory standards, and you denied that. What is the basis for the denial?

A. I think the whole report is inaccurate. I 12:41 don't --

Q. Okay. So you're disagreeing that the content is right. But are you denying that there's any part of the report that's supposed to be here that's missing?

A. Ask the question again.

12:41 Q. Are you contending that there is a component of the report that's supposed to be here that is missing as opposed to that you just think is wrong?

MR. ROBERTS: Objection, form.

Q. (BY MS. ALBIN) So, for example, the reports are

12:42 required to have the land use assumptions. Do you



understand that?

A. I'm not objecting to the contents of the report. I'm objecting to the information in the report.

Q. Okay. Thank you.

12:42 And that is the basis for your denial --

A. Yes.

Q. -- on Number 18?

Was that yes?

A. Yes.

12:42 Q. Okay. Thank you.

And Number 20 is similar, "Admit the capital improvement plan prepared by Freese and Nichols dated April 11, 2023, contained an analysis of the total capacities, level of current usage and commitments of

12:42 the existing capital improvements," and this is a "Deny." Is that denial because you believe that the content is wrong as opposed to that it's missing altogether?

A. Yes.

12:43 Q. You just believe the content is wrong?

A. Yes, ma'am.

Q. Okay. Number 21 is also similar. This asks about whether it contained the description of all or parts of capital improvements or facility expansions.

12:43 Is it the same answer, that you believe the content is



wrong not that information is missing?
A. Correct.
Q. Okay. Number 22, if you'll read that. Is your answer the same for Number 22, that you believe the
12:43 content is wrong, not that the component is missing?
A. Yes, ma'am.
Q. All right. And is the same for Number 23?
A. Yes, ma'am.
Q. The same for Number 24?
12:44 A. Yes, ma'am.
Q. And Number 24, this is talking about the projected demand for the capital improvements or facility expansions required by new service units.
A. Um-hum.
12:44 Q. What do you understand that -- that question to be about?
A. Expansions required by new service units. The number -- the number of connections to water and sewer.
Q. Okay. And why do you believe that the number
12:44 of connections is wrong?
A. The maps in here show -- show projects that were from back in 2016. Since then, all of the projects that have been approved have been less density, which would mean less connections. So I think they're wrong.

Q. And what are you basing your belief that the



density is less for all of the projects identified in the maps?

A. The actual knowledge of the projects. I mean, for example, was all 70-foot lots, and they're actually 120-foot lots. So in 2016, when it was approved, it was thousands of lots; now it's only 700. So there's 4- or 500 less connections.

Q. But that's just in the development that West FM worked on; correct?

A. Correct.

Q. And the maps identify developments that West, Ltd., is not affiliated with; correct?

A. Correct.

Q. So is it your testimony that you know what the density changes are for all of those other developments?

A. Yes. I've seen the maps and I've seen the approved drawings and subdivision plats and master plans, and there's less density overall in that 5,000 acres of West -- West League City.

Q. Okay. And I believe the maps cover all of League City, though; right?

A. Yes.

Q. Okay.

A. I'm specifically talking about the west side.

12:46 Q. When you say west side, are you talking about



west of --

A. West of 45.

Q. West of 45?

A. Yes, ma'am.

12:46 Q. Okay. So you're not challenging the density assumptions on anything east of 45; is that correct?

A. No, ma'am.

Q. All right. What are some of the other developments where you think the density is wrong that's

12:47 identified in these maps?

A. Samara to the north. To the far west would be Westland Ranch.

Q. Is Samara completed?

A. No.

12:47 Q. Do you know about how -- project completion, what the percentage --

A. 40 percent.

Q. And Westland Ranch.

A. Westland.

12:47 Q. Westland Ranch, is that complete?

A. No, ma'am.

Q. How about what would you guess the percentage --

A. 50 percent.

Q. Okay. And none of the entities of which you're



affiliated are involved in Samara or Westland Ranch; correct?
A. Correct.
Q. All right. Do you know the developers of those properties?
A. Yes.
Q. Who are the developers?
A. Lennar is the developer of Samara and -- I drew a blank -- D.R. Horton Development Group. Four Star, Four Star is the Westland Ranch.
Q. Okay. Other than Samara and Westland Ranch, are there other developments that are identified in these maps where you believe the density is less than what was projected?
A. Yes. Actually, about 1,700 acres between Samara and Westland Ranch that we're currently working with Hines Group on a contract and -- where they had projected about, I don't know, 700 acres of -- of high density, 60- and 70-foot lots were going to go in and do 100- to 120-foot lots, which will create less density. And this is at the City's request.
Q. The City requested to lower density?
A. Yes.
Q. And that was specifically you said in the

12:49 700 acres?



A. 1,700.
Q. Okay. What -- what borders that or what -- how would you describe that land?
A. Westland Ranch on the west side, Samara on the
12:49 east side.
Q. Who at the City has indicated that they wanted lower density in that area?
A. Chris Sims, Chris Carpenter. I think Chris Carpenter is the City planner, and Chris Sims is
12:50 the City engineer.
Q. Anyone else?
A. That's the only one I can think of at the moment.
Q. Okay. Is there any other developments or
12:50 projects related to density that form your belief that the information in the capital recovery fee is wrong?
A. No, ma'am.
Q. All right. Request For Admission Number 25 asks about the -- whether the report contains a plan for
12:50 awarding credits, and this was denied. What was the basis of the denial?
A. Just that the information is inaccurate.
Q. Okay. And is that the same answer for Number 26?

12:51 A. Yes, ma'am.



Q. Okay. So I'll represent to that you Chapter 395 requires certain things to be in the report.
A. Correct.
Q. Okay? And that's what's being referenced here
12:51 when it says "statutory elements"?
A. Correct.
Q. And as I understand your testimony today, it's not your contention that a statutory element is missing. It's your contention that the elements that are in there
12:51 the information is wrong; is that correct?
A. Yes, ma'am.
Q. All right. And do you have any other reasons besides what we've already talked about to believe that the capital recovery fee update did not comply with
12:51 Chapter 395?
A. No, ma'am.
Q. Okay.
THE WITNESS: Are we getting close to a break.
12:52 MS. ALBIN: We can take one now if you need.
THE WITNESS: Yeah.
THE VIDEOGRAPHER: Off the record at 2 -- 12:51.

12:58 (Recess from 12:51 p.m. to 12:58 p.m.)



THE VIDEOGRAPHER: Okay. Back on the record at 12:58.

Q. (BY MS. ALBIN) Mr. Goza, we're back on after a short break. I'd like to just finish marching through

12:58 these admissions. I think we stopped -- we're at 28.

A. Okay.

Q. The question is "Admit the capital -- capital improvements plan did not include costs for construction, acquisition or expansion of public

12:58 facilities or assets other than capital improvements or facility expansions identified in the plan," and you've denied that. What is the basis for the denial?

A. The information, same as before.

Q. Okay. So it's not your contention that

12:59 included in the overall recovery fee there was some project that's not in the plan?

A. Correct.

Q. All right. And is that the same basis for the denial on 29, you believe the information in the report

12:59 is just inaccurate?

A. Yes, ma'am.

Q. Okay. And what about Number 30, the same response?

A. The same.

Q. Okay. Number 31 asks to "Admit that the



capital improvement plan did not include costs for upgrading, updating, expanding or replacing existing capital improvements to provide better service to existing development," and you denied that?
A. Same reason.
Q. Okay. So you're not contending that there's a project other than the Pedregal lift station which we talked about?
A. Correct.
Q. That should not have been included in the plan at all?
A. Correct.
Q. All right. And 32, "Admit that the improve -- capital improvement plan did not include costs for administrating -- administrative and operating costs of the City, "and you denied that. What's the basis for the denial?
A. I -- I don't know -- based on the information here, I don't know that that's not the case.
Q. Okay. So is it your testimony as you're sitting here today you don't know whether this Number 32 should be denied?
A. No. I believe it should be denied --
Q. Okay.

01:01 A. -- because I don't know what's contained in



this report (indicating). I don't believe any of it is accurate because part of it is not accurate.

Q. Well, this specifically asks whether administrative and operate -- operating costs of the City are included in the report, and the response was "Deny." So are you contending it's not in the report, or what is the basis for the denial?

A. I can admit that it did not include those costs because those numbers are so inflated it has to be something.

Q. Okay. But you don't specifically know whether administrative and operating costs are included in the plan or not; is that right?

A. No, I do not.

Q. Okay. And on Number 33, do you know whether or not principal payments, interest and finances -- charges other than what's authorized under the statute are included in the report?

A. I -- I'm denying it for the same reason.

Q. Okay.

A. If the numbers are inflated, then the principal and interest payments are inflated and they're not accurate and they shouldn't be in this report.

Q. Well, I will represent to you that 395,

01:02 Chapter 395, which covers impact fees, lays out things



that can go in a report and things that cannot be included in the -- in the report. Do agree with that?
A. Yes.
Q. Okay. And when I say "things," I mean -- I'm
01:03 talking about costs --
A. Yes.
Q. -- there's costs that you can include and costs that you cannot include.
And this is specifically asks asking about
01:03 principal payments, interest and finances charged other than those that are allowed under the statute. So my question is: Are you contending that there is some cost or charge in the report that should not be included at all as opposed to the -- you think the numbers are
01:03 wrong?
A. It's -- it's the same answer. The answer is I'm -- I'm contending that there are costs in there that should not be in there.
Q. Okay. Because they've included -- because the
01:03 report includes something that it's not supposed to or because the numbers are inaccurate in your view?
A. Both. If I contend that it has operating costs in there, the same thing here. I contend that it shouldn't have operating costs in there and that it

01:04 shouldn't be in there.



Q. All right. So know it's a long report, but if you're --
A. Yes.
Q. -- if you're contending that there is a -- a
01:04 principal payment, interest or other finance charge that's not allowed under Chapter 395, I'd like you to direct me to it in the report so know what it is you're complaining about?
MR. ROBERTS: Object to the form of the
01:04 question. The dollars are overstated, and they're not spent on construction. Where did they go? That's the point, where did they go? How do we know?
MS. ALBIN: Counsel, I'd asked for him to give the answer and not testify --
01:04 MR. ROBERTS: I know. But I'm going to object to the form of the question --
MS. ALBIN: Okay.
MR. ROBERTS: -- because it's misleading.
MS. ALBIN: You -- you can ask that. You
01:04 can raise your objection. What --
MR. ROBERTS: But we're doing the same thing over and over again. He's told you over and over again he can't find out the basis for the money and if it didn't go to construction, where did it go. That

01:05 seems to be the million-dollar question --



multimillion-dollar question, where did it go. How does he know where it went?

MS. ALBIN: I'm not asking him to direct where it went. And I don't think this is an appropriate
01:05 objection.

MR. ROBERTS: Okay. Go ahead. Go ahead.

Q. (BY MS. ALBIN) What I -- what I'm asking of you, Mr. Goza, is whether you can point to something in the report where there is an item or a cost that you
01:05 think is not allowed to be in the report?

A. I think anywhere there's a cost that's overstated is something that's not allowed to be in the report. I believe that all items of cost in here should be reasonable costs, not just arbitrary numbers made up.

01:05 Q. So you can't point to something, though, that's stated in the report; is that correct?

MR. ROBERTS: Objection, form.

A. I can point to everything we've talked about under the wa -- the water and the wastewater. An
01:06 example would be the Pedregal lift station. If bonds were issued on that, they should not be; and, therefore, it's not supposed to be in this report.

Q. (BY MS. ALBIN) Okay. So the Pedregal lift station, that's an --

01:06 A. Yes.



Q. -- example?
Are there other examples in the report that you can point me to?
A. Any -- any data that's inaccurate shouldn't be
01:06 in this report.
Q. Okay. So is that the same basis for the denial on Number 35?
A. Yes, ma'am.
Q. All right. On Number 39, the park fees --
01:07 A. Um-hum.
Q. -- this asks about whether you believe there's an essential nexus between the park fees and the City's planning acquisition, development, operation and maintenance of the City's park, trails and open spaces,"
01:07 and you denied?
A. Yes.
Q. What's the basis of the denial?
A. I -- I don't believe that you can -- that you can collect park fees from one group of people and not
01:08 collect it from all. And I believe that the maintenance of these parks is paid for out of sales tax. They have a 4B or whatever sales tax that pays for the maintenance of the parks.
Q. Anything else?

01:08 A. No.



Q. And you said -- I understood you to testify that some people pay it and others do not?
A. No, I didn't say that.
Q. Okay.
01:08 A. I said -- well, I said that -- I said that you're required to pay both the park fees and dedicate land.
Q. Um-hum. Right. I understand that. Okay. I'm sorry, I must have misunderstood your testimony.
01:08 Let me ask this another way: Do you think that -- do you have any belief about whether the City is using the dollars collected for the park fees and not spending them on parks?
A. I have no idea what they're spending them on.
01:09 And the years that I've been doing business in the City of League City, I've never seen them spend a dollar on parks that I could attribute to our area of town.
Q. Okay. So is it that the parks -- well, let me ask this first: Does the City of League City have
01:09 public parks that you're aware of?
A. Yes.
Q. Okay. And do you believe the City uses park fees to help pay for those parks?
A. I said I don't know what they use the parks

01:09 fees for.



Q. Okay. Is it your belief if a developer on the west side, west of 45, pays for the park fees then the City should be putting the park on that side of town?
A. If they're allowed to collect park fees, yes, I
01:10 think it should be spent in the area where the park -- I mean, where the development is.
Q. All right. Are you familiar with the Muller Law Group?
A. Yes.
01:11 Q. Okay. And I believe Richard Muller has been designated as an expert witness in this case. Do you agree with that?
A. I believe so, yes.
Q. Okay. Have you had any business dealings with
01:11 Muller Law Group through any of the entities we've talked about today?
A. Yes, but not through Richard Muller.
Q. Was it through somebody at this firm?
A. Yes.
01:11 Q. Who was that?
A. Nancy.
Q. Nancy Carter?
A. Nancy Carter, yes.
Q. And can you describe what that business

01:11 relationship was?



A. She helped us in the formation of a PUD, planned unit development, that included our acreage and Kenny Duncan's acreage to the north of us.
Q. When was that?
01:11 A. In 2020 -- well, between 2015 and 2020.
Q. Is that in League City?
A. Yes.
Q. Okay. Anything else?
A. That's all I can think of.
01:12 Q. All right. Just one moment.
MS. ALBIN: Can we go off the record for just a second.
THE VIDEOGRAPHER: Okay. Off the record at 1:12.
01:12 (Recess from 1:12 p.m. to 1:13 p.m.)
THE VIDEOGRAPHER: Okay. Back on record at 1:13.
Q. (BY MS. ALBIN) Mr. Goza, are you familiar with the company ClearPave?
01:14 A. No.
Q. Okay. Have you ever worked with Daniel Marcelli? (SPELLING?)
A. No.
MR. ROBERTS: Marcelli.

01:14 Q. (BY MS. ALBIN) Marcelli?



A. No and no.
Q. Okay. And what about John Crofton?
A. No.
Q. Or James Tripon?
01:14 A. No.
Q. All right. What did you do to prepare for your deposition today?
A. Nothing, really. I looked over these -- the answers to the interrogatories, and I skimmed that
01:14 report just to -- in case you asked me about it.
Q. I'm glad I did, then; didn't waste your time.
Prior to sending in the May 2, 2023, letter, did you talk to any engineers about the report?
A. Yes.
01:15 Q. Who were the engineers that you talked to?
A. Our engineer, Dannenbaum Engineering.
Q. Was it a particular person?
A. No. Just talking about the numbers, costs, things like that.
01:15 Q. But was there a particular -- is Dannenbaum a person, or is that the name of the company?
A. It's a firm.
Q. Dannenbaum is the firm?
A. Yes.

01:15 Q. So who with the Dannenbaum firm did you talk



to?
A. Steve.
Q. Is Steve an engineer?
A. Yeah.
01:15 Q. Did you know if he had looked at the report that Freese and Nichols prepared?
A. I'm sure he had.
Q. Are Dannenbaum and Freese and Nichols competitors?
01:15 A. Yes.
Q. Okay. Did Steve assist you in preparing the letter that you submitted that was Exhibit 9?
A. No.
Q. All right. Did you rely on any information
01:16 that he gave you when you sent that letter in?
A. No.
Q. Okay. And you don't know Steve's last name?
A. Sheldon.
Q. Steve Sheldon.
01:16 Has Mr. Sheldon before or since that conversation provided you with any records related to estimates of costs or anything like that?
A. He's our engineer. So he would provide us with information related to cost. He's also the one that

01:16 approved this Grand Bargain invoice.



Q. Okay.
A. Not him but someone from his firm.
Q. And that's Exhibit Number 10?
A. Scott Stankovich.
01:17 Q. And Grand Bargain is not one of the projects that was included in the capital recovery fee; right?
A. Correct.
Q. Are there any projects that are in the capital recovery fee study that you have received documents from
01:17 Mr. Sheldon to show a difference in cost or pricing or anything like that?
A. No. I asked him specifically if we did the Pedregal upgrades, and he said yes.
Q. And that's Project Number 3 under the
01:17 wastewater; correct?
A. Yes, ma'am.
Q. Okay. And why would you ask him that question?
A. Because he's our engineer.
Q. And he was at the engineer for the Pedregal
01:17 lift station?
A. Yes.
Q. Okay. Any other engineers besides Mr. Sheldon that you've talked to about the capital recovery through the City?

01:18 A. No.



MS. ALBIN: All right. I'll pass the witness.

EXAMINATION

QUESTIONS BY MR. JEFFREY D. ROBERTS:

01:18 Q. I have just a couple points of clarification. You testified earlier you're a developer?

A. That I'm a developer?

Q. Yes, sir.

A. Yes.

01:18 Q. And you prepare land to be sold and lots to builders?

A. Yes.

Q. And you also testified earlier that the builders pay this impact fee to the City?

01:18 A. Yes, sir, they have.

Q. The builder is paying the impact fee and not you as developer. If these impact fees are unreasonable how are you aggrieved?

A. Builders won't pay me as much for the lots as

01:19 they would prior to the impact fee being increased.

Q. What do you base that on?

A. Experience. Ultimately the costs have to be passed on to somebody. I share it. The builder shares it. And then the homeowner at the end gets some of it.

01:19 Everybody does.



Q. So the increased costs of development whether you directly bear the cost, whether it's passed on to the builder or the homeowner affects everyone involved?
A. Yes.
01:19 Q. Earlier you talked about the Pedregal project as a project that you paid for and had been completed before this 2023 impact study?
A. Yes.
Q. How did it get included as a projected project
01:19 in the 2023 impact study?
A. I'm not sure how it got included. We designed the lift station to include all the areas south of us as part of a negotiation to get rid of some drill site locations on our property. That's why we accounted for
01:20 it and that's why we increased the sizing of our lift station. I don't know why they would have included it in there.
Q. Did anyone reach out to from you the City or from Freese and Nichols and said, "Hey, what's the deal
01:20 on this Ped -- Pedregal lift station"?
A. No.
Q. How much was it in the report?
A. It was a million six in the report. The whole lift station didn't cost a million six.

01:20 Q. So they projected a project that had already



been done and they projected a cost to do a project that
had already done in the amount of the project when it
was done?
A. Yes.
01:20 Q. And then they're going to include that in a
bond issuance and charge interest on top of that?
A. Yes.
Q. Okay. The 24-inch pipeline that you did, your
calculation was 185 a foot on a green field 24-inch
01:21 pipeline?
A. Yes.
Q. What does green field mean?
A. Green field means out in the middle of a
pasture with nothing to interrupt it.
01:21 Q. So you brought that in as a contractor for the
City at $185 a foot. And what type of contingency was
allowed?
A. 10 percent.
Q. So at the time you finished that project,
01:21 Freese and Nichols is calculating a 24-inch water line
by applying green field at $400 a foot?
A. Yes.
Q. With a 30 percent contingency?
A. Yes.

01:21 Q. Did you see anything in the report documenting



or supporting that?
A. No.
Q. Did you see any bids or -- from anyone supporting that?
01:22 A. No.
Q. Now, you said earlier that you had personal knowledge about the 24-inch pipelines and about the Pedregal project. But there's many other projects in this report; correct?
01:22 A. Correct.
Q. And you don't have personal knowledge about all of them?
A. No, sir.
Q. But if you assume the one you did have personal
01:22 knowledge of are that far off, you assume the other ones must be pretty far -- that far off?
A. Yes.
Q. Even on the other ones, did you see a lot of detailed or specs? For instance, there's a storage tank
01:22 I think for a million dollars. Is there any specs to show what that tank is like, size, dimensions?
A. No.
Q. How would a reasonable person look at this and have any idea whether there's any accuracy?

A. You wouldn't.



Q. You said there was no meaningful committee. What does that mean?

A. No committee input. The -- I don't recall a committee going back and forth with staff or even back and forth with me as a developer or even our engineers who work for the City from time to time. There's no back and forth between anybody.

Q. But there's supposed to be workshops?

A. Supposed to be workshops. There's supposed to be talking about projects. They're supposed to be estimates. There's supposed to be some kind of justification for the cost, not just twice the number.

Q. Do you know of any other developers who reached out and criticized this study of lack of input?

A. I believe there was several, but I don't -- I don't know specifically who.

Q. But you personally never were contacted by any committee or workshop?

A. Never.

Q. Did you do a rough calculation how many linear feet of 24-inch pipeline were in these proposals in this study?

A. Yes. I believe it was -- what was the number? I forget what the footage was, but it was about -- you

01:24 know, if you multiplied times 200 or $215 a foot, it was



like 12.9 million worth of overruns or costs over and above.

Q. So if we just look at 24-inch pipeline?

A. Just the water line.

01:24 Q. Don't even focus on all the other projects?

A. Correct.

Q. And based on your own personal experience, if they're that far off, you calculate that to be $12 million alone?

01:24 A. Yes.

Q. And, again, there has to be a bond issuance, then interest charged over a long period of time for that?

A. Yes. And you also keep saying my experience.

01:24 It's the City's experience. It's their contract with me to install that water line at $185 a foot.

Q. Did the City ever ask you to come back and bid these other 24-inch water lines?

A. No. But I will.

01:25 Q. Were they happy with the work you did?

A. Yes.

MS. ALBIN: Objection, form.

Q. (BY MR. ROBERTS) Have you ever heard from my other contractor that was ever asked to give a bid or an

01:25 estimate for all these 24-inch pipelines?



A. No.
Q. Is there anything in the Freese and Nichols report that indicates where they got those numbers?
A. No.
01:25 MR. ROBERTS: Thank you. I'll pass the witness.

FURTHER EXAMINATION

QUESTIONS BY MS. KELLY R. ALBIN:
Q. Mr. Goza, you said that the -- essentially the
01:25 cost is to the builders you feel is then passed onto you when the impact fees are ere increased. Was that fair -- is that a fair summary of your testimony?
A. Yes. They're going to pay me less for a lot when the impact fees are higher.
01:25 Q. And has that happened since December 1, 2023?
A. Yes.
Q. Where?
A. Everywhere.
Q. Which -- which developments?
01:26 A. Pedregal, The Commons at Sedona.
Q. Any others?
A. No, that's it. That's the only two in League City.
Q. Okay. And what is the difference between what

01:26 you were making before December 20 December 1, 2023, per



lot and what you make now per lot?
A. Well, it's their time. It's things like that that slow down the sale of houses; right? So if houses sell slower, I don't make my money back as fast;
01:26 therefore, I don't make as much.
Q. So there's not a correlating percentage or dollar number that you can testify has changed from November 2023 to today?
A. No.
01:26 Q. Okay.
A. Other than time. People buy houses based off a payment. The more they've got to pay for a house, the slower they sell.
Q. So it's your belief that the impact fee causes
01:27 home sales to slow?
A. Yes.
Q. Okay. And that it's that slowing that then causes there to be a change in what you can make per lot?
01:27 A. And the marketability of the lots. If -- if I'm trying to sell them and they're building in the City of League City, they're going to equate or calculate into it that they have to pay an $18,000 impact fee. That's just part of it, building a house. So they can't

01:27 pay me as much, they don't make as much and the



homeowner ultimately pays more?
Q. And you have sold lots to West FM 517, Ltd., since -- I'm sorry, let me start that question again.
West FM 517, Ltd., has sold lots in
01:28 Pedregal and The Commons at Sedona since December 1, 2023?
A. Yes, ma'am.
Q. Okay. Do you know about how many lots?
A. 16 a month every month since then. So whatever
01:28 that calculates to be.
Q. How many were they -- how many was West, Ltd., selling per month prior to December 1 --
A. 16.
Q. So it was 16 per month before the impact fees
01:28 changed, and it's 16 per month since the impact fees have changed?
A. Yes.
Q. Okay. But you don't know the difference in the dollar amount you're getting per lot?
01:28 A. I'm getting the same dollar amount in Pedregal. I'm getting the same dollar amount in The -- The Commons at Sedona. The Commons at Sedona is not a strict a takedown as Pedregal. So The Commons at Sedona, they're taking lots down slower than they normally would

01:29 be; therefore, we're not making as much as we normally



would.
Q. And what do you base your belief on that they're taking the lots down slower because of the impact fees in The Commons at Sedona?
01:29 A. People buy houses off what they can afford. And as all of these fees get tacked on the cost of a house, which they do, less and less people can afford to buy them. And the fewer people that can afford to buy them, the fewer homes that are sold.
01:29 Q. Are Pedregal and The Commons at Sedona in this -- both on the west side of League City?
A. Yes.
Q. Okay. So same impact fees in both of those developments; right?
01:29 A. Yes.
Q. But it's your testimony that only one has slowed down in taking down the lots; right?
A. Correct.
Q. Okay.
01:30 A. One has a contractual obligation to take down 16. One does not.
Q. And which is which?
A. Pedregal, the builder has a contractual obligation to take down 16 per month.

01:30 Q. And when you say take down, are you talking



about --
A. Purchase from me.
Q. Okay.
A. Me being West, Ltd., sorry.
01:30 Q. Thank you.
When does that contract with Pedregal expire?
A. When all the lots are completed and done.
Q. Okay. So you're not going to see any change as
01:30 a result of the impact fees in Pedregal, are you?
A. No.
Q. Okay. But you don't have that same agreement with The Commons at Sedona?
A. Correct.
01:30 Q. All right. And -- and you probably said this earlier, but it will take me longer to go through my notes than just to ask you, who's the builder in The Commons at Sedona?
A. K. Hovnanian.
01:31 Q. The one you couldn't pronounce; right?
A. Or spell.
Q. All right. Do they have a specific takedown requirement that's less than 16, or do they just not have one at all?

01:31 A. It's not 16. It's like 12 a quarter, and they



have a specific takedown of 12 a quarter. But historically when they're building in one of my subdivisions, they take down more than that.
Q. How long have you been selling the lots to the
01:31 K. Hovnanian builder?
A. In this subdivision or all subdivisions?
Q. In The Commons at Sedona?
A. About nine months.
Q. So you were only selling lots, then, about the
01:31 summer of 2023?
A. Yes, ma'am.
Q. In The Commons at Sedona?
A. Yes, ma'am.
Q. All right. So you're basing your estimation of
01:32 change based just on this nine-month period; right?
A. No, ma'am.
Q. Okay. What else are --
A. Historically I've been selling Hovnanian lots for ten years.
01:32 Q. In League City?
A. In all cities.
Q. Okay. Were there any others in 2022?
A. In League City?
Q. Yes.

01:32 A. No.



Q. And is that agreement with The Commons at Sedona the same as Pedregal in that it runs until all the lots are sold?
A. Yes.
01:32 Q. Okay. The expansion on the Pedregal lift station, I believe you testified that was finished in 2020; is that right?
A. Yes, ma'am.
Q. All right. So when the estimated project total
01:33 listed in here is 1.6 million, that's in 2023; right?
A. Yes.
Q. Okay. Would you expect the cost to go up or down from 2020?
A. Up.
01:33 MS. ALBIN: Pass the witness.
MR. ROBERTS: Just one follow-up.

FURTHER EXAMINATION

QUESTIONS BY MR. MR. JEFFREY D. ROBERTS:
Q. As far as a decision as developer, where to
01:33 develop and not develop, do reas -- unreasonable impact fees affect the -- potentially going forward in City League City if their impact fees are unreasonable? Does that affect the decision-making process of developers, builders and ultimately home buyers as to where to go?

01:33 A. Abs --



MS. ALBIN: Objection, form.
A. Absolutely it does.
MR. ROBERTS: All right. Thank you, sir.
THE VIDEOGRAPHER: Off the record at
01:34 1:34 p.m.

* * * * * *

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Ricardo Navarro
Bar No. 14829100
ggwilliams@rampagelaw.com
Envelope ID: 86372127
Filing Code Description: Plea to Court
Filing Description: Defendant City of League City's Partial Plea to the Jurisdiction
Status as of 4/8/2024 8:21 AM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Rachel Valdez | | rvaldez@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |

Received: 4/5/2024 5:22 PM
Envelope No. 86372127

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD.,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

**ORDER ON DEFENDANT'S**
**PARTIAL PLEA TO THE JURISDICTION**

On this day came on to be considered Defendant City of League City's Partial Plea to the Jurisdiction. The Court, after considering the motions, and the record on file, as well as the arguments of counsel, is of the opinion that this court lacks jurisdiction over any claims and causes of action brought by the Plaintiff against the Defendant and that the Defendant's Partial Plea to the Jurisdiction should in all things be GRANTED.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that the DEFENDANT'S Partial Plea to the Jurisdiction is hereby GRANTED in all respects. It is also ORDERED that any relief not expressly granted is hereby DENIED.

SIGNED this ____ day of ___________, 2024.

______________________________
JUDGE PRESIDING

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Ricardo Navarro
Bar No. 14829100
ggwilliams@rampagelaw.com
Envelope ID: 86372127
Filing Code Description: Plea to Court
Filing Description: Defendant City of League City's Partial Plea to the Jurisdiction
Status as of 4/8/2024 8:21 AM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Rachel Valdez | | rvaldez@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |

Filed: 4/5/2024 5:22 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 86372127
By: Lisa Kelly
4/8/2024 8:20 AM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD.,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

**DEFENDANT CITY OF LEAGUE CITY'S**
**REQUEST FOR ORAL HEARING SETTING**

May It Please The Court:

COMES NOW DEFENDANT CITY OF LEAGUE CITY, and hereby requests the Court to set their Partial Plea to the Jurisdiction for oral hearing.

SIGNED this 5th day of APRIL 2024.

Respectfully submitted,

DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
210/227-3243
210/225-4481 Fax
lfdenton@rampagelaw.com

By: ______________________________
LOWELL F. DENTON
State Bar No. 05764700
SCOTT M. TSCHIRHART
State Bar No. 24013655

RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com
DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH, P.C.
701 E. Harrison, Ste. 100
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com
DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

*Attorneys for Defendant League City*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 5th day of April 2024.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

LOWELL F. DENTON

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Ricardo Navarro
Bar No. 14829100
ggwilliams@rampagelaw.com
Envelope ID: 86372127
Filing Code Description: Plea to Court
Filing Description: Defendant City of League City's Partial Plea to the Jurisdiction
Status as of 4/8/2024 8:21 AM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |
| Rachel Valdez | | rvaldez@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 4/5/2024 5:22:46 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 4/5/2024 5:22:46 PM | SENT |

Filed: 2/2/2024 4:52 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 84111023
By: Lisa Kelly
2/5/2024 7:34 AM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD., Plaintiff** | § § § | **IN THE DISTRICT COURT** |
| **VS.** | § § | **405TH JUDICIAL DISTRICT** |
| **CITY OF LEAGUE CITY Defendant** | § § | **GALVESTON COUNTY, TEXAS** |

**DEFENDANT CITY OF LEAGUE CITY' S MOTION TO QUASH DEPOSITIONS AND MOTION FOR PROTECTIVE ORDER**

---

MAY IT PLEASE THE COURT:

COMES NOW THE CITY OF LEAGUE CITY ("City") and files this Motion to Quash the Depositions of Andy Mann, Chad Tressler, Sean Saunders, Tommy Cones, and Tom Crews (collectively "Councilmembers"), and Motion for Protective Order in connection therewith, and would show the following:

## I. BACKGROUND

1. The depositions being sought are of the City Councilmembers in League City, Texas, and appear to be designed to question the Councilmembers about their votes on the impact fees that the City Council approved in June 2023.

2. An impact fee is defined under Chapter 395 of the Texas Local Gov't Code as "a charge or assessment imposed by a political subdivision against new development in order to generate revenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development." Tex. Loc. Gov't Code § 395.001(4). Impact fees are grounded in the theory that new growth should share in the cost of new growth. Specifically, local governments may recoup some of the costs associated with new-growth driven infrastructure and capital improvements from the developers advancing the new growth.

3. Plaintiff ("Developer") is a "developer that owns and develops property in League City for residential purposes." Pl.'s Original Pet. ¶ 7. In this declaratory judgment action, Developer asks the Court to declare that the impact fees that Developer will have to pay on its new developments in Legue City are unreasonable and excessive and that League City's park fees are illegal. Pl.'s Original Pet. ¶¶ 11-12.

4. Developer seeks the depositions of Councilmembers Tommy Cones, Council Position 2 of League City (**City's Ex. "A")**, Tom Crews, Council Position 3 of League City **(City's Ex. "B"),** Sean Saunders, Council Position 7 of League City **(City's Ex. "C"),** Chad Tressler, Council Position 6 of League City **(City's Ex. "D")**. and Andy Mann, Council Position 1 of League City (**City's Ex. "E**").

5. The Notices served by Developer set the depositions of Andy Mann for February 27, 2024, at 10:00 a.m., Tommy Cones for February 28, 2024, at 10:00 a.m., Tom Crews for February 29, 2024, at 10:00 a.m., Chad Tressler for March 1, 2024, at 10:00 a.m., and Sean Saunders for March 1, 2024, at 2:00 p.m. with all depositions to be taken in person at Denton Navarro Rocha Bernal & Zech, P. C., 2517 N. Main Avenue, San Antonio, Texas 78212 and continue thereafter until complete.

## II. DEFENDANT MOVES TO QUASH THE DEPOSITION NOTICES AND SEEKS A PROTECTIVE ORDER

3. Defendant hereby objects to the time and place of the depositions noticed and oppose the taking of any depositions. Because this motion is filed within three days of the date of service the depositions are stayed until this motion may be heard. See Tex. R. Civ. P. 199.4.

4. Defendant further seeks an order protecting the City Councilmembers from deposition based on legislative privilege.

## III. ARGUMENT AND AUTHORITY

5. The deposition notices should be quashed pursuant to Texas Rule of Civil Procedure 199.4, which provides that:

> A party or witness may object to the time and place designated for an oral deposition by . . . motion to quash the notice of deposition. If the motion is filed by the third business day after the service of the notice of deposition, an objection to the time and place of a deposition stays the oral deposition until the motion can be determined.

TEX. R. CIV. P. 199.4.

6. Because Defendant filed their objections to the time and place designated in Plaintiff's Notices within the third business day after the service of the Notices of Deposition, the depositions of Andy Mann, Chad Tressler, Sean Saunders, Tommy Cones, and Tom Crews, are automatically stayed until a hearing may be had on this motion.

7. Further, a protective order should be issued because the City Councilmembers have legislative privilege, which forecloses Developer from inquiring into the motives of the Councilmembers' decision-making process about the impact fees.

8. "Texas and federal courts have recognized that individuals acting in a legislative capacity are immune from liability for those actions." *In re Perry*, 60 S.W. 3d 857, 859 (Tex. 2001) (citing *Bogan v. Scott–Harris*, 523 U.S. 44, 46 (1998); *Camacho v. Samaniego*, 954 S.W.2d 811, 823–24 (Tex. App.—El Paso 1997, pet. denied). Legislative immunity "shields individual legislators from litigation challenging the substance of a decision." *Koepke v. Texas State Senate*, Cause No. 04-22-00256-CV, 2023 WL 4854839 at *2 (Tex. App.—San Antonio July 31, 2023, no pet.)(quoting *Hays Cty. v. Hays Cty. Water Planning P'ship*, 69 S.W.3d 253, 260 (Tex. App.—Austin 2002, no pet.).

9. The United States Supreme Court has articulated the critical concerns that underlie the doctrine:

> [T]he threat of liability can create perverse incentives that operate to inhibit officials in the proper performance of their duties. In many contexts, government officials are expected to make decisions that are impartial or imaginative, and that above all are informed by considerations other than the personal interests of the decisionmaker. Because government officials are engaged by definition in governing, their decisions will often have adverse effects on other persons. When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct.

*Forrester v. White*, 484 U.S. 219, 223, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (emphasis in original).

10. "The Supreme Court has explained that it is 'not consonant with our scheme of government for a court to inquire into the motives of legislators.'" *In re Perry*, 60 S.W.3d at 860 (quoting *Bogan*, 523 U.S. at 55) (additional citations omitted). "Thus, **courts have affirmed that the doctrine generally shields legislative actors not only from liability, but also from being required to testify about their legislative activities**." *In re Perry*, 60 S.W. 3d at 860 (referencing *Gravel v. United States*, 408 U.S. 606, 615–16 (1972) (holding that senator could not be made to answer questions about events that occurred in senate subcommittee meeting); *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (noting that legislators "should be protected not only from the consequences of litigation's results but also from the burden of defending themselves"); *Schlitz v. Virginia*, 854 F.2d 43, 46 (4th Cir.1988) (holding that legislator could not be required to testify about matters of legislative conduct); *Miller v. Transamerican Press, Inc*., 709 F.2d 524, 529 (9th Cir.1983) (holding that former congressman could not be required to testify about his legislative activities); *Clear Lake City Water Auth*. v. Salazar, 781 S.W.2d 347, 349–50 (Tex. App.—Houston [14th] 1989, original proceeding) (holding that members of water

authority could not be questioned about legislative activities))).

11. The legislative privilege doctrine extends beyond federal and state legislators to other individuals performing legitimate legislative functions, including city councilmembers. *In re Perry*, 60 S.W.3d at 860 (referencing *Bogan*, 523 U.S. at 55 (applying legislative immunity doctrine to mayor and city council vice-president); *Supreme Court of Va. v. Consumers Union of the United States*, 446 U.S. 719, 734 (1980) (applying legislative immunity doctrine to state supreme court and its chief justice for their action in promulgating code of professional responsibility); *Clear Lake City Water Auth.*, 781 S.W.2d at 349–50 (applying legislative immunity doctrine to local water authority).

12. "An action is legislative in nature when it reflects a discretionary, policymaking decision of general application, rather than an individualized decision based upon particular facts." *In re Perry*, 60 S.W.3d at 860 (citing *Bogan*, 523 U.S. at 55–56; *Bryan v. City of Madison*, 213 F.3d 267, 273–74 (5th Cir. 2000); *Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984); *Bowles*, 920 S.W.2d at 758.

13. At issue here is the decision of the Councilmembers to set League City's impact fees as they did, which falls squarely within their discretionary, policymaking functions. As such, they are shielded from the Developer's questioning about same and the Court should issue a protective order to protect against this or further intrusion into their legislative activities.

## III. PRAYER

In sum, Defendant respectfully request that the depositions of Andy Mann for February 27, 2024, at 10:00 a.m., Tommy Cones for February 28, 2024, at 10:00 a.m., Tom Crews for February 29, 2024, at 10:00 a.m., Chad Tressler for March 1, 2024, at 10:00 a.m., and Sean Saunders for March 1, 2024, at 2:00 p.m. be quashed and that the Court issue a protective order shielding the Councilmembers from any future depositions or questions that violate the legislative privilege doctrine.

Further, Defendant respectfully prays that it be granted all other and further relief to which they are justly entitled.

SIGNED on the 2nd day of February 2024.

Respectfully submitted,

DENTON NAVARRO ROCHA BERNAL & ZECH
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
210/227-3243
210/225-4481 Fax
lfdenton@rampagelaw.com

By: ______________________
LOWELL F. DENTON
State Bar No. 05764700
SCOTT M. TSCHIRHART
State Bar No. 24013655

RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com
DENTON NAVARRO ROCHA
BERNAL & ZECH, P.C.
701 E. Harrison, Ste. 100
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com
DENTON NAVARRO ROCHA
BERNAL & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

*Attorneys for Defendant League City*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 1st day of February 2024.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

LOWELL F. DENTON
RICHARD J. NAVARRO
KELLY R. ALBIN

# EXHIBIT A

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD. *Plaintiff*, | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| v. | § | 405TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| CITY OF LEAGUE CITY, | § | |
| *Defendant*. | § | GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD.'S NOTICE OF ORAL AND/OR VIDEOTAPED DEPOSITION OF TOMMY CONES, COUNCIL POSITION 2 OF LEAGUE CITY**

TO: Defendant, City of League City, by and through its attorneys of record, Lowell F. Denton, Ricardo J. Navarro, Kelly R. Albin, and Scott M. Tschirhart, Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212.

Please take notice that pursuant to the provisions of the Texas Rules of Civil Procedure, Plaintiff, West FM 517, LTD., will take the oral and/or videotaped deposition of Tommy Cones on February 28, 2024, beginning at 10:00 a.m. in the offices of Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212, before an officer authorized by law to take depositions. This deposition shall continue from day to day until completed. All parties are invited to attend and examine the witness as prescribed by the Texas Rules of Civil Procedure.

Respectfully submitted,

**Roberts Markel Weinberg Butler Hailey PC**



Jeffrey D. Roberts

TBA No. 17008800
jroberts@rmwbh.com
Justin L. Spears
TBA: 24117086
jspears@rmwbh.com
2800 Post Oak Blvd., Floor 57
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on January 30, 2024.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Scott M. Tschirhart
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
2517 N. Main Avenue
San Antonio, Texas 78212

JUSTIN L. SPEARS

# EXHIBIT B

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*, | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | 405TH JUDICIAL DISTRICT |
| CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§ | GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD.'S NOTICE OF ORAL AND/OR VIDEOTAPED DEPOSITION OF TOM CREWS, COUNCIL POSITION 3 OF LEAGUE CITY**

TO: Defendant, City of League City, by and through its attorneys of record, Lowell F. Denton, Ricardo J. Navarro, Kelly R. Albin, and Scott M. Tschirhart, Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212.

Please take notice that pursuant to the provisions of the Texas Rules of Civil Procedure, Plaintiff, West FM 517, LTD., will take the oral and/or videotaped deposition of Tom Crews on February 29, 2024, beginning at 10:00 a.m. in the offices of Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212, before an officer authorized by law to take depositions. This deposition shall continue from day to day until completed. All parties are invited to attend and examine the witness as prescribed by the Texas Rules of Civil Procedure.

Respectfully submitted,

**Roberts Markel Weinberg Butler Hailey PC**

______________________________
Jeffrey D. Roberts

TBA No. 17008800
jroberts@rmwbh.com
Justin L. Spears
TBA: 24117086
jspears@rmwbh.com
2800 Post Oak Blvd., Floor 57
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD.**

**CERTIFICATE OF SERVICE**

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on January 30, 2024.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Scott M. Tschirhart
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
2517 N. Main Avenue
San Antonio, Texas 78212



JUSTIN L. SPEARS

# EXHIBIT C

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*, | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | 405TH JUDICIAL DISTRICT |
| CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§ | GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD.'S NOTICE OF ORAL AND/OR VIDEOTAPED DEPOSITION OF SEAN SAUNDERS, COUNCIL POSITION 7 OF LEAGUE CITY**

TO: Defendant, City of League City, by and through its attorneys of record, Lowell F. Denton, Ricardo J. Navarro, Kelly R. Albin, and Scott M. Tschirhart, Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212.

Please take notice that pursuant to the provisions of the Texas Rules of Civil Procedure, Plaintiff, West FM 517, LTD., will take the oral and/or videotaped deposition of Sean Saunders on March 1, 2024, beginning at 2:00 p.m. in the offices of Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212, before an officer authorized by law to take depositions. This deposition shall continue from day to day until completed. All parties are invited to attend and examine the witness as prescribed by the Texas Rules of Civil Procedure.

Respectfully submitted,

**Roberts Markel Weinberg Butler Hailey PC**

Jeffrey D. Roberts
TBA No. 17008800
jroberts@rmwbh.com

Justin L. Spears
TBA: 24117086
jspears@rmwbh.com
2800 Post Oak Blvd., Floor 57
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on January 30, 2024.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Scott M. Tschirhart
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
2517 N. Main Avenue
San Antonio, Texas 78212



JUSTIN L. SPEARS

# EXHIBIT D

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*, | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | 405TH JUDICIAL DISTRICT |
| CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§ | GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD.'S NOTICE OF ORAL AND/OR VIDEOTAPED DEPOSITION OF CHAD TRESSLER, COUNCIL POSITION 6 OF LEAGUE CITY**

TO: Defendant, City of League City, by and through its attorneys of record, Lowell F. Denton, Ricardo J. Navarro, Kelly R. Albin, and Scott M. Tschirhart, Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212.

Please take notice that pursuant to the provisions of the Texas Rules of Civil Procedure, Plaintiff, West FM 517, LTD., will take the oral and/or videotaped deposition of Chad Tressler on March 1, 2024, beginning at 10:00 a.m. in the offices of Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212, before an officer authorized by law to take depositions. This deposition shall continue from day to day until completed. All parties are invited to attend and examine the witness as prescribed by the Texas Rules of Civil Procedure.

Respectfully submitted,

**Roberts Markel Weinberg Butler Hailey PC**

Jeffrey D. Roberts
TBA No. 17008800
jroberts@rmwbh.com

Justin L. Spears
TBA: 24117086
jspears@rmwbh.com
2800 Post Oak Blvd., Floor 57
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD.**

**CERTIFICATE OF SERVICE**

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on January 30, 2024.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Scott M. Tschirhart
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
2517 N. Main Avenue
San Antonio, Texas 78212

JUSTIN L. SPEARS

# EXHIBIT E

CAUSE NO. 23-CV-1501

| | | |
|---|---|---|
| WEST FM 517, LTD.<br>*Plaintiff*, | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | 405TH JUDICIAL DISTRICT |
| CITY OF LEAGUE CITY,<br>*Defendant*. | §<br>§ | GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD.'S NOTICE OF ORAL AND/OR VIDEOTAPED DEPOSITION OF ANDY MANN, COUNCIL POSITION 1 OF LEAGUE CITY**

TO: Defendant, City of League City, by and through its attorneys of record, Lowell F. Denton, Ricardo J. Navarro, Kelly R. Albin, and Scott M. Tschirhart, Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212.

Please take notice that pursuant to the provisions of the Texas Rules of Civil Procedure, Plaintiff, West FM 517, LTD., will take the oral and/or videotaped deposition of Andy Mann on February 27, 2024, beginning at 10:00 a.m. in the offices of Denton Navarro Rocha Bernal & Zech, P.C., 2517 N. Main Avenue, San Antonio, Texas 78212, before an officer authorized by law to take depositions. This deposition shall continue from day to day until completed. All parties are invited to attend and examine the witness as prescribed by the Texas Rules of Civil Procedure.

Respectfully submitted,

**Roberts Markel Weinberg Butler Hailey PC**

______________________________
Jeffrey D. Roberts

TBA No. 17008800
jroberts@rmwbh.com
Justin L. Spears
TBA: 24117086
jspears@rmwbh.com
2800 Post Oak Blvd., Floor 57
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on January 30, 2024.

***Via E-Serve:***
Lowell F. Denton
lfdenton@rampagelaw.com
Ricardo J. Navarro
rjnavarro@rampage-rgv.com
Kelly R. Albin
kralbin@rampagelaw.com
Scott M. Tschirhart
DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
2517 N. Main Avenue
San Antonio, Texas 78212

JUSTIN L. SPEARS

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Lowell Denton
Bar No. 05764700
ggwilliams@rampagelaw.com
Envelope ID: 84111023
Filing Code Description: Motion
Filing Description: Defendant City of League City's Motion to Quash Depositions and Motion for Protective Order
Status as of 2/5/2024 7:34 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 2/2/2024 4:52:53 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 2/2/2024 4:52:53 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 2/2/2024 4:52:53 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |

Received: 2/2/2024 4:52 PM
Envelope No. 84111023


**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD.,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

---

**ORDER GRANTING CITY OF LEAGUE CITY'S MOTION TO QUASH DEPOSITIONS AND MOTION FOR PROTECTIVE ORDER**

---

On this day, ____________, this Court heard the CITY OF LEAGUE CITY'S Motion to Quash the Depositions of Andy Mann, Chad Tressler, Sean Saunders, Tommy Cones, and Tom Crews (collectively "Councilmembers"), and Motion for Protective Order in connection therewith. The City of League City, by and through their respective attorneys of record, appeared before this Court. The Court, after considering the motions, the records on file and the arguments of counsel, is of the opinion that the City of League City's Motions should in all things be GRANTED.

THEREFORE, IT IS ORDERED that the Depositions of Andy Mann, Chad Tressler, Sean Saunders, Tommy Cones, and Tom Crews (collectively "Councilmembers") be QUASHED, and further that the Councilmembers are shielded from future depositions and/or any and all questioning that violates the legislative privilege doctrine.

Signed on this the _______ day of ______________ 2024.

____________________________________
HONORABLE JARED ROBINSON,
PRESIDING JUDGE

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Lowell Denton
Bar No. 05764700
ggwilliams@rampagelaw.com
Envelope ID: 84111023
Filing Code Description: Motion
Filing Description: Defendant City of League City's Motion to Quash Depositions and Motion for Protective Order
Status as of 2/5/2024 7:34 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 2/2/2024 4:52:53 PM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 2/2/2024 4:52:53 PM | SENT |
| Justin Spears | | jspears@rmwbh.com | 2/2/2024 4:52:53 PM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 2/2/2024 4:52:53 PM | SENT |

Filed: 12/4/2023 9:32 AM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 82183233
By: Shailja Dixit
12/4/2023 9:37 AM

**CAUSE NO. 23-CV-1501**

| | | |
|---|---|---|
| **WEST FM 517, LTD., Plaintiff** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **VS.** | § | **405TH JUDICIAL DISTRICT** |
| | § | |
| **CITY OF LEAGUE CITY** | § | |
| **Defendant** | § | **GALVESTON COUNTY, TEXAS** |

---

**DEFENDANT CITY OF LEAGUE CITY'S JURY DEMAND**

---

MAY IT PLEASE THE COURT:

COMES NOW DEFENDANT, CITY OF LEAGUE CITY, and respectfully requests that this case be tried in front of a jury.

SIGNED on this 4th day of December 2023.

Respectfully submitted,

DENTON NAVARRO ROCHA BERNAL & ZECH
A Professional Corporation
2517 N. Main Avenue
San Antonio, Texas 78212
210/227-3243
210/225-4481 Fax
lfdenton@rampagelaw.com

By: ______________________________
LOWELL F. DENTON
State Bar No. 05764700
SCOTT M. TSCHIRHART
State Bar No. 24013655

RICARDO J. NAVARRO
State Bar No. 14829100
rjnavarro@rampage-rgv.com
DENTON NAVARRO ROCHA
BERNAL & ZECH, P.C.
701 E. Harrison, Ste. 100
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

KELLY R. ALBIN
State Bar No. 24086079
kralbin@rampagelaw.com
DENTON NAVARRO ROCHA
BERNAL & ZECH, P.C.
549 N. Egret Bay Blvd., Suite 200
League City, Texas 77573
832/632-2102
832/632-2134 (Fax)

*Attorneys for Defendant League City*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on the persons or parties identified below in accordance with one or more of the recognized methods of service by the Texas Rules of Civil Procedure on the 4th day of December 2023.

Jeffrey D. Roberts
Justin L. Spears
ROBERTS MARKEL WEINBERG BUTLER HAILEY PC
2800 Post Oak Blvd., Floor 57
Houston, Texas 77056

**VIA E-NOTIFICATION**

LOWELL F. DENTON

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Gina Williams on behalf of Lowell Denton
Bar No. 05764700
ggwilliams@rampagelaw.com
Envelope ID: 82183233
Filing Code Description: Jury Demand
Filing Description: Defendant City of League City's Jury Demand
Status as of 12/4/2023 9:37 AM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Jeffrey D.Roberts | | jroberts@rmwbh.com | 12/4/2023 9:32:29 AM | SENT |
| Kelly Albin | 24086079 | kralbin@rampagelaw.com | 12/4/2023 9:32:29 AM | SENT |
| Ricardo J. Navarro | 14829100 | rjnavarro@rampagelaw.com | 12/4/2023 9:32:29 AM | SENT |
| Denton FrankLowell | | lfdenton@rampagelaw.com | 12/4/2023 9:32:29 AM | SENT |
| Christy Burke | | ceburke@rampagelaw.com | 12/4/2023 9:32:29 AM | SENT |
| Stefanie Martinez | | smartinez@rmwbh.com | 12/4/2023 9:32:29 AM | SENT |
| Justin Spears | | jspears@rmwbh.com | 12/4/2023 9:32:29 AM | SENT |
| Gina Williams | | ggwilliams@rampagelaw.com | 12/4/2023 9:32:29 AM | SENT |

# CITATION

## THE STATE OF TEXAS

**WEST FM 517, LTD. VS. CITY OF LEAGUE CITY**

**Cause No.: 23-CV-1501**
**405th District Court of Galveston County**

City of League City
Received
SEP 13 2023
Office of
City Secretary

**TO: City of League City**
**c/o Diana Stapp, City Secretary**
**300 West Walker**
**League City, TX 77573**

**GREETINGS: YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days from the date you were served this citation and petition/motion, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.**

Said written answer may be filed by mailing same to: District Clerk's Office, 600 59th Street, Suite 4001, Galveston, Texas 77551-2388. The case is presently pending before the **405th District Court** of Galveston County sitting in Galveston, Texas, and the **Original Petition - OCA** was filed **September 08, 2023.** It bears cause number **23-CV-1501** and see the attached petition/motion for named parties to the suit.

Issued and given under my hand and the seal of said court at Galveston, Texas, **on this the 12th day of September, 2023.**

Issued at the request of:
Justin L. Spears
Roberts Markel Weinberg Butler Hailey PC
2800 Post Oak Blvd Floor 57
Houston TX 77056

DISTRICT COURTS OF GALVESTON COUNTY, TEXAS

**John D. Kinard,** District Clerk
Galveston County, Texas

Elissa Alvarado

By Elissa Alvarado, Deputy

**The District Courts of Galveston County, Texas Status Conference Notice**
**Please calendar this event**

**All Status Conferences will be set for Thursdays (subject to exceptions for county holidays)**

| Court Name | Status Conference Time | Court Phone Number | | |
|---|---|---|---|---|
| 10th District Court | @ 9:00 A.M. | 409-766-2230 | Fax | 409-770-5266 |
| 56th District Court | @ 9:30 A.M. | 409-766-2226 | Fax | 409-770-5264 |
| 122nd District Court | @ 9:30 A.M. | 409-766-2275 | Fax | 409-770-6265 |
| 212th District Court | @ 9:00 A.M. | 409- 766-2266 | Fax | 409-765-2610 |
| 405th District Court | @ 10:00 A.M. | 409-765-2688 | Fax | 409-765-2689 |

**Date :12/07/2023 set in the 405th District Court - Judge Jared Robinson**

Filed: 9/8/2023 2:21 PM
JOHN D. KINARD - District Clerk
Galveston County, Texas
Envelope No. 79360191
By: Shailja Dixit
9/11/2023 8:16 AM

23-CV-1501
CAUSE NO. ______________

| | | |
|---|---|---|
| WEST FM 517, LTD. *Plaintiff,* | § § | IN THE DISTRICT COURT Galveston County - 405th District Court |
| v. | § § | _____ JUDICIAL DISTRICT |
| | § § | |
| CITY OF LEAGUE CITY, *Defendant.* | § § | GALVESTON COUNTY, TEXAS |

**PLAINTIFF WEST FM 517, LTD.'s ORIGINAL PETITION AND APPLICATION FOR TEMPORARY INJUNCTION**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff West FM 517, LTD. ("Plaintiff"), and files this, its Original Petition and Application for Temporary Injunction against Defendant City of League City (the "City") in the above-captioned matter, and respectfully shows the Court the following:

## I. DISCOVERY LEVEL

1. Plaintiff West FM 517, LTD. pleads that discovery should be conducted under a Level 2 discovery control plan pursuant to Tex. R. Civ. P. 190.3.

## II. PARTIES AND SERVICE

2. Plaintiff West FM 517, LTD. is a limited partnership organized and existing under the laws of the State of Texas. Plaintiff conducts business in Galveston County, Texas.

3. Defendant City of League City is a Texas municipality. Pursuant to Texas Civil Practice and Remedies Code Sec. 17.024(b), the City may be served with

Status Conference - 12/07/2023

process through its City Secretary, Diana Stapp.

## III. JURISDICTION AND VENUE

4. The subject matter of this controversy is within the jurisdiction of this Court and the Court has personal jurisdiction over the Defendant.

5. Venue is proper in Galveston County, Texas, because the acts and/or omissions occurred in Galveston County, Texas and the City of League City is located in Galveston County. Venue is also proper under Texas Local Government Code Sec. 395.077(e) as League City is located in Galveston County.

## IV. RULE 47 STATEMENT

6. Plaintiff seeks only non-monetary relief at this time.

## V. BACKGROUND

7. Plaintiff West FM 517, LTD. is a developer that owns and develops property in League City for residential purposes. As a residential developer in League City, Plaintiff is subject to "impact fees" that are set and adopted by League City. Impact fees are assessments imposed by a political subdivision on developers for the costs of capital improvements or facility expansions that are necessitated by new development. On or about June 13, 2023, the League City City Council voted on and approved an adoption of new impact fees. The City Council voted to increase its impact fees on developers by 93%, or nearly double the amount of previous impact fees. The City's impact fees will be assessed on Plaintiff and other developers or homebuilders per lot developed, effective December 1, 2023. The City last adopted impact fees in 2019.

8. As developers like Plaintiff often develop their land into hundreds and thousands of individual lots for residential purposes, a 93% increase in impact fees will result in millions of additional dollars assessed to Plaintiff and other developers. Moreover, the City's increased impact fees are far in excess of reasonable construction (including inflation and contingency) and financing costs that the City will incur. Being that the City has increased its impact fees by 93% after only four years since its last increase, this lawsuit is necessitated to address the City's unsupported and excess impact fees. Plaintiff has been damaged by the City's adoption of the new impact fees.

9. The City has also adopted "park fees" that it is levying on Plaintiff. The City is charging Plaintiff $3,000.00 per lot for a "park fee" for which the City has not articulated a basis. Park fees are not impact fees, not listed under Chapter 395 of the Texas Local Government Code as contemplated park fees, nor otherwise authorized under law or statute. In addition to the park fees, the City also imposes park land dedication requirements equal to 1 acre per 75 lots for new development in the City. The City's park fees and park land dedication requirements fail the rough proportionality test under Texas law and qualify as an illegal exaction. Plaintiff has been damaged by the City's adoption and wrongful taking of park fees.

## VII. CAUSES OF ACTION

### *A. Claim for Declaratory Judgment – Impact Fees.*

10. Plaintiff incorporates by reference the allegations found in paragraphs 7-9.

11. Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, the Declaratory Judgment Act, Plaintiff seeks a judicial declaration of the following:

I. The City's June 13 adoption of impact fees was not done in conformity with Chapter 395 of the Texas Local Government Code.

II. The City's June 13 adoption of impact fees was based on flawed methodology.

III. The City's adopted impact fees are excessive and unreasonable.

***B. Claim for Declaratory Judgment – Park fees.***

12. Plaintiff seeks a judicial declaration of the following:

I. The City's park fees have no basis under Chapter 212 of the Texas Local Government Code.

II. The City's park fees have no basis under Chapter 395 of the Texas Local Government Code.

III. The City's park fees, together with the park land dedication requirements, fail the rough proportionality test set forth under Section 212.904 of the Texas Local Government Code.

IV. The City's park fees are an illegal exaction and must be withdrawn.

## VIII. REQUEST FOR INJUNCTIVE RELIEF

13. Plaintiff incorporates and re-alleges in full the preceding paragraphs of this petition as if fully set forth herein.

**Application for Temporary Injunction**

14. Plaintiff's application for injunctive relief is authorized by Section 65.011(5) of the Texas Civil Practices and Remedies Code.

15. Plaintiff requires injunctive relief prohibiting the City from assessing impact fees, other than those in place before June 14, 2023, until such time that this Court has made a judicial determination as set forth in this Petition. Plaintiff further seeks injunctive relief prohibiting the City from charging Plaintiff park fees until such time that this Court has made a judicial determination as set forth in this Petition.

## IX. CONDITIONS PRECEDENT

16. Pursuant to Texas Local Government Code Sec. 395.077(b), Plaintiff has filed this lawsuit within ninety (90) days of the City's adoption of the resolution setting impact fees.

## X. PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff West FM 517, LTD. respectfully requests that Defendant League City be cited to appear and answer, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendant for the declaratory relief sought herein; a temporary injunction be entered; and all the other relief to which Plaintiff may deem itself entitled at law or in equity.

*[Signature to follow]*

**Roberts Markel Weinberg Butler Hailey PC**

Jeffrey D. Roberts
TBA No. 17008800
jroberts@rmwbh.com
Justin L. Spears
TBA: 24117086
jspears@rmwbh.com
2800 Post Oak Blvd., Floor 57
Houston, TX 77056
(713) 840-1666
(800) 713-4625
**ATTORNEYS FOR PLAINTIFF WEST FM 517, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to Tex. R. Civ. P. 21a, a true and correct copy of the foregoing instrument was served upon the parties listed below by fax, delivery service, messenger, mail, and/or through the serving party's electronic filing service provider, on this 8th day of September 2023.

JEFFREY D. ROBERTS

## The District Courts of Galveston County, Texas Status Conference Notice

### Please calendar this event

**All Status Conferences will be set for Thursdays (subject to exceptions for county holidays)**

| Court Name | Status Conference Time | Court Phone Number | | |
|---|---|---|---|---|
| 10th District Court | @ 9:00 A.M. | 409-766-2230 | Fax | 409-770-5266 |
| 56th District Court | @ 9:30 A.M. | 409-766-2226 | Fax | 409-770-5264 |
| 122nd District Court | @ 9:30 A.M. | 409-766-2275 | Fax | 409-770-6265 |
| 212th District Court | @ 9:00 A.M. | 409- 766-2266 | Fax | 409-765-2610 |
| 405th District Court | @ 10:00 A.M. | 409-765-2688 | Fax | 409-765-2689 |

**Date: 12/07/2023 set in the 405th District Court**

| | |
|---|---|
| **Case Number:** | **23-CV-1501** |
| **Case Style: West FM 517, Ltd. vs. City of League City** | |

***Helpful Information:* Please visit our website at**
***http://www.galvestoncountytx.gov/dc/Pages/default.aspx***

*FAQ*

*Forms*

*Fee Schedules*

*Remote Access to on-line case record searches*

*Contact and Mailing information*

*Passport Services*

*E Filing Information*

*Helpful Links to Legal Resources and sites*

**Notice: If this case is filed as an expedited action pursuant to Rule 169 of the Texas Rules of Civil Procedure, please contact the Court to inform them of the same as soon as possible.**